UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

ABRAHAM GROSS,

              Plaintiff,

                                **20-cv-4340**

                                **COMPLAINT**
                                **JURY TRIAL REQUESTED**

                -against-

THE CITY OF NEW YORK, LOUISE CARROLL, ANNA-MARIE
HENDRICKSON, MARAGERET BROWN, BABBA HALM, VICTOR
HERNANDEZ, SHATARA PELL, EDWIN LUGO, NIDIA DORMI, GABRIEL
MOMBRUN, HAROLD WEINBERG, NICK LUNDGREN, SAMANTHA
SCHONFELD, JAMES E. JOHNSON, HELEN ROSENTHAL, BREAKING
GROUND, JEANNE-MARIE WILLIAMS, BRENDA ROSEN, TERRESA
PALMIERI, VANESSA CUCURULO, STEPHANIE LABARTA AND TRAVIS
FONG.

                      Defendants.
_____x

Abraham Gross, aka Avi Gross ("Plaintiff"), as a pro se litigant, complaining of the
Defendants, alleges as follows:

## <u>NATURE OF THE ACTION</u>

1. Plaintiff brings this action to recover damages, secure protection of and to

    redress deprivation of rights secured by the Civil Rights Act of 1871, *42*

    *U.S.C. § 1981* ("Section 1981"), Title VIII of the Civil Rights Act of 1968

    Fair Housing Act, *42 U.S.C. §§ 3601-19* ("Title VIII")*,* Title VI of the Civil

    Rights Act of 1964- Nondiscrimination in Federally Assisted Programs, *42*

*U.S.C. § 2000d-1* ("Title VI"), Article XVII of the New York State Constitution ("Article XVII")[1], the 14th Amendment of the U.S. Constitution "14th Amendment")[2], Title 24 of the Code of Federal Regulations Discriminatory Conduct Under the Fair Housing Act ("Title 24"), Executive Order 11063 (November 20, 1962) prohibiting discrimination in the rental of properties provided with federal funds ("Order 11063"), Executive Order 12898 (February 11, 1994), requiring federal agency programs to avoid discrimination in conducting activities that substantially affect public health ("Order 12898), the New York State Human Rights Law as contained in New York State Executive Law § 296 ("NYSHRL"), and the New York City Human Rights Law as contained in the Administrative Code of the City of New York § 8-107 ("NYCHRL"). Hereinafter, the aforesaid will collectively be referred to as "Protective Regulations".

2. The aforesaid Defendants acting in official capacity on behalf of the City of New York and affiliated agencies such as the Department of Housing

---

[1] "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine".

[2] "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

Preservation and Development ("HPD"), Office of the Mayor ("City Hall"),

NYC Law Department ("Corporation Counsel"), and numerous

publicly-funded, Non-For-Profit organizations such as Defendant Breaking

Ground ("BG"), methodically violated the Protective Regulations.

3.  As a direct and proximate result of such conduct, Plaintiff and millions of

other affordable-housing applicants endured- and continue to endure-

unfathomable harm, pain, and suffering, as they are deprived of the

apartments for which they qualified.

4.   By clear and convincing evidence[3], Defendants and their co-conspirators

have turned New York City's affordable-housing lottery process ("the

Process") into a get-rich criminal enterprise ("the Scam") that is motivated

by (a) racially-tainted decisions (b) insatiable greed of public officials sworn

to protect the integrity of the Process.

5.  As part of the Scam, hundreds of millions of dollars of affordable-housing

properties ("Properties", or "Property") designated for low income

applicants, are instead embezzled, transferred, granted-for-free, or for

nominal value to the Defendants, family and friends of the Defendants, other

---

[3] 344 incriminating documents that provide a glimpse into the thousands of pages of irrefutable, supporting evidence are available on the NYSCEF, E-File platform, Appellate Division, Case Number, 2019-04206, Docket #9, pages 71-415, EXHIBITS B-H.

unqualified applicants, business associates of the Defendants, NYC agency executives, council members, unqualified city employees, trial judges, appellate judges, court employees, politicians, and other privileged parties. Instead of protecting the integrity of the Process, a trove of official city transfer deeds demonstrates that the Process is, in fact, a sophisticated Scam. Upon information and belief the Scam is so pervasive that it likely qualifies as being prosecutable under the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§ 1961-1968 ("RICO").

6. Furthermore, by clear and convincing evidence, the reason the Scam has flourished for so long, stems from the active participation of entities such as City Hall, Corporation Counsel, and regretfully, the judicial branch. As one illustration,[4] City Hall and Corporation Counsel have repeatedly falsely sworn that an open bid was held for a specific Property, and that the Property was awarded to the highest bidder, despite no such bid ever being held, the property being awarded to a fraction of its value (million dollar properties were awarded for sums ranging from $250-$2500)[5].

---

[4] Ibid, Docket #9, pages 354-369.

[5] As another illustration, official city records demonstrate that numerous NYC judges received for free, or for below-market-value, affordable housing Properties. In other cases, NYC judges resided simultaneously in multiple rent-stabilized apartments, which violates NYC housing regulations. In exchange, cases involving various city agencies are assigned to "favorable courts", who consistently ruled in favor of the agency, regardless of how outrageous the agency

## JURISDICTION AND VENUE

7.  The United States District Court for the Eastern District of New York ("the

    Honorable Court") has subject matter jurisdiction over this action pursuant

    to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. §

    1367(a) over the state and city causes of action. Venue is proper in this

    district pursuant to 28 U.S.C. § 1391(b) because of the location of the

    subject property, Waterline Square, as well as the result of the violations

    aforesaid, occurring in the Eastern District of New York.

## THE PARTIES AND GENERAL ALLEGATIONS

8.  Plaintiff is a law-abiding, New York resident, who has been applying to

    affordable housing for the past ten years, to no avail. In November 2018,

    Plaintiff applied to the Waterline Square ("the Property"). On March 05,

    2019, pursuant to winning the housing lottery for the first time (Plaintiff's

    priority number was #103 out of #74,000 applicants), Plaintiff was called in

    for his first and only interview in ten years of applications. Between March

    05, 2018-June 07, 2019, Plaintiff successfully passed eight (8) additional

    rounds of due diligence, providing Defendants with hundreds of requested

---

acted. This assertion is proven by overwhelming evidence that the random assignment of cases
has been corrupted.

documents in a timely manner. On June 07, 2019, after undergoing a Process

that featured utter disregard for fairness and lawful procedure, Defendant

Travis Fong ("Fong") notified Plaintiff that his application was approved,

and that he would be coming to sign a lease on the week of June 10, 2019.

Thereafter, upon merely asking for his file to be transferred to another

associate in light of Fong's sickening attempts to sabotage his application,

Plaintiff was rejected without any justifiable cause. Thereafter, Plaintiff was

rejected four times based on a shifting array of reasons (some of which are

unlawful-per-se), disparate income calculations, and bewildering

mathematical conclusions that remain unexplained, and are inconsistent with

the supporting income documentation that Plaintiff provided. Based on

credible, sworn affidavits of numerous whistleblowing employees, Plaintiff

was rejected solely because of his race and the vested interests of the

decision-makers, who reject as many qualified applicants as possible, such

that more Properties can be embezzled for themselves, family, friends, and

the other Scam participants aforesaid.

9. Defendant the City of New York ("City") is a municipal agency existing by

virtue of the laws of the State that employed Defendants #2-#15 through

City agencies, including: HPD, City Hall, Corporation Counsel, and the City

Council. Based on Defendants correspondence evidence, all of these Defendants had direct knowledge of Plaintiff's housing application, and were active participants either in the original rejection, or subsequent rejections of remedial efforts of the Public Advocate Office, Volunteers for American and Churches United for Fair Housing.

10. All of the following Defendants are sued in their official capacity, and pursuant to the Protective Statutes based on unlawful discmirnation based on race, deprivation of Plaintiff's rights, and breach of fiduciary duties to ensure a fair Process.

11. Defendant LOUISE CARROLL ("Carroll") is the Commissioner of HPD. Based on public records, Defendant Carroll has lived for twenty-five years in a low-income, City-owned, Public Housing Complex, located on the Lower East Side (RIIS 2). Upon information and belief, Caroll's annual salary of over $225,000 disqualifies her from low-income housing. HPD is a constituent agency of the City of New York with its principal place of business at 100 Gold Street, NY, NY, 10038.

12. Defendant ANNA-MARIE HENDRICKSON ("Henrdrickson") is the Deputy Commissioner of HPD. Based on public records, for nineteen (19) years, Defendant Hendrickson lived simultaneously in multiple

rent-stabilized Properties in Brooklyn. Furthermore, in 2018, Defendant Hendrickson was accused by a whistle-blowing HPD, Mr. Ricarte Echevarria ("Echevarria") of forcing him to grant affordable-housing to an out-of-State relative who was ineligible on multiple grounds (EXHIBIT A). When Echevarria protested to Hendrickson's supervisor, the supervisor admitted to Echevarria that "she hated when Defendant Henderson did stuff like that", but nevertheless proceeded to award the apartment to the relative. When Echevarria further protested to DOI, he was threatened, instructed to delete incriminating information, and eventually fired. DOI took no disciplinary action against Hendrickson. HPD rushed to settle this case before discovery and paid Echevarria. Furthermore, in 2019, Hendrikson was fined $6,000 by the Committee of Conflicts Board (COIB) for taking illegal gifts in the form of tickets to a sporting event.

13. Defendants MARAGERET BROWN ("Brown") and BABBA HALM ("Halm") are Deputy Commissioners at HPD. Based on public records, they too, live or lived simultaneously in multiple rent-stabilized Properties.

14. VICTOR HERNANDEZ ("Hernandez") is the Director of Affordable Housing and Affordability Oversight at HPD. Based on public records,

Hernandez has been involved in seven-three (73) unlawful transactions[6].

Furthermore, Hernandez lives simultaneously in multiple rent-stabilized

apartments. Pursuant to an initial investigation by the Department of

Investigations ("DOI"), none of these properties were unlawfully embezzled.

Upon the Manhattan District Attorney's office requesting a second

investigation, the DOI rescinded its prior determination, and concluded

Hernandez broke the law by audaciously claiming these properties. DOI is

currently pursuing a criminal investigation with a possible indictment.

According to the DOI, Hernandez has since retired from HPD, despite being

an active participant in Plaintiff's rejection.

15. In 2018, another HPD whistleblower, Karina Rodgriguez revealed in a

sworn complaint that HPD's policy is to discriminate against any affordable

housing applicant that isn't hispanic. Plaintiff is a non-hispanic person. She

further accused Hernandez and Defendant SHATARA PELL ("Pell"), of

intimidation, retaliation, discrimnation, abusive conduct and physical

violence (EXHIBIT B). HPD rushed to settle this case before discovery.

16. Defendants EDWIN LUGO ("Lugo") and NIDIA DORMI ("Dormi"), and

GABRIEL MOMBRUN ("Mombrun"), are also HPD employees that were

---

[6] Illustrations in 2019-04206, Docket #9, EXHIBITS B.

active participants in unlawful discrimiantion and in the Scam[7]. Per the

determination of DOI, they in fact embezzled Properties in Brooklyn and in

the Bronx.

17. Defendants HAROLD WEINBERG ("Weinberg"), NICK LUNDGREN

("Lundgren"), and SAMANTHA SCHONFELD ("Schonfeld"), are all

lawyers working for HPD, who have committed audacious fraud on the

Court and actively participated in the Scam in various ways. They are also

well-aware of HPD's racial discmination against non-hispanic applicants[8].

18. Defendant Breaking Ground ("BG") is a Not-For-Profit entity mandated to

determine the eligibility of applicants to the Property based on applicable

laws. In this capacity, BG is performing the traditional-state-function of

eligibility evaluation for public housing.

19. Irrefutable evidence is demonstrative of BG's active participation in the

racial discrimination, disregard for statutory obligations and continual

deprivation of Plaintiff's rights. BG is incorporated under the laws of the

State of New York, with its principal place of business located at 505 8th

Avenue, 5th Floor, NY, NY 10018.

---

[7] Illustrations in 2019-04206, Docket #9, EXHIBITS C-H.
[8] Illustrations in 2019-04206, Docket #9, EXHIBITS C-H.

20. Defendant Brenda Rosen ("Rosen"), is the current CEO of BG, who is also an affordable-housing real-estate mogul with six affordable property interests, while living simultaneously in multiple rent stabilized apartments.

21. Defendant Terasa Palmieri ("Palmieri"), current Director of Leasing at BG, Defendant Vanessa Cucurullo ("Cucurullo"), current Assistant Director of Leasing at BG, issued Plaintiff's 3rd rejection, Defendant Stephanie Labarta ("Labarta"), senior analyst at BG, issued Plaintiff's 2nd rejection. Defendant Travis Fong ("Fong"), intake specialist at BG, issued Plaintiff's 1st rejection. All of them are active participants in racial discrimination and the Scam. Defendant Jeanne Williams is the attorney for BG, who has actively participated in the Scam, and refused to report the criminal conduct of her clients.

## ADDITIONAL RELEVANT STATUTORY PROVISIONS

22. ***New York City Charter***: HPD is a mayoral agency of the City of New York, established pursuant to Chapter 61 of the New York City Charter, which specifies HPD's powers as functions relating to the rehabilitation, maintenance, alteration and improvement of city-housing developments.

23. ***New York City Zoning Resolution Inclusionary Housing:*** Under the Inclusionary Housing Program, as set forth in Section 23-90 of the New York City Zoning Resolution, in return for agreeing to keep developed housing permanently affordable, the owners receive a bonus in the form of additional developable floor. Such owners enter into a regulatory agreement with HPD that requires compliance with all applicable provisions of an affordable housing plan.

24. ***The HPD Marketing Handbook :*** In 2018, HPD published a Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy ("Marketing Handbook"), which contains the general policies, procedures, and requirements for the marketing and selection of residents for developments assisted by HPD[9].

25. ***The Regulatory Agreement Between HPD and BG and HPD ("The Agreement":***Provides the specific binding provisions of the Subject Property, Waterline Square ("the Property"), such as under what grounds an applicant can be rejected, and the way of computing an applicant's income. It also includes the Marketing Summary Plan.

---

[9] On page 70, the HPD Handbook specifically incorporates all applicable Federal and State laws into the Handbook.

26. ***The Applicant Income Calculation Guide*** (the "Income Guide"), published by HPD, illustrates the income calculation method that HPD and BG *should take into consideration* when evaluating an applicant's income.

## SPECIFIC ALLEGATIONS

### I.   July 2018: Plaintiff's Applies to the Property

27. The Property is a residential complex in Manhattan with 1132 housing units, developed by the GID Real Estate Group ("Developer"). Of these units, 269 units are designated by the relevant statutes as affordable housing units for applicants whose annual income is between $37,578-$43,860.

28. In ten years of applying to affordable housing, Plaintiff never received a number low enough to advance him past the initial lottery stage.

29. Plaintiff filed a timely application in July 2018, for a one-bedroom or studio apartment at the Property. Over 74,000 applicants applied to the Property.

30. For the first time in ten years of applications, Plaintiff received an extremely favorable priority, placing him in the 0.9987% priority percentile. For the first time in ten years of applications, this number effectively guaranteed Plaintiff an apartment, permitting he passed the income calculation phaze[10].

---

[10] Plaintiff's actual log number/number of applicants = 103/74,000 = 0.9987%.

31. On March 05, 2019, Plaintiff was called in for an initial (first-ever) interview at the BG offices. In this meeting, Plaintiff furnished all documents that were required of him (approximately 90 documents).

32. From March 05, 2019 to June 07, 2019, Plaintiff complied in a timely manner with eight additional requests for hundreds of additional sensitive financial documents.

33. Throughout this entire period, Plaintiff was subjected to the admittedly-unlawful conduct[11] of Defendant Fong, who violated lawful procedure and deprived Plaintiff of various rights, including the right for a fair application process by: (1) applying pressure on Plaintiff to withdraw his application; (2) threatening to reject Plaintiff for infractions such as redacting sensitive information, or sending files in the wrong format; (3) taking active measures to have Plaintiff rejected, for example, demanding new files hours before a critical deadline; (4) lying to Plaintiff in emails

---

Plaintiff's *raw log number* was #5695- the lowest (and as such- most favorable) number he ever received. Considering the Developer was mandated by law to give applicants from Community Board 7 a 50% preference (Plaintiff lived in Community Board 7), Plaintiff's *actual log number*- as confirmed by the specific property manager, Mr. Gabrial Mombrun- was #103. Per Mr. Mombrun's account, were Plaintiff to pass the income evaluation phaze, his low log number effectively guaranteed him an apartment.

[11] Plaintiff presented to Defendants counsels' hi-quality audio recordings, in which Fong's manager, Labarta, apologized for Fong's unlawful conduct.

about the time of a critical deadline. There was no reason, no justification for

Fong's outrageous conduct, which remains unexplained.

### II.    June 7, 2019: Plaintiff Is Notified of Qualification

34. On June 07, 2019, at 11:53am, after undergoing an excruciating,

eight-month application process that featured countless violations of law,

Fong notified Plaintiff his application was approved, and that he would be

coming to sign a lease on the week of June 10, 2019.

### III.    June 10, 2019: Fong Issues 1st Rejection

35.  Upon politely protesting a disturbing attempt to sabotage his application by

Fong (pursuant to being approved), Plaintiff was sent a cryptic 1st rejection

letter, based on the unauthorized and unlawful-per-se cause of 'inconsistent

information'.

36. The rejection letter sent to a good-faith after a grueling, eight-month

application process, did not reveal what information was allegedly

inconsistent.

37. Critically, the Handbook and the Agreement- as the relevant authorities-

specifically prohibited a rejection based on such a cause. Till this day, nearly

nine months later, neither Defendant, nor their respective counsel, offer any

justification for this unlawful 1st rejection.

### IV.   1st Rejection is Generally Fatal

38. Worse yet, the bitter, irrefutable truth is that once that first rejection is

issued, the applicant is doomed. No matter how baseless, both Defendants

will stop at nothing to affirm the original determination, even if they have to

*discover novel justifications to reject the affordable housing applicant.*

39. We know this for three reasons: (a) HPD's spokesperson admitted this fact

with an investigative journalist[12] who authored a paper illustrating the

stomach-turning injustice inflicted on millions of affordable housing

applicants; (b) due to the dismal number of determination reversals; (c) alas,

it is also rational: rather than exposing an arbitrary and capricious

determination, Defendants are motivated to appear competent by *discovering*

*new post-facto justifications that gives credence to a baseless rejection.*

40. On first appeal, Defendant Labarta, senior manager at BG, apologized for

the rejection and the unlawful conduct of Fong. Labarta immediately

reversed the determination. Defendant Labarta then required Plaintiff to

---

[12] EXHIBITS A3-A4 of Docket # 9 on NYSCEF, Appl. Dep. 04-206).

undergo a second evaluation of documents which had already been vetted and given three months prior, in violation of law[13].

41. In recorded conversations, Labarta promised that in an effort to remedy the torture Fong had unjustly inflicted, that *she would reach out to Plaintiff regarding any questions she would have- prior to issuing a second rejection.*

     V.    **June 20, 2019: Defendant Labarta Issues 2nd Rejection[14]**

    VI.    **June 28, 2019: Defendant Rosen Lies about File Being Transferred.**

   VII.    **June 11-July 03, 2019: Defendant Pell's Indifference to the law [15].**

  VIII.    **July 03, 2019:  Defendant Cucurullo Issues 3rd Rejection.**

    IX.    **July 9, 2019: Pell Issues 4th Rejection.**

     X.    **June 10-July 09, 2019: Plaintiff Is Unlawfully Rejected Four Times On Shifting Grounds**

## PROCEDURAL POSTURE

### I.    Commencement of Article 78

---

[13] Page 5 of the Handbook specifically requires the application process to be fair. Forcing an applicant to undergo a second evaluation of documents that were already approved, is anything but fair.

[14] On the scale of egregious, arbitrary and capricious Labarta's 2nd rejection did little to improve. It contained three blatantly-erroneous numbers with no underlying computation showing how these numbers were reached, and a single conclusory number with a brief, erroneous calculation. Whereas the relevant statute of law required giving a specific and detailed explanation, Plaintiff was deprived of this right. Whereas Labarta expressly promised to reach out for clarifying information, no such call was made.

[15] On June 11, 2019, Plaintiff contacted Pell. Pell did absolutely nothing to enforce the blatant violations of the Handbook. HPD's FOIL response demonstrates that not a single internal HPD communication showed any concern about a marketing agent rejecting applicants based on fictitious justifications.

42. Plaintiff commenced an article 78 seeking judicial review of the agency determinations[16] ("Prior Proceedings"), on July 12, 2019, in the Supreme Court Part 56 ("the Court"), by an Order to Show Cause and Verified Petition, and was instructed to serve opposing parties by July 25, 2019. The opposing parties were instructed to respond by July 29, 2019. Plaintiff properly served opposing parties on July 23 and July 24. Defendants served their Verified Answers 11 days later, on August 09.

43. On July 18, 2019, based on the merits of the evidence presented, the Court issued a Temporary Restraining Order ("TRO"), barring the leasing of any apartment to an applicant with a lower priority than Plaintiff. Defendant HPD's redacted FOIL response, dated December 05, 2019, demonstrates that Defendant brazenly disregarded the Court's order.

---

[16] In this context, it is well established that the judicial review in an article 78 must not evaluate the final determination in isolation, independent of the process leading up to the final determination. Rather, it must also account for the process leading up to the final determination. The elaborate case in support of this contention includes: *Charles A Field Delivery Service Inc.*, 66 N.Y.2d 516, 520 (1985); Mtr. of *Richardson v. Conmr* of N.Y. City Dep't of SS, 88 N.Y.2d 35 (1996); *Mtr. of Parkmed Assocs. V. N.Y. State Tax Comm.*, 60 N.Y.2d 935 (1983); *Scherbvn V. Wavne-Finger Lakes BOCES*, 77 N.Y.2d 753 (1991); and *Matter of AVJ Realty Corp.*, 8 AD.3d 14 (lst Dep't 2004); and *Mtr. of Stone Landing Corp. v. Bd. of Appeals*, 5 AD.3d 496 (2d Dep't 2004). Furthermore, although technically HPD is the administrative agency, it relies on BG to supply it with all of the documentation pertaining to an individual. In addition BG has unlimited access to the sensitive financial documents of all its applicants. And most critically, the HPD Marketing Handbook repeatedly places the onus of lawful compliance on both agencies. As such, the judicial review of the must include determinations rendered by *both agencies*: BG, as the lower tribunal agency and HPD, as the appellate tribunal agency, HPD.

44. On August 16, 2019, the Court dismissed the Petition based on the conclusion that Petitioner's income was too low. Critically, many of the Court's factual findings are inconsistent with evidence on the record. For example, the Court concluded that the "inconsistent information" alleged in the first rejection was based on Plaintiff's family gift income, whereas, a written admission from the decision-maker, proved otherwise. Respectfully, the Court also disregarded Defendants disturbing violations of law.

## II.  September 06, 2019: Settlement Conference

45. On September 06, 2019, the Court held a settlement conference. In this conference, the Court stated that a settlement is warranted in the case at bar, and asked opposing counsel to explain what steps would be necessary for a settlement. Opposing counsel raised three issues: tax benefit implications, rent payment assurances, filing an amended tax return for 2018 The Court dismissed the first issue as irrelevant, and instructed opposing parties to be in touch with Plaintiff regarding the other issues. On the very next day, Plaintiff resolved both of the remaining issues- amending his tax return to fix the single error, and securing a loan to pay rent for the entire year in advance. This created a resolution for Defendants that was endorsed by the Court, and which resolved any potential risks for Defendants. Nonetheless,

Defendants ferociously and irrationally refused to consider the merits of the Court's recommendation.

46. On September 12, 2019, Plaintiff filed a notice of appeal in the Appellate Division First Department. While the appeal is currently pending, Defendants shocking ex-parte modification of a valid Appellate stay order, is threatening to render the appeal moot before it has its day in court.

47. On September 23, 2019, as a direct result of Defendants refusal to consider the Honorable Court's recommendation to settle, Plaintiff was forced into public shelter survival. Plaintiff has since been transferred to three different shelters, and a halfway home without running water or heat, paying a heavy toll of stress and disorientation for each transition.

48. This escalation has occurred despite Plaintiff pleading with opposing counsel to recognize there is no reason to continue inflicting pain and suffering on Plaintiff- a good faith applicant- who at the very least has made a compelling case for qualification.

49. Furthermore, based on Defendants own rules, if a candidate is a referral from the Department of Homlessness Services ("DHS"), then the criteria is whether his income is at or below the income criteria. Plaintiff is now officially a DHS referral. Further, Plaintiff received a referral from his

shelter asking Defendants to help Plaintiff find affordable housing. Still,

Defendants refuse to even consider this development.

## DEFENDANTS FLABBERGASTING DEPRIVATION OF RIGHTS

I.   **Defendants Deprived Plaintiff's Right for a Fair Application Process**

50. Page 5 of the Handbook states:

> The primary objective of the marketing, lease-up and sales
> effort is to ensure that the process is fair and provides equal
> opportunity to all applicants, regardless of race, color, religion,
> gender, sexual orientation, gender identity or expression,
> national origin, age, genetic information, disability, or veteran
> status. s and within the neighborhood, and by providing
> applicants with mobility, vision, or hearing disabilities that
> require accessible/adaptable units.

51. By virtue of this provision, Plaintiff (and all other applicants) were granted

the right to a fair application process. And yet, denial of Plaintiff's right for

fairness is the common thread prevalent throughout all of the deprivations

stated herein.