# Case Number: CV-20-4340—GBD—RL

## Dear Honorable Clerk,

## Please Find the Attached EXHIBITS
## D- F, as part of Plaintiff's
## First Amended Complaint
## That Was already uploaded to ECF,
## along with EXHIBITS A-C

## I, Abraham Gross,
## Affirm that I am the
## Pro Se Plaintiff
## In this proceeding.

**October 09, 2020** 

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

KARINA RODRIGUEZ,

                              Plaintiff,

            - against -

THE CITY OF NEW YORK, ANNE-MARIE
HENDRICKSON, ERIC ENDERLIN, VICTOR
HERNANDEZ, SHATARA PELL, MARGARET
BROWN, LISA TALMA, and JOHN and JANE DOES 1-5
(said names being fictitious, the persons intended being
those who aided and abetted the unlawful conduct of the
named Defendants),

                              Defendants.

**STIPULATION OF
VOLUNTARY DISMISSAL**

18 Civ. 1626 (ER)

------------------------------------------------------------------X

    **IT IS HEREBY STIPULATED AND AGREED**, by and between the

parties as represented below, as follows:

    1.   Pursuant to Federal Rule of Civil Procedure Rule 41(a)(1)(A)(ii), all of

Plaintiff's claims in the above-referenced action, are hereby dismissed, with prejudice,

and that an order to that effect may be entered without further notice.

Dated:       New York, New York
             December 19, 2018


**MADUEGBUNA COOPER, LLP**
Attorneys for Plaintiff
30 Wall Street – 8th Floor
New York, New York 10005
Tel: (212) 232-0155
sam.m@mcande.com


By: _____
           Samuel O. Maduegbuna


**ZACHARY W. CARTER**
Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
Tel: (212) 356-4083
emurrell@law.nyc.gov


By: _____
           Eric Murrell
        Assistant Corporation Counsel

18-CV-01626 (ER)

| UNITED STATES DISTRICT COURT |
| SOUTHERN DISTRICT OF NEW YORK |

KARINA RODRIGUEZ,

Plaintiff,

-against-

THE CITY OF NEW YORK, ANNE-MARIE HENDRICKSON, ERIC ENDERLIN, VICTOR HERNANDEZ, SHATARA PELL, MARGARET BROWN, LISA TALMA, and JOHN and JANE DOES 1-5 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

Defendants.

## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Room 2-140*
*New York, N.Y. 10007-2601*

*Of Counsel:  Eric Murrell*
*Tel:  (212) 356-4083*
*Matter No.:  2018-009803*

*Due and timely service is hereby admitted.*

*Dated: New York, N.Y.  ................................ , 2018*

*Signed:  ...............................................................*

*Attorney for ............................................................*

(b)  Denying her overtime she worked contrary to unit policy that allows 5 hours of such work without advance notice;

(c)  Failing to approve her timesheet resulting in her not receiving her pay check;

(d)  Screaming at her to answer the phone even when she was on the phone working;

(e)  Undermining her work decisions;

(f)  Sabotaging her work and performance; and

(g)  Verbal and physical abuse and general hostility towards her.

136.    Before working for HPD, Defendant PELL worked as an occupancy compliance coordinator for a non-profit agency that works with HPD to provide affordable housing to low and moderate income families (the "developer"). While working for the developer, Defendant PELL would send files for applicants seeking affordable housing subsidized by HPD, such as the Brooklyn Grand project.

137.    As a project manager, RODRIGUEZ reviewed those files to determine final eligibility and regularly emailed with Defendant PELL while she was employed by the developer.

138.    During that time, RODRIGUEZ emailed Defendant PELL about the status of an African American applicant who was eligible for an affordable housing lottery in the Brooklyn Grand project but not processed by Defendant PELL's office.

139.    On her first day working for HPD, February 13, 2017, Defendant PELL questioned RODRIGUEZ's decision regarding the final eligibility of tenants for units in the Brooklyn Grand project, and made clear her intention to reverse those determinations, including for the eligibility of the African American applicant.

140.    Defendant PELL was supporting the developer, her former employer, who was improperly rejecting non-Hispanic applicants for units in the project.

141.    The African American applicant was eligible and entitled to the unit based on her lottery log number.

142.    RODRIGUEZ knew and believed in good-faith, based on her experience with housing law and City rules and policies, that it was impermissible to base lottery decision on race or national origin and that it was improper to deny an African American applicant in favor of a Hispanic applicant who was lower on the list.

143.    Beginning in or around February 13, 2017, RODRIGUEZ protested, to no avail, PELL's improper and discriminatory actions of rejecting non-Hispanic applicants for housing units in the Brooklyn Grand project, including the African American applicant.

144.    During the same period, RODRIGUEZ also complained and reported to Defendants HERNANDEZ and HENDRICKSON as well as Assistant Commissioner BROWN about PELL's improper and discriminatory refusal to adhere to the tenant selection plan and affordable housing process in order to harm non-Hispanic applicants.

145.    Rather than address her concerns, Defendant HERNANDEZ warned RODRIGUEZ to "back down" or she would be removed from the Brooklyn Grand project if she did not reject the African American applicant pursuant to Defendant PELL's instructions

146.    In or about May 2017, BROWN told RODRIGUEZ that HERNANDEZ would address the problem and that she did not need to be concerned.

147.    In or about May 2017, BROWN also told RODRIGUEZ that HPD Commissioner Maria Torres-Springer was looking into the matter. HERNANDEZ and PELL were both aware of the complaint of RODRIGUEZ to BROWN, and as a result, beginning on or about February

13, 2017, took a number of adverse employment actions against RODRIGUEZ, including denying her promotions, subjecting her to unwarranted discipline, demoting her, physically assaulting her, having her duties reduced to menial clerical tasks, and all her projects reassigned.

148. On February 15, 2017, at RODRIGUEZ's first one-on-one meeting with Defendant PELL (the "February 15 meeting"), Defendant PELL informed RODRIGUEZ that she was aware of the circumstances under which Cardona, the former deputy director was terminated, and asked RODRIGUEZ if she would have any problems taking direction from a younger "boss."

149. Following the February 15 meeting, Defendant PELL was constantly trying to sabotage and provoke RODRIGUEZ by ordering her to do something and then reprimanding her for doing so; giving her vague and unclear instructions, and trying to suggest that she did not follow her instructions; luring her into her office to pick-up a document and either reprimanding her for doing so or accusing her of being rude once she is in her office.

150. After yelling at RODRIGUEZ for days about answering the phones, Defendant PELL sent her a meeting request for February 28, 2017 entitled "Issues" (the "February 28 meeting").

151. During the February 28 meeting, Defendant PELL falsely accused RODRIGUEZ of always being on her office phone, although she was unsure as to the nature of the calls, and being rude and disrespectful. RODRIGUEZ immediately asked to stop the meeting so she could obtain union representation.

152. On May 2, 2017, Defendant PELL yelled at RODRIGUEZ unprovoked and threatened to have RODRIGUEZ's time and leave revoked. RODRIGUEZ complained about this incident to Defendant HERNANDEZ, who ignored her complaint.

153. The following day, May 3, 2017, Defendant PELL issued RODRIGUEZ a disciplinary memorandum, charging her with insubordination for not appearing for a meeting that, in reality, Defendant PELL had never scheduled or issued a request for.

154. On May 10, 2017, while RODRIGUEZ was speaking with a colleague, Defendant PELL approached the pair and yelled at RODRIGUEZ again in a threatening and abusive tone. RODRIGUEZ also reported this May 10 incident immediately to the disciplinary unit, to no avail.

155. Since at least February 13, 2017, RODRIGUEZ has also been complaining to Defendant HERNANDEZ and HPD's Disciplinary Unit about PELL's unlawful conduct towards her. However, HPD took no action despite an acknowledgement from the Director of the Disciplinary Unit, Siheem Roseborough, that her claims about being yelled at and humiliated by Defendant PELL were corroborated.

156. Instead, on May 24, 2017, RODRIGUEZ was called to the Disciplinary Unit to face new charges of insubordination based on Defendant PELL's May 3 memorandum. During this meeting, Investigator Daniel Carcana told RODRIGUEZ that "things are going to get bad for [you]." RODRIGUEZ attempted to follow-up on her complaints regarding Defendant PELL's verbal abuse, again to no avail.

157. On May 25, 2017, RODRIGUEZ advised a New York City Department of Investigation investigator that Defendants HERNANDEZ and PELL were allowing the developer to violate the lottery process. The investigator said that she would be contacting Defendant HERNANDEZ.

158. On May 31, 2017, Defendant PELL escalated her abuse to the physical. When RODRIGUEZ was returning to her desk from the copy machine Defendant PELL, who was

- 24 -

walking past, intentionally bumped RODRIGUEZ with her shoulder and sent her falling into filing cabinets. RODRIGUEZ immediately reported the incident to the Disciplinary Unit.

159.    As a result of her EEO complaint and Defendants' continued retaliation, on May 31, 2017, while remaining a staff of the division, RODRIGUEZ was relocated by Defendants HERNANDEZ and PELL and others acting in concert with them, to the Strategic Research Division on another floor, her duties reduced to menial clerical tasks, and all her projects reassigned.

160.    Although RODRIGUEZ was advised she would be a liaison for marketing related issues on the few assignments she received, Defendant HERNANDEZ told her not to speak with his staff or contact the Marketing Unit.

161.    The relocation, which RODRIGUEZ was promised would be temporary for approximately six weeks, until a new, permanent position was established, continues to date.

162.    Presently, RODRIGUEZ has no workload or clear responsibilities and is seated in the Strategic Research Division handling menial work.

163.    In July 2017, RODRIGUEZ filed an online complaint with the New York City Conflicts of Interest Board about the housing lottery violations.

164.    Prior to May 2017, the African American applicant had filed complaints with advocacy groups and was communicating with the HPD Commissioner's office. Ultimately, the attention her file received for being unfairly rejected forced HPD to process her application in accordance with the tenant selection guidelines for the lottery and she was granted an affordable housing unit, in or around July 2017.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

SHARON LEWIS, MALINDA
GONSALVES, RAVEEN SEATON,
and WANDA SINCLAIR,

                    Plaintiffs,

-against-

THE CITY OF NEW YORK,
RUTHANNE VISNAUSKAS, VICKI
BEEN, ERIC ENDERLIN, MICHAL
ARONSON, KIMBERLY DARGA,
BRIAN HALUSAN, LISA TALMA,
CYRIL LAMAR MYERS, LARISA
ROZENZAFT, WILLIAM DUNN,
ELLIS BAUMEL, and JOHN and
JANE DOES 1-5 (said names being
fictitious, the persons intended being
those who aided and abetted the
unlawful conduct of the named
Defendants),

                    Defendants.

--------------------------------------------------------X

**Docket No.:**

**<u>COMPLAINT</u>**

**<u>JURY TRIAL REQUESTED</u>**

**MADUEGBUNA COOPER LLP**
***Attorneys for Plaintiffs*** *Sharon Lewis, Malinda*
*Gonsalves, Raveen Seaton, and Wanda Sinclair*
30 Wall Street, 8th Floor
New York, NY 10005
Tel.: (212) 232-0155
Fax: (212) 232-0156

Samuel O. Maduegbuna (sam.m@mcande.com)
William W. Cowles II (wcowles@mcande.com)

# TABLE OF CONTENTS

Page

I.      NATURE OF THIS ACTION ...................................................................1

II.     JURISDICTION AND VENUE ..............................................................2

III.    PROCEDURAL REQUIREMENTS .......................................................2

IV.     THE PARTIES ........................................................................................2

        A.  Plaintiffs .........................................................................................2

        B.  Defendants ......................................................................................5

V.      FACTUAL ALLEGATIONS FOR ALL PLAINTIFFS ........................9

        A.  HPD has a Long History of Discriminatory Employment Practices .....................9

        B.  HPD's Discriminatory Policies & Customs Continue ...........................12

        C.  Defendants Maintain a Race-Neutral Hiring and Promotional Policy that
            has a Disparate Impact on Black, African American and Older Candidates
            for HPD Managerial Positions .......................................................14

        D.  HPD's Retaliatory Use of Employee Performance Appraisals .............15

VI.     PLAINTIFF LEWIS ..............................................................................16

        A.  LEWIS' Skill, Qualifications, and Experience .....................................16

        B.  Defendants MYERS and TALMA Deny LEWIS Promotion to Deputy
            Director, ANCP .............................................................................18

        C.  LEWIS is Hired Outside the Office of Development ............................20

        D.  HPD denies LEWIS promotion to Director of Dispositions..................20

        E.  DARGA and ARONSON Deny LEWIS Promotion to Deputy Director,
            Green Housing Preservation Program ..............................................21

VII.    PLAINTIFF GONSALVES ...................................................................23

        A.  GONSALVES' Skill, Qualifications, and Experience ...........................23

i

X.      DEFENDANTS' ACTIONS CONTINUE AND WARRANT INJUNCTIVE
        AND OTHER RELIEF ................................................................................46

XI.     CAUSES OF ACTION ...............................................................................47

FIRST COUNT (Race Discrimination in Violation of Sections 1981 and 1983).........................47

SECOND COUNT (Race Discrimination in Violation of Title VII) .............................................48

THIRD COUNT (Race and Color Discrimination in Violation of NYSHRL)..............................49

FOURTH COUNT (Race and Color Discrimination in Violation of NYCHRL)..........................50

FIFTH COUNT (Disparate Impact Race and Color Discrimination in Violation of NYSHRL
and NYCHRL)...............................................................................................................................50

SIXTH COUNT (Disparate Impact Age Discrimination in Violation of NYSHRL
and NYCHRL)...............................................................................................................................51

SEVENTH COUNT (Age Discrimination in Violation of NYSHRL and NYCHRL).................51

EIGHTH COUNT (Retaliation Pursuant to Sections 1981 and 1983) .........................................52

NINTH COUNT (Retaliation in Violation of NYCHRL) .............................................................53

TENTH COUNT (Retaliation in Violation of NYSHRL) .............................................................54

ELEVENTH COUNT (Violation of the Equal Pay Act ("EPA"))................................................54

TWELFTH COUNT (Violation of N.Y. Labor Law § 194) .........................................................55

THIRTEENTH COUNT (Sex Discrimination in Violation of Title VII) .....................................56

FOURTEENTH COUNT (Sex Discrimination in Violation of NYSHRL and NYCHRL)..........56

FIFTEENTH COUNT (Retaliation in Violation of the EPA, Section 215(a)(3))........................57

SIXTEENTH COUNT (Retaliation in Violation of Title VII)......................................................57

SEVENTEENTH COUNT (Hostile Work Environment in Violation of Sections 1981 and
1983, NYSHRL and NYCHRL) ...................................................................................................58

XII.    PUNITIVE DAMAGES ............................................................................58

XIII.   PRAYER FOR RELIEF.............................................................................58

iii

B.  GONSALVES becomes Deputy Director of Conversions and requests
    Equal Pay ............................................................................................23

C.  GONSALVES' Supervisors Retaliate against her for Seeking Equal Pay............25

D.  Defendants Use Performance Appraisals to Retaliate against GONSALVES.......28

E.  DUNN Demotes GONSALVES in Retaliation......................................................30

F.  Defendants Assign GONSALVES the Same Work after her Demotion ...............31

G.  Further Discrimination and Retaliation against GONSALVES............................31

VIII.  PLAINTIFF SEATON ....................................................................................32

A.  SEATON'S Skill, Qualifications, and Experience................................................32

B.  SEATON is Hired and Discriminatorily Placed in a Lower Position ..................32

C.  SEATON Excelled as Director of Rehabilitation Loan Programs ........................33

D.  DARGA Discriminatorily Denies SEATON Promotion to Executive Director ....34

E.  SEATON suffers a Heart Attack Due to DARGA's Discriminatory Treatment.....35

F.  DARGA Subjects SEATON to a Racially Hostile Work Environment ................36

G.  DARGA Strips SEATON of Job Responsibilities and Awards them to a
    Younger, White Employee ..................................................................................37

H.  DARGA's Discriminatory Treatment of SEATON Becomes Unbearable ............39

IX.  PLAINTIFF SINCLAIR ...................................................................................39

A.  SINCLAIR'S Skill, Qualifications, and Experience.............................................39

B.  HPD's Past Mistreatment of SINCLAIR .............................................................40

C.  SINCLAIR's Prior Employment Discrimination Lawsuit.....................................41

D.  Defendants' Ongoing Mistreatment of SINCLAIR ..............................................42

E.  Defendants Use SINCLAIR's Performance Appraisal to Retaliate for the
    First Action..........................................................................................................45

Plaintiffs, by their attorneys, **MADUEGBUNA COOPER LLP**, complaining of the defendants, allege as follows:

## I.      NATURE OF THIS ACTION

1.      Plaintiffs bring this action to secure protection of and to redress deprivation of rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), and 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981"); the New York State Human Rights Law as contained in New York State Executive Law, § 296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107 *et seq.* (the "NYCHRL"), providing for injunctive relief and other relief against discrimination on the basis of race, color, sex, and age.

2.      In addition to the above claims, Plaintiff Malinda Gonsalves ("GONSALVES") brings this action under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.* ("Equal Pay Act"), and the New York Equal Pay Law, N.Y. Labor Law § 194, for injunctive relief and other relief against discrimination on the basis of race and sex.

3.      This action is being brought to vindicate Plaintiffs' human and civil rights. Plaintiffs contend that the terms, conditions, and privileges of their employment relationship with the City of New York were adversely affected because of their race, color, sex, and age, and in retaliation for their complaints of unlawful discrimination.

## II.     JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

5. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state and city causes of action pleaded herein.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in the Southern District of New York.

## III.   PROCEDURAL REQUIREMENTS

7. Immediately after commencing this action, Plaintiff will serve a copy of the complaint upon New York City Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with New York City Administrative Code Section 8-502(c).

8. On August 24, 2015, Plaintiff GONSALVES filed a *pro se* charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII.

9. The EEOC issued GONSALVES a Notice of Right to Sue letter dated October 16, 2017.

10. This action is brought within 90 days of GONSALVES's receipt of the Notice of Right to Sue letter in or around November 2017.

## IV.   THE PARTIES

### A. Plaintiffs

11. Plaintiffs are black and African American women over the age of 40 years and all are current or former employees of Defendant City of New York ("CITY") in the New York City Department of Housing Preservation and Development ("HPD").

12. Plaintiffs work or worked for HPD in its Office of Development.

13. Based on their respective backgrounds and individual work experience, Plaintiffs, at

all relevant times, participated in, supervised, directed, and managed housing development projects under programs and initiatives established for the purpose of preserving and developing the City's affordable housing stock.

14.     Plaintiffs' duties and responsibilities are overseen and managed by supervisors who are mostly white-Caucasian.

### i. Sharon Lewis

15.     Plaintiff Sharon Lewis ("LEWIS") is an Afro-Caribbean American woman aged 46 years and is a resident of Brooklyn.

16.     Since 2004, LEWIS was continuously employed by the CITY and HPD in various capacities including Project Manager, Senior Project Manager, and Deputy Director, until November 2017 when she resigned from City employment.

17.     Prior to her resignation, LEWIS held the Civil Service title of Housing Development Specialist at HPD.

18.     While employed by the CITY and HPD, LEWIS performed duties related to managing and facilitating complex property transactions, including performing underwriting and financial analysis as part of the Affordable Neighborhood Cooperative Program ("ANCP").

### ii. Malinda Gonsalves

19.     Plaintiff GONSALVES is an African American woman of Guyanese descent aged 41 years and is a resident of Brooklyn.

20.     Since September 2005, GONSALVES has been continuously employed by the CITY and HPD in various capacities including Community Liaison Worker, Coordinator of Project Based Section 8 Programs, and Deputy Director.

21.     Between November 2013 and December 20, 2016, GONSALVES was employed

by the CITY and HPD as Deputy Director of Conversions. As Deputy Director of Conversions, GONSALVES performed duties related to the development and implementation of strategic plans for HPD's housing projects. GONSALVES was responsible for supervising and supporting the work of HPD's conversions project managers.

22. At all times relevant, GONSALVES was a female "employee" of the CITY, as defined by the Equal Pay Act.

### iii. Raveen Seaton

23. Plaintiff Raveen Seaton ("SEATON") is a black woman, aged 45 and is a resident of Queens.

24. Between March 2014 and September 16, 2016, SEATON was employed by the CITY and HPD as Director of Rehabilitation Loan Programs.

25. As Director of Rehabilitation Loan Programs, SEATON oversaw the implementation of several CITY housing finance programs, including, prior to March 11, 2016, the Participation Loan Program.

### iv. Wanda Sinclair

26. Plaintiff Wanda Sinclair ("SINCLAIR") is an African American woman, aged 64 years, and is a resident of Brooklyn.

27. Since 1978, SINCLAIR has been continuously employed by the City and HPD in various capacities including Property Manager, Project Development Coordinator, Deputy Director, and Mortgage Officer.

28. SINCLAIR currently holds the Civil Service title of Associate Housing Development Specialist at HPD, a title in which she has remained for over 23 years since 1993.

29. At all times relevant to this lawsuit, SINCLAIR performed the duties of

Underwriter/Mortgage Officer, with responsibility for managing complex housing development projects from conception and financing to closing, under various HPD development programs.

### B. Defendants

30.     Defendants are the CITY and its employees who participated in, and contributed to, the discriminatory employment practices Plaintiffs complain of.

31.     At all relevant times, by virtue of their respective positions, the individual defendants were responsible for developing, implementing, and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within HPD, including the Plaintiffs.

32.     At all relevant times, Defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the State of New York.

33.     The individual defendants named herein are each sued in both their individual and official capacities.

#### i. The City of New York

34.     Defendant CITY is a municipal agency existing by virtue of the laws of the State of New York.

35.     HPD is a mayoral agency of the CITY.

36.     At all times relevant, the CITY was an "employer" under the Equal Pay Act.

#### ii. RuthAnne Visnauskas

37.     Defendant RuthAnne Visnauskas ("VISNAUSKAS"), a white female, is a former employee of the City and of HPD.

38.     Prior to September 2013, VISNAUSKAS was Deputy Commissioner of Development at HPD.

- 5 -

39.     During or about September 2013, VISNAUSKAS was appointed Commissioner of HPD.

40.     As Commissioner, VISNAUSKAS was responsible for developing and implementing the policies, practices and/or customs of HPD.

41.     As Commissioner, VISNAUSKAS also had ultimate responsibility for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the individual defendants named herein.

### iii. Vicki Been

42.     Defendant Vicki Been ("BEEN"), a white female, is a former employee of the City and of HPD.

43.     During or about February 2014, BEEN succeeded VISNAUSKAS as Commissioner of HPD.

44.     As Commissioner, BEEN was responsible for developing and implementing the policies, practices and/or customs of HPD.

45.     As Commissioner, BEEN also retained ultimate responsibility for the hiring, screening, training, retention, supervision, discipline, counseling, and control of the individual defendants named herein.

46.     In or around January 2017, BEEN resigned as Commissioner of HPD, and since then is no longer employed by the City.

### iv. Eric Enderlin

47.     Defendant Eric Enderlin ("ENDERLIN"), a white male, is a former employee of the City and of HPD.

48.     From June 2013 to October 2016, ENDERLIN was Deputy Commissioner of

Development at HPD.

49.     ENDERLIN's tenure as Deputy Commissioner of Development continued from June 2013 to October 2016 notwithstanding two changes in the Commissioner position at HPD.

50.     At all times relevant, ENDERLIN was an "employer" under the Equal Pay Act.

### v. Michal Aronson

51.     Defendant MICHAL ARONSON ("ARONSON"), a white female, is and was an employee of the City and of HPD.

52.     ARONSON is and was, at all relevant times, Director of Operations in the Division of Preservation Finance at HPD.

### vi. Kimberly Darga

53.     Defendant Kimberly Darga ("DARGA"), a white female, is an employee of the City and of HPD.

54.     From October 2013 to December 2016, DARGA was Assistant Commissioner in the Division of Preservation Finance. She currently holds the position of Associate Commissioner of Preservation and manages two divisions, Preservation Finance and Property Disposition & Finance.

### vii. Brian Halusan

55.     Defendant Brian Halusan ("HALUSAN"), a white male, is a former employee of the City and of HPD.

56.     Between March 2014 and March 2016, HALUSAN was a Deputy Director in the Division of Preservation Finance.

### viii. Lisa Talma

57.     Defendant Lisa Talma ("TALMA"), a black female, is an employee of the City

- 7 -

and of HPD, and is and was at all times relevant, Assistant Commissioner in the Division of Property Disposition & Finance.

### ix. Cyril Lamar Myers

58.     Defendant Cyril Lamar Myers ("MYERS"), a black male, is a former employee of the City and HPD.

59.     While employed by HPD, MYERS served, at all relevant times, as Director, Affordable Neighborhood Cooperative Program ("ANCP").

60.     In his capacity as Director of ANCP, MYERS supervised and directed duties performed by LEWIS.

### x. Larisa Rozenzaft

61.     Defendant Larisa Rozenzaft ("ROZENZAFT"), a white female, is an employee of the City and of HPD.

62.     Prior to September 25, 2015, ROZENZAFT was Director of Conversions at HPD.

63.     From November 2013 to September 25, 2015, ROZENZAFT supervised and directed duties performed by GONSALVES.

64.     At all times relevant, ROZENZAFT was an "employer" under the Equal Pay Act.

### xi. William Dunn

65.     On September 25, 2015, ROZENZAFT was replaced as Director of Conversions by Defendant William Dunn ("DUNN"), a white male.

66.     As Director of Conversions, DUNN, supervised and directed duties performed by GONSALVES.

67.     At all times relevant, DUNN was an "employer" under the Equal Pay Act.

- 8 -

*xii. Ellis Baumel*

68.     Defendant Ellis Baumel ("BAUMEL"), a white male, is an employee of the City and of HPD.

69.     At all relevant times BAUMEL was Executive Director of Budget & Conversions.

70.     As Executive Director, BAUMEL ran the unit where GONSALVES worked.

71.      BAUMEL also supervised DUNN and ROZENZAFT.

72.     At all times relevant, BAUMEL was an "employer" under the Equal Pay Act.

## V.     FACTUAL ALLEGATIONS FOR ALL PLAINTIFFS

### A.  HPD has a Long History of Discriminatory Employment Practices

73.     Over the years, HPD has instituted preferential employment policies and customs designed to hire, retain, and reduce the rate of turnover among younger and mostly white employees. In doing so, HPD engaged in a pattern of racial discrimination and retaliation based on the failure to promote minority employees, such as Plaintiffs.

74.     Pursuant to HPD's preferential policies and customs, these newer, younger and white employees were provided special treatment and diverse opportunities to move and advance within various HPD programs and, in some instances, from division to division, providing them with a more diverse and deeper overall experience within HPD.

75.     Defendant City through HPD did not offer comparable opportunities to Plaintiffs, and other employees, who were older and predominantly non-white.

76.     Defendant HPD's deliberate policies and customs of providing special opportunities and exposure to these younger, white employees enhanced their professional growth and led to guaranteed career advancement and salary increases. These opportunities often manifested in high-profile and premiere projects that garnered publicity for HPD.

77.     In contrast, HPD has acknowledged that older employees, such as the Plaintiffs, are viewed only as a resource for leveraging information and for nurturing and training the newer hires. That perception at HPD, together with the active policy and custom of favoring the newer, younger, mostly white employees, has marginalized the older and minority staff and has created an atmosphere within HPD that promotes and condones "career and salary stagnation" for the older employees above the age of 40 years, particularly those who are of African American, Hispanic, or otherwise of non-white race or ancestry.

78.     For several years following the institution of the discriminatory policies described above, Plaintiffs and other well-qualified staff have performed the same work as the newer, younger and non-minority employees with limited or no career advancement.

79.     Furthermore, Plaintiffs not only perform the same work as the younger, newer and non-minority employees, they are frequently paid less and given heavier and more onerous duties and assignments, including training the newer employees to perform duties of positions to which Plaintiffs had been denied promotion and attendant pay increases.

80.     Plaintiffs have been consistently passed-over for promotions and salary increases, or simply not considered for career growth opportunities, in favor of younger, less experienced, and overwhelmingly white employees who have relied on the training and expertise of the Plaintiffs to navigate and gain experience in the various programs and departments within the Office of Development and throughout HPD. As a consequence, these younger, white employees often advanced to supervise the very Plaintiffs who have trained and developed them within the Agency.

81.     Defendants maintain a policy and custom of fast tracking younger, newer and white employees by placing them on high-profile and premiere development deals and giving

them more deals than older, non-white employees in an effort to enhance their image and promote them more quickly.

82.     In addition to the foregoing discriminatory and surreptitious tactics, Defendants would simply "stonewall" the Plaintiffs, by refusing to respond to their applications for open positions or formally inform them whether or not a decision had been reached or a candidate selected for such open positions. As a consequence, Plaintiffs and others similarly situated are discouraged from applying for promotional opportunities – the message to Plaintiffs being: "don't even bother."

83.     In or about April 2007, and partly in response to complaints regarding the Agency's preferential advancement policies, HPD's then-Commissioner, Shaun Donovan, commissioned a Staff Working Group to address issues surrounding career development within HPD in general and its Office of Development in particular.

84.     The published outcome of the Staff Working Group consistently identified that older, more experienced employees had strong resentment toward and dissatisfaction with existing obstacles to career advancement and the preferential hiring policies and practices within HPD.

85.     In or about September 2009, the President of Local 375, District Council 37, the Union representing the Plaintiffs, complained to HPD regarding the foregoing preferential and discriminatory employment practices.

86.     In or about September 2009, SINCLAIR and other HPD employees also protested these practices in a written complaint to Letitia James, who then served as a member of the New York City Council.

87.     The CITY, HPD and the named Defendants knew, and ought reasonably to have

known, that the consequence of these policies and customs was an adverse impact on the prospects, as well as on the terms and conditions of employment, of its older and minority employees.

88.     Defendants VISNAUSKAS and BEEN along with ENDERLIN and DARGA had the authority and discretion to create, implement, and continue to carry out the above municipal hiring policies and did not need permission outside of HPD from any other CITY employee or agency to make final decisions on hiring, promotions or salary increases.

### B.  HPD's Discriminatory Policies & Customs Continue

89.     Nonetheless, HPD, and especially HPD's Office of Development, has continued to systematically discriminate against their older and female employees of color.

90.     Women of color at HPD have been continuously denied opportunities for job growth, career advancement, promotions, and salary increases.

91.     Defendant CITY, through HPD, is engaged in a systematic policy and custom of swiftly advancing the careers of young, predominantly white employees. White employees sometimes receive two or three separate promotions within several years of being hired. Often, this practice has come at the expense of advancement opportunities for less favored classes of workers.

92.     Defendant CITY, through HPD, has continuously hired and promoted white employees that are recent graduates with little or no job experience despite the availability of older, non-white candidates who were more qualified.

93.     Often, white employees have been hired as Project Managers, often within HPD's storm recovery programs, and quickly promoted to Deputy Director and ultimately to Director of an HPD program.

94.     In some cases, new positions have been created and quickly filled by white employees.

95.     For example, HPD hired and fast-tracked Jeremy Hoffman ("Hoffman"), a white male, under 40 years old, to a senior position even though he had little relevant work experience.

96.     Hoffman was first hired by HPD in April 2013 as a Project Manager.

97.     By July 2014, only about fifteen months after having been hired, Hoffman was promoted to the position of Senior Policy Analyst, a position in which he had many of the same duties as in his previous job, but yet received a salary increase of almost $5,000.

98.     In or about March 2015, less than a year after his first promotion, Hoffman was promoted again to the position of Director of Housing Preservation Opportunities, with a salary increase of nearly $15,000.

99.     Defendant DARGA, who was Hoffman's supervisor, subsequently expanded his role by taking away certain responsibilities from Plaintiff SEATON, a black female employee over 40 years old.

100.    In June 2016, Hoffman was further advanced and given the new role of Director of Leveraged Preservation Programs.

101.    In July 2017, Hoffman was also promoted to Executive Director for Multifamily Programs (MPP), a new position.

102.    As a second example, Sean Almonte ("Almonte"), a white male under 40 years old, was hired in October 2014, and swiftly promoted through the ranks at HPD.

103.    HPD hired Almonte as a Project Manager in the Multifamily Storm Recovery unit also known as "Build it Back."

- 13 -

104.     In April 2015, only six months after his hire, HPD promoted Almonte to Deputy Director, Multifamily Storm Recovery & Resiliency Lending Program and increased his salary by $5,000.

105.     In April 2016, one year after his first promotion and only eighteen months after his initial hiring at HPD, Almonte was promoted a second time, and made Director, Multifamily Storm Recovery & Resiliency Lending Program, with a salary increase of $15,000.

106.     Since 2013, a number of other young, white employees have been hired and quickly promoted within HPD's Office of Development; often these employees were hired to work in the "Build it Back" program – a program that has been criticized in the media for its shortcomings.

107.     Conversely, older, non-white employees have not had access to equivalent opportunities that were afforded young, white employees. Instead, HPD has consistently passed over their older, black and minority, female employees, including the Plaintiffs, for promotions in favor of younger, less experienced, and overwhelmingly white employees.

### C. Defendants Maintain a Race-Neutral Hiring and Promotional Policy that has a Disparate Impact on Black, African American and Older Candidates for HPD Managerial Positions

108.     In addition to intentional discrimination, Defendants' policy of hiring and fast-tracking recent graduates into managerial positions is a race-neutral policy that has a disparate impact on the promotional opportunities and pay increases of HPD's black and African American employees as well as black and African American external candidates.

109.     In short, Defendants' race-neutral policy has the unintended effect of taking promotions and pay increases away from highly-qualified black and African American employees and giving them to white employees.

- 14 -

110.    Based on the operation of Defendants' policy, such an adverse impact does not affect the hiring, promotional rate or pay increases of similarly-situated white employees seeking to be hired or promoted into a managerial position at HPD.

111.    Upon information and belief, the goal of Defendants' race-neutral policy is to attract and retain promising but inexperienced employees that can be molded into high-level managers and supervisors at HPD.

112.    Upon information and belief, the policy was adopted without discriminatory intent.

113.    Yet, the impact of the policy disproportionally benefits white candidates over black and African American candidates at a statistically significant rate.

114.    In addition to the use of undisciplined discretion in these hiring and promotional decisions, the race-neutral policy also creates a disparate impact by favoring candidates with certain academic credentials over experience and project-based results that are more typical of the black and African American candidates, such as Plaintiffs.

115.    The disparate impact of the initial hiring decisions are then further compounded by the policy's strategy of creating new managerial positions to give to the "rising stars" so HPD has a basis to justify giving that employee a salary increases and keeping the employee engaged and interested in working for HPD.

116.    As a result, the specific race-neutral practice of creating new positions for predetermined employees, has a disparate impact on black and African American employees who – at a statistically significant rate – do not receive these "custom tailored" promotions.

### D.  HPD's Retaliatory Use of Employee Performance Appraisals

117.    Since at least 2001, HPD's administration of Performance Appraisals to its

employees has been erratic.

118.    Results of Performance Appraisals were used, at all relevant times, to make promotional decisions and for career advancement.

119.    Although employees are supposed to receive Performance Appraisals each year, this is not done in practice.

120.    Some employees have not been evaluated for years or even for over a decade.

121.    Instead of administering regular and fair Performance Appraisals, HPD has used Performance Appraisals as an offensive weapon against disfavored employees.

122.    In particular, HPD has used performance appraisals as a mechanism to retaliate against employees, including SINCLAIR and GONSALVES, who complained about or resisted HPD's unfair and discriminatory employment practices.

**VI.    Plaintiff LEWIS**

**A. LEWIS' Skill, Qualifications, and Experience**

123.    Plaintiff LEWIS is a 47-year-old black woman who has worked continuously at HPD for eleven years.

124.    LEWIS is a well-qualified employee with substantial specialized training and experience relating to work on housing development and preservation projects.

125.    LEWIS holds a Master's degree in Environmental and Occupational Health Sciences from Hunter College.

126.    LEWIS was first hired by HPD as a Project Manager in April 2006.

127.    LEWIS has not received a performance evaluation since November 2006.

128.    In her eleven years at HPD, LEWIS has successfully undertaken the important work of the department and gained substantial experience.

- 16 -

continuation of, the wage discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant CITY willfully violated the New York Equal Pay Law by intentionally paying GONSALVES less than similarly-stituated men.

412.    GONSALVES is therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorney's fees and costs for all willful violations.

### THIRTEENTH COUNT ON BEHALF OF GONSALVES AGAINST DEFENDANT CITY
**(Sex Discrimination in Violation of Title VII)**

413.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

414.    Defendant CITY has discriminated against Plaintiff GONSALVES by paying her lower than similar situated male colleagues on the basis of her gender, even though she performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

415.    Defendant CITY had the discretion to raise Plaintiff GONSALVES salary to provide her equal pay for equal work, but refused.

416.    Because of the Defendants CITY's unequal pay, Plaintiff GONSALVES suffered loss and damage in an amount to be determined at trial.

### FOURTEENTH COUNT ON BEHALF OF GONSALVES AGAINST DEFENDANTS CITY, ENDERLIN, ROZENZAFT AND BAUMEL
**(Sex Discrimination in Violation of NYSHRL and NYCHRL)**

417.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

418.    Defendants have discriminated against Plaintiff GONSALVES by paying her lower than similar situated male colleagues on the basis of her gender, even though she

performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

419.   Defendants had the discretion to raise Plaintiff GONSALVES salary to provide her equal pay for equal work, but refused.

420.   Because of the Defendants' unequal pay, Plaintiff GONSALVES suffered loss and damage in an amount to be determined at trial.

## FIFTEENTH COUNT ON BEHALF OF GONSALVES AGAINST
## DEFENDANTS CITY, ROZENZAFT, BAUMEL AND DUNN
### (Retaliation in Violation of the EPA, Section 215(a)(3))

421.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

422.   By the acts described above, Defendants retaliated against Plaintiff GONSALVES for her complaints against and resistance to discriminatory and unfair employment practices in violation of the EPA.

423.   Because of Defendants' retaliatory conduct, GONSALVES has suffered loss and damage in an amount to be determined at trial.

## SIXTEENTH COUNT ON BEHALF OF GONSALVES
## AGAINST DEFENDANT CITY
### (Retaliation in Violation of Title VII)

424.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

425.   By the acts described above, Defendant CITY retaliated against Plaintiff GONSALVES for her complaints against and resistance to discriminatory and unfair employment practices in violation of Title VII.

426.   Because of Defendants CITY's retaliatory conduct, GONSALVES has suffered loss and damage in an amount to be determined at trial.

## SEVENTEENTH COUNT ON BEHALF OF SEATON
## AGAINST DEFENDANT DARGA
### (Hostile Work Environment in Violation of
### Sections 1981 and 1983, and the NYSHRL and NYCHRL)

427.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

428.  On account of her race, Defendant DARGA and others acting on her behalf, have continuously and to date subjected Plaintiff SEATON to a pattern of harassment which had the effect of unreasonably interfering with SEATON's work performance and creating an intimidating, hostile and offensive work environment that seriously affected the psychological well-being of Plaintiff.

429.  By reason of the foregoing, Plaintiff SEATON has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

## XII.   PUNITIVE DAMAGES

430.   By reason of the wanton, unrepentant, reckless, and egregious conduct of the individual Defendants, Plaintiffs claim punitive damages.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a)  Issue an order for the following preliminary injunctive relief:

   i.   Enjoining the CITY from continuing with its policy and custom of classifying HPD employees on the basis of age for purposes of promotion, salary increases, and career advancement opportunities;

   ii.  Enjoining the CITY from the further withholding merit-based salary increases, promotion, and career advancement opportunities

- 58 -

to Plaintiffs who are Hispanic, African American or non-white; or are over the age of 40 years.

b) Issue a judgment declaring that the CITY's policy and custom of disparate treatment of its HPD employees who are Hispanic, African American or non-white; or are over the age of 40 years, is unlawful in that it violates Section 1981 and the laws of New York State and New York City;

c) Award compensatory damages for all causes of action in amounts that are fair, just and reasonable, to be determined at trial;

d) Award punitive damages for all causes of action;

e) Award Plaintiffs attorney's fees pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 216(b), and the NYCHRL;

f) Award all Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988, 29 U.S.C. § 216(b), and New York City Human Rights Law; and

g) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
December 21, 2017

Respectfully Submitted,

SAMUEL O. MADUEGBUNA (6084)
MADUEGBUNA COOPER LLP
Attorneys for Plaintiffs
30 Wall Street, 8th Floor
New York, New York 10005
(212) 232-0155

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------- x

RICARTE ECHEVARRIA,

                                 Plaintiff,

             -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT; and ANNE-MARIE
HENDRICKSON, in her official and individual
capacity,

                                Defendants.

--------------------------------------------------------------------------- x

**STIPULATION
OF DISMISSAL
WITH PREJUDICE**

17 Civ. 6073 (AT)

       **IT IS HEREBY STIPULATED AND AGREED** by and between the parties as

represented by their attorneys below, that, pursuant to Rule 41(a)(1)(ii) of the Federal Rules of

Civil Procedure, the above-captioned action be, and it hereby is, withdrawn, discontinued, and

dismissed, with prejudice and without costs, expenses or fees of any kind to any party.

Dated: Park Ridge, New Jersey
        February 15 , 2018

**KRAKOWER DICHIARA LLC**
Attorneys for Plaintiff
77 Market Street, Suite 2
Park Ridge, New Jersey 07656
(201) 746-0303
tk@kdlawllc.com

Dated: New York, New York
        February 15 , 2018

**ZACHARY W. CARTER**
Corporation Counsel of the
   City of New York
Attorney for Defendants
100 Church Street, Room 2-112
New York, New York 10007-2601
(212) 356-4078
mconnaha@law.nyc.gov

By: _____
               Todd Krakower

By: _____
               Matthew J. Connahan
               Assistant Corporation Counsel

Todd Krakower, Esq.
Krakower DiChiara LLC
77 Market Street, Suite 2
Park Ridge, NJ 07656
Telephone: 201-746-0303
Fax: 347-765-1600

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
RICARTE ECHEVARRIA,

     Plaintiff,

  -against-


CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT; and
ANNE-MARIE HENDRICKSON, in her official
and individual capacity,

     Defendants.
--------------------------------------------------------x

    **COMPLAINT**

    **CIVIL ACTION NO.**

    **DEMAND FOR JURY TRIAL**

   Plaintiff, by his attorneys, KRAKOWER DICHIARA LLC, complaining of the Defendants,

respectfully alleges, upon information and belief, as follows:

       **INTRODUCTION**

   1.  Plaintiff brings this action seeking monetary and equitable relief based upon

Defendants' violations of 42 U.S.C. Section 1983 and New York Civil Service Law Section 75-b

(hereinafter "CLS § 75-b") as a result of maltreatment and retaliatory actions taken against him.

   2.  Plaintiff seeks economic and compensatory damages and punitive damages to the

extent allowable by law, and other appropriate legal and equitable relief pursuant to federal and

state law.

**JURISDICTION AND VENUE**

3.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) as this matter involves a federal question.

4.      This Court has supplemental jurisdiction over the New York state law claims under 28 U.S.C. § 1367(a), as they are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

**THE PARTIES**

**Defendants.**

7.      The Department of Housing Preservation and Development ("HPD") is, and at all times material hereto was, a public employer as that term is defined by N.Y. CLS Civ. S. §75-b and is an agency of Defendant City of New York.

8.      At all times relevant to this Complaint, Defendant HPD employed Plaintiff.

9.      At all times relevant herein, Defendant Anne-Marie Hendrickson was the Deputy Commissioner of the Office of Asset and Property Management within HPD.

2

10.     At all times relevant to this Complaint, Defendant City of New York employed Plaintiff.

**Plaintiff**

11.     Plaintiff Ricarte Echevarria ("Plaintiff") is a resident of Kings County in the State of New York.

12.     Plaintiff was employed by Defendants as Director of the Tenant Interim Lease Program at HPD from August 24, 2015 until September 9, 2016 when he was wrongfully terminated.

**FACTS**

13.     While employed at the City's HPD, Plaintiff was responsible for the day-to-day operations of the Tenant Interim Lease Program (TIL).

14.     The TIL Program assists organized tenant associations in City-owned buildings to develop economically self-sufficient low-income cooperatives where tenants purchase their apartments for $250.

15.     Tenant associations enter into a lease with the City to maintain and manage the buildings in which they live.

16.     Each tenant association participating in the TIL Program has a Net Lease with HPD that conveys property management and building operations to the Tenants' Association, including tenant selection.

17.     Each Tenants' Association operates under by-laws that specifically govern tenant selection procedures and protocols.

18.    Per the relevant rules and procedures, HPD's only involvement in tenant selection is approving each tenant selected by the Tenant Associations.

19.    Shortly after Plaintiff began working for HPD, Plaintiff began raising concerns about various unlawful activities to his supervisors and to the New York City Department of Investigation ("DOI").

20.    Shortly after Plaintiff began working for Defendant HPD, Plaintiff began raising issues to his supervisors and to the DOI, which Plaintiff reasonably believed to constitute improper governmental action.

21.    Specifically, in January 2016, Defendant Hendrickson—Deputy Commissioner of the Office of Asset and Property Management and Plaintiff's supervisor—sent Plaintiff an email directing him to grant an apartment in one of the buildings he managed for Mr. Brown.

22.    At all times relevant to this Complaint, Mr. Brown was an individual who was a resident of another state and a relative of an employee in the NYC Law Department.

23.    As Mr. Brown was a resident of another state, providing Mr. Brown with one of the low-income apartments violated relevant laws and regulations.

24.    Upon information and belief, Mr. Brown was not selected or approved by any Tenant Association.

25.    Plaintiff met with Vivian Louie—Assistant Commissioner of the HPD—in her office, and complained that giving Mr. Brown an apartment was unlawful because Mr. Brown did not meet any criteria or administrative purpose for receiving such an apartment.

26.    Ms. Louie responded that she "hated when [Defendant Hendrickson] does stuff like this."

27.     Ms. Louie further conceded that Mr. Brown did not meet any of the required criteria to be granted an apartment within the TIL Program.

28.     Nevertheless, over Plaintiff's objections, Defendant Hendrickson and Ms. Louie proceeded to provide an apartment for Mr. Brown.

29.     Plaintiff reasonably believed Defendant Hendrickson's and Ms. Louie's actions to constitute improper governmental action.

30.     In May 2016, Plaintiff reported Defendant Hendrickson's and Ms. Louie's unlawful actions to the New York City Department of Investigation (DOI).

31.     Plaintiff met with Deputy Inspector General David Jordan in Plaintiff's office and complained of Defendant Hendrickson's and Ms. Louie's unlawful actions.

32.     Plaintiff informed Mr. Jordan that he would provide the DOI with documents regarding his complaint once Plaintiff received an apartment inspection report for the apartment selected by Mr. Brown.

33.     Accordingly, on August 12, 2016, Plaintiff sent an email to Mr. Jordan and Ondie Frederick, an employee of the DOI, with documents related to Mr. Brown's unlawful apartment selection, as well as a copy of the email from Defendant Hendrickson instructing Plaintiff to grant Mr. Brown an apartment.

34.     On August 18, 2016, Plaintiff met with Mr. Jordan and Ms. Frederick to discuss Plaintiff's concerns regarding the legality and propriety of providing Mr. Brown with an apartment through the TIL Program.

35.     During the August 18, 2016 meeting, Plaintiff, Mr. Jordan, and Ms. Frederick discussed whistle-blower protection for Plaintiff.

36.     During the August 18, 2016 meeting, Mr. Jordan exclaimed that the selection of apartment for Mr. Brown through the TIL program "wreaks of impropriety!"

37.     Shortly thereafter, on August 29, 2016, Deputy Director Joan Smith walks into Plaintiff's office and informs Plaintiff that the DOI requested a copy of the apartment scope for the apartment linked to Mr. Brown.

38.     Plaintiff instructed Ms. Smith to provide the DOI with any documents they requested.

39.     Later in the day on August 29, 2016, Ms. Louie sends an email to Plaintiff directing Plaintiff to provide Ms. Louie with full access to Plaintiff's calendar.

40.     At no point in Plaintiff's employment as Director prior to his complaints to the DOI had Ms. Louie requested full access to Plaintiff's calendar.

41.     Plaintiff called the DOI and spoke with Ms. Frederick about Ms. Louie's calendar request.

42.     Ms. Frederick consulted with Jessica Heegan, Inspector General for HPD, and then Ms. Frederick instructed Plaintiff to delete all calendar events reflecting his meetings with the DOI and then to provide Ms. Louie with access to Plaintiff's calendar.

43.     The DOI began scheduling interviews and investigating Plaintiff's complaints in mid-August 2016.

44.     Immediately thereafter, on September 9, 2016, Defendant Hendrickson summarily and unlawfully terminated Plaintiff in retaliation for his complaints.

45.     Plaintiff was terminated in retaliation for his complaints to governmental bodies.

46.     Plaintiff was terminated in retaliation for his complaints to the DOI.

47.     Plaintiff was terminated in violation of NY Civil Service Law § 75-b.

48.     Defendants committed the above alleged acts knowingly, intentionally and willfully.

### FIRST CLAIM FOR RELIEF
### RETALIATION AGAINST PLAINTIFF FOR EXERCISING FREEDOM OF SPEECH IN VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS AND §1983

49.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

50.     Plaintiff's complaints to Defendants' regarding Defendants' unlawful actions were made as a private citizen.

51.     By complaining of the government's unlawful usage of governmental housing and public funds, Plaintiff complained of a matter of public concern.

52.     While acting under color of State Law, Defendants violated Plaintiff's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to matters of public concern by being an informant and/or reporting of unethical practices regarding improper governmental actions.

53.     As a proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of N.Y. CLS Civ. S. §75-b)

54.     Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

55.     Section 75-b of the New York Civil Service Law provides: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

56.     Plaintiff reasonably believed Ms. Hendrickson and Ms. Louie engaged in improper governmental actions.

57.     Plaintiff complained to his supervisors about actions Plaintiff reasonably believed to constitute improper governmental action.

58.     By complaining to his supervisors about actions Plaintiff reasonably believed to constitute improper governmental action, Plaintiff engaged in protected activity pursuant to N.Y. CLS Civ. S. §75-b.

59.     Plaintiff provided his supervisors reasonable time to take appropriate action in response to his complaints of improper governmental action.

60.     Plaintiff's supervisors failed to take any actions to remedy the issues complained of by Plaintiff.

61.     Plaintiff also complained to the DOI about actions Plaintiff reasonably believed to constitute improper governmental action.

62.     By complaining to the DOI about actions Plaintiff reasonably believed to constitute improper governmental action, Plaintiff engaged in protected activity pursuant to N.Y. CLS Civ. S. §75-b.

63.     In response to Plaintiff's complaints of improper governmental action, Defendants subjected Plaintiff to unlawful personnel action.

64.     In response to Plaintiff's complaints of improper governmental action, Defendants unlawfully terminated Plaintiff.

65.     As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages in amount to be determined at trial and attorneys' fees, as provided by N.Y. CLS Civ. S. §75-b.

WHEREFORE, Plaintiffs demand judgment against the Defendant in an amount in excess of the jurisdictional limits of the lower courts, together with the costs and disbursements of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     An award of damages, according to proof, including liquidated damages, to be paid by Defendants;

B.     Penalties available under applicable laws;

C.     Costs of action incurred herein, including expert fees;

D.     Attorneys' fees, including fees pursuant to applicable statutes;

E.     Pre-Judgment and post-judgment interest, as provided by law; and

F.      Such other and further legal and equitable relief as this Court deems necessary,

just and proper.

Dated:   Park Ridge, New Jersey        Respectfully submitted,
         August 11, 2017
                                        KRAKOWER DICHIARA LLC

                                        By:

                                        ____s/ Todd Krakower_____

                                        Todd Krakower

                                        One Depot Square
                                        77 Market Street, Suite 2
                                        Park Ridge, New Jersey 07656
                                        201-746-6333
                                        347-765-1600 (fax)

                                        *Attorneys for Plaintiff*


**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to
which they have a right to jury trial.

# EXHIBIT F

### *Defendants Corruption of the State-related Proceedings*
### *Disregard for the Rules of Professional Conduct*
### *and Breach of Fundamental Fairness*

1. Pursuant to the 14th Amendment of the US Constitution: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

2. Due process includes the right to an impartial judge who will apply the law equally and fairly, avoid conduct rising to the appearance of impropriety, and recuse themselves from proceedings where the adjudicator's impartiality could be reasonably questioned[1].

3. By virtue of CPLR 321 (a) a pro se litigant the right to self represent himself in the State of New York. No judge, court attorney, court clerk, opposing counsel or any other court employee has the authority to deprive a pro se litigant of due process, to include the cardinal right to an impartial tribunal.

4. Under to 28 U.S.C. Section 455, a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned", or "where he has a personal bias or prejudice concerning a party", or when the judge or a member of his or her immediate family has a relevant financial interest.

5. Pursuant to 28 U.S.C. Section 144, when a party files a timely and sufficient motion that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, the case is transferred.

6. Pursuant the Judiciary Law § 487 an attorney who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is subject to civil and criminal liability. Further, it is settled that Judiciary Law § 487 focuses on the attorney's intent to deceive, rather than the deceit's success[2].

---

[1] The New York Bar Judicial Rules of Professional Conduct.
[2] *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

7. Rule 3.3 of the ABA Rules of Professional Conduct ("The ROC Rules") provides that lawyers are obliged to protect the courts from criminal or fraudulent conduct that undermines the integrity of the adjudicative process.

8. This includes the prohibition against destroying/modifying evidence as well as turning a blind eye to a client's engagement in such conduct. The ROC Rules also provide that once a lawyer becomes aware of their client's criminal or fraudulent- they are obligated to share such information with the court, rather than continue protecting the criminal or fraudulent conduct.

9. The pervasive manner in which the Defendants and their co-conspirators have- and continue to- nonchalantly defy and render the aforesaid provisions of law ("Integrity Laws") null and void has horrified countless objective legal minds who reviewed the record.

10. Rather than protect the Defendants by offering post-facto justifications, the Judiciary, respectfully, should demonstrate a zero-tolerance stance visa-vi Defendants willingness to corrupt the judicial process.

11. **<u>ARGUMENT:</u> _In Light of the Substantial Evidence Proving that the Defendants Corrupted the Random Process by which Cases Are to Be Assigned- Plaintiff argues that the Burden of Persuasion Should Shift onto the Defendants who Must Justify Each Instance in Which Plaintiff's Due Process was Violated._**

I. **_<u>Defendants Egregiously Corrupted the Judicial Process on October 02, 2019, by Colluding with Ms. Holmes, and Denying Plaintiff of Due Process</u>_**

12. On October 02, 2019, upon due consideration of the motion papers submitted to the Appellate Division First Department ("Appellate Division"), the Honorable Appellate Justice Webber ("Justice Webber") issued an order that renewed the Temporary Restraining Order ("TRO") first issued by the Hon. Trial Court Part 56 ("the Court") on July 18, 2019. The TRO temporarily barred the Defendants from leasing out additional apartments in Waterline Square to applicants with a lower priority than Plaintiff.

13. At that point in time, Defendants had admitted that they were processing applicants with much lower priorities than Plaintiff's priority #103 out of 74,000 (accounting for the community board 7 preference, as stated and confirmed by Defendant Gabriel Mombrun- project manager at Waterline Square).

14. This meant that renewal of the TRO meant Defendants would be barred from leasing out any additional one bedroom apartments. Accordingly, it would be highly implausible for Defendants to continue to deny Plaintiff of the only affordable opportunity he ever qualified for.

15. In fact, if the Defendants were willing to freeze the entire lease-up solely to deny Appellant, this would substantiate Appellant's argument that Defendants fierce opposition has nothing to do with the official excuses conjured. Furthermore, Defendants Counsel admitted on multiple occasions that more than anything, her clients did not want to freeze the process, and if the TRO was reinstated, the Defendants would likely settle.

16. As such, it is critical to appreciate the overwhelming relief, joy, and gratitude Plaintiffexperienced when Justice Webber, upon due consideration, reinstated the TRO.

17. At that time, Plaintiff was coping with public shelters during the Jewish holiday of Succot. Plaintiff knew that this decision put him inches from the outcome that Plaintiff argues was- and still- heavily warranted as a matter of law and equity.

18. Had the Defendants not egregiously corrupted the judicial process, Plaintiff would likely have been spared from the hell he endured, as of October 02, 2019.

19. Prior to the Appellate Court Attorney, Ms. Lauren Holmes ("Ms. Holmes") taking the motion papers to Justice Webber, Plaintiff was subjected to a flurry of disgusting, unmerited, and berating remarks from Ms. Holmes, which were heard by multiple parties in the vicinity.

20. For example, Ms. Holmes stated, *inter alia,* that: (a) Defendants justifiably didn't want to settle because Plaintiff was a pain in the neck (b) Plaintiff's application for relief was without merit (c) the Hon. Judge would likely refuse to renew the TRO. All of these comments were extremely unprofessional and uncalled for. It is noted that several disparaging remarks were made by the Appellate Division staff to the effect of "how annoying pro se litigants are to deal with".

21. Furthermore, when Ms. Holmes came back with the signed order in hand, she stated out loud: "surprise, surprise, the relief was granted".

22. Justice Webber reinstated the TRO as written by the Court. Plaintiff was given a piece of paper which likely meant he would be free from homelessness. Ms. Holmes then explained the process to both parties, and entered October 04, as the date Plaintiff should serve the TRO, and further entered answer due date, and a reply date.

23. The Defendants counsel, Defendant Schonfeld (HPD), an attorney for BG named Phillip Shreiber (Ms. Williams was on vacation) and another paralegal (collectively "Counsesl") were all visibly angry. They asked Ms. Holmes if the terms of the TRO could be modified.

24. Ms. Holmes responded loud and clear: "No". As the TRO was already issued, "any request for modification needs to be submitted in your opposition papers".

25. Defendants Counsels left the Clerk's Office.

26. Plaintiff took a deep breath. A home, belated justice, and the ability to help Mother were all within reach for the first time. Plaintiff sat down and reviewed the language of the TRO. He got up and asked Ms. Holmes if there was a way to enforce the TRO if Defendants violated it. Her response frightened Plaintiff. He sat back down, texted his mother and father, shared the good news, and a picture of the TRO. Plaintiff started gathering his personal belongings.

27. Due process, fundamental fairness, equal protection under the law, finality of judgement, and the proper legal decorum- all demanded that Plaintiff was entitled to rely on the fact proceedings had concluded. This is especially true as a pro se litigant. In the legal profession, there is no precedent for parties who disagree with a valid order to demand, post-proceedings, that the order should be substantially-modified as to suit their specifications. Rather, it is settled that any such request must be in writing, with notice, and served properly.

28. As such, what followed was a despicable abuse of authority, profound violation of fundamental fairness, and more than anything, attested to Defendants credo that they are above-the-law.

29. Approximately ten minutes later, Defendants Counsels stormed back into the Clerk's Office, walked up directly to Ms. Holmes, and said something in low voice

to Ms. Holmes that Plaintiff did not hear. Plaintiff was confused as to what was happening, and walked over. It was revealed that Defendants Counsels called partners in their firms to share the news. The partners weren't happy, and instructed Defendants Counsels to go back into the Clerk's Office and attempt to modify the TRO.

30. Plaintiff was certain that Ms. Homeless would repeat the same answer: any such modification has to be in writing, with proper notice. There is no back door that is exclusively available to privileged parties, such as powerful partners in a law firm, or for high-ranking lawyers in corporation counsel.

31. Instead, Ms. Holmes sprang into action, indicating that she would help the Defendants. Plaintiff protested. Ms. Holmes ignored. Plaintiff pleaded with Ms. Holmes to recognize that her actions were outrageous and inconsistent with the rule she had just stated. Plaintiff further asked: how could she do this post proceedings: "what if I had already left the room?" Plaintiff asked.

32. Ms. Holmes responded with a sadistic smile, and proclaimed: "oh... now you really wish you had left the room... but you didn't!".

33. In desperation, Plaintiff pleaded with Defendants Counsels to recognize that their actions were improper, a breach of a lawyer's oath, and they could face discipline. In response, they laughed.

34. Ten minutes later, Ms. Holmes returned from an ex-parte conversation with Justice Webber, in which Plaintiff was deprived of a fundamental right to be heard. The TRO was modified to suit the exact demands of Defendants: instead of stopping the leasing process, Defendants only had to set aside the last available studio or one bedroom apartment. This gave Defendants the inspiration they needed to resort back to the ruthless, inhuman disregard for the fact they had just sentenced Plaintiff back into shelter.

35. A clerk who witnessed the bizarre episode stated that they never had never seen an Order changed in such a manner. The clerk even suggested that if Plaintiff simply ran out of the building, it is possible that the original TRO would still be in effect. If in the past five years, there is not a single time where the Appellate Division allowed for a signed, valid order to be modified in this manner, is the

Plaintiff not correct to assert that Defendants corrupted the judicial process, and deprived him of his fundamental rights?

## II.   ***Ms. Holmes Corrupted The Judicial Process a Second Time Pursuant to Her Collusion to Modify A Valid Order on October 02, 2019***

36. On November 25, 2019, the Honorable Appellate Justice Rosalyn R. Richter ("Justice Richter") held a conference with all parties regarding Plaintiff's Motion to Compel Compliance with the FOIL. In this conference, Justice Richter asked the Defendants to comply with their stated guarantee to expedite a single document they had promised to expedite on October 16, 2019, but which was still not delivered.

37. Furthemore, it was ordered that the Appellate Division will defer discussion of Plaintiff's Motion until December 13, 2019, in order for Plaintiff to be given a fair chance to access and submit, as part of his Reply, critical FOIL information withheld by Defendants, and deleted from the administrative record, in violation of of CPRR 7804 (e). Justice Richter further instructed Ms. Holmes to make sure the motion sleeve would be labeled as adjourned and placed accordingly.

38. The order stated: "Per RHR, if document sought per FOIL is obtained by 12/13/19, Appellant may submit it to be considered with motion- 7793".

39. Upon receiving in his hand a copy of the order, Plaintiff had a justifiable reliance that this order would be honored. Similarly, it was appropriate for Plaintiff to assume that Ms. Holmes would comply and file the motion sleeve as "adjourned".

40. Plaintiff requests for Defendants to explain why Ms. Holmes, the same person with whom Defendants colluded on October 02, 2019, to change a valid order- ignored the clear instruction given to her a second valid order, to docket the motion as adjourned. On December 05, 2019, the Appellate Division went ahead, disregarded the Justice Richter's order, deciding it on December 05, 2019. Even more egregious is the fact that the FOIL request which eventually came on December 05, 2019 contained multiple omissions of troubling documents that heavily support Plaintiff's allegations.

Attorney for Movant

Name _____ Abraham Gross, Pro Se _____

Address _____ Volunteers for America _____

_____ 65 Charles Gay Loop, NY, NY, 10035 _____

Tel. No. _____ 917 673 1848 _____

Appearing by _____

_____

_____

_____

_____

Attorney for Opposition

Ms. Samantha Schonfeld

Corporation Counsel

100 Church Street, NY, NY, 10007

212 356 2183

Mr Philip G. Schreiber

Kellner Herlihy Getty + Friedman LLP

Attorneys for Breaking Ground

470 Park Avenue South - 7N

New York, NY 10016

---

**(Do not write below this line)**

DISPOSITION

Relief

Interim granted only to the
Extent temporary restraining Respondent
from leasing out any apartments in
Riverside Square that is subject to the
lottery in which the petitioner participates
to any person who is lower on that list
than petitioner pending determination of
the motion by the full bench.

TKW  Justice

tion Date 10/28/19     Opposition 10/21     Reply 10/28     [date] 2/15

PEDITE ___✓___ PHONE ATTORNEYS _____ DECISION BY _____

PAPERS TO BE SERVED PERSONALLY.                    ELH
                                                Court Attorney

ng papers to be served by 10/4/19 by 1:00 pm in hand

"Revised 06/18"

FILED: NEW YORK COUNTY CLERK 03/02/2020 05:11 PM
NYSCEF DOC. NO. 36

INDEX NO. 101960/2019
RECEIVED NYSCEF: 03/02/2020

---

| Attorney for Movant | Attorney for Opposition |
|---|---|
| Name    Abraham Gross, Pro Se | Ms. Samantha Schonfeld |
| Address    Volunteers for America | Corporation Counsel |
| 65 Charles Gay Loop, NY, NY, 10035 | 100 Church Street, NY, NY, 10007 |
| Tel. No.    917 673 1848 | 212 356 2183 |

Appearing by _____

Mr Philip G. Schreber
Kellner Herlihy Getty + Friedman LLP
Attorneys for Breaking Ground
470 Park Avenue South – 7N
New York, NY 10016

---

**DISPOSITION**

(Do not write below this line)

Revised

Relief

Interim granted only to the
Extent temporary restraining Respondent
from leasing out one Studio apartment and one
apartments in (1 bed.
Riverside Square That is Subject to the
lottery in which The petitioner participates
to any person who is lower on that list
than petitioner pending determination

Motion Date 10/28/19   Opposition 10/21   Reply 10/28    2/15

EXPEDITE ____✓    PHONE ATTORNEYS ____    DECISION BY ____

ALL PAPERS TO BE SERVED PERSONALLY.                    Court Attorney

re motion by the full bench.

ring papers to be served by 10/4/19 by 1:00 pm in hand

"Revised 06/18"

FILED: NEW YORK COUNTY CLERK 03/02/2020 05:11 PM

NYSCEF DOC. NO. 37

INDEX NO. 10196

RECEIVED NYSCEF: 03/0

Attorney for Movant

Attorney for Opposition

Name  PRO SE LITIGANT- ABRAHAM GROSS

Address  NONE - DUE TO RESPONDENTS UNCOMPROMISING REFUSAL TO HONOR THE HON.
COURT'S DETERMINATION THAT A SETTLEMENT IS WARRANTED.

Tel. No.  917-673-1848

Appearing by

Ms. Samantha Schonfeld, Counsel for HPD

Ms. G. Williams, Counsel for Breaking Ground

(Do not write below this line)

DISPOSITION

motion denied
no appealable order

(per RHR, if document sought per FOIL is obtained by 12/13/19, Pet'r may
submit it to be considered w/ M-7793)

Justice      RHR                    Date  11/25/19

Motion Date _____ Opposition _____ Reply _____

EXPEDITE _____ PHONE ATTORNEYS _____ DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.

Court Attorney

FILED: NEW YORK COUNTY CLERK 03/02/2020 05:11 PM          INDEX NO. 10196

NYSCEF DOC. NO. 37                                    RECEIVED NYSCEF: 03/0

Present - Hon. David Friedman,          Justice Presiding,
          Troy K. Webber
          Ellen Gesmer
          Cynthia S. Kern,          Justices.
---------------------------------------x
Abraham Gross,
      Petitioner-Appellant,

          -against-                         M-7793
                                      Index No. 101081/19

Affordability Oversight Program of
Department of Housing Preservation
and Development, et al.,
      Respondents-Respondents.
---------------------------------------x

        An appeal having been taken to this Court from an order and
judgment (one paper) of the Supreme Court, New York County,
entered on or about  August 16, 2019, which denied the petition
and upheld the determination denying petitioner's application for
a rental apartment at Waterline Square,

        And petitioner-appellant having moved for reinstatement of
the interim order of Supreme Court, New York County, entered on
or about July 18, 2019, to the extent that it limited
respondents' ability to lease any apartment at Waterline Square
that is subject to the lottery in which petitioner participated,
to any person who is lower on the list then petitioner, pending,
among other things, "release of critical information purposefully
omitted from the record," "expedition of FOIL request to release
material documents," and "a rational explanation" as to why he
should not qualify, and for other and alternative relief,

        Now, upon reading and filing the papers with respect to the
motion, and due deliberation having been had thereon,

FILED: NEW YORK COUNTY CLERK 03/02/2020 05:11 PM          INDEX NO. 10196

NYSCEF DOC. NO. 37                                         RECEIVED NYSCEF: 03/0

It is ordered that the motion is denied in its entirety, and the interim relief granted by the order of a Justice of this Court, dated October 2, 2019, is vacated.

ENTERED: December 5, 2019

CLERK

### III. _Why Did the Court To Which Defendants Steered This Case Repeatedly Set Aside Well-Established Law_

41. Why did the Court assert that "vacatur of a judgment pursuant CPLR § 5105 (a) (3) only applies to a party's commission of extrinsic fraud", and that any argument of intrinsic fraud is precluded[3], by referencing two cases[4] which are irreconcilable, respectfully, with the Court's argument. The Court argues these cases to hold that:

> "5015 (a) (3) only applies to a party's commission of extrinsic fraud".

Contrary to the Court's stance, respectfully, the first case held[5]:

> "In any event, the appellant failed to demonstrate a reasonable excuse for the default, which is required when a CPLR 5015 (a) (3) motion alleges intrinsic fraud" _(LaSalle Bank N.A. v Oberstein, 146 AD3D, 2017);_

whereas the second case held:

> "thus, the appellants were required to show a reasonable excuse for their default" (_Wells Fargo_ V. Colletta, 153 AD3D (2017).

Furthermore, the Appellate Division[6] referenced the said cases as follows:

> "5015 (a) (3) applies to a party's commission of both extrinsic fraud and intrinsic fraud", except that the latter requires "a defendant to demonstrate a reasonable excuse for her default and a potentially meritorious defense[7]".

And critically, the Court of Appeal itself held[8]:

---

[3] The Sanctions Order, Page 11.

[4] LaSalle Bank N.A. v Oberstein, 146 AD3D (2017); Wells Fargo V. Colletta, 153 AD3D (2017).

[5] LaSalle Bank N.A. v Oberstein, 146 AD3D (2017);

[6] _Bank of N.Y. Mellon Trust Co., N.A. v Ross, 170 AD3d 931 (2019)._

[7] _Bank of N.Y. Mellon Trust Co., N.A. v Ross, 170 AD3d 931 (2019)_

[8] (Wilson Vs. Galicia, 36 AD3D 695, 2008 quoting Oppenheimer v Westcott, 47 NY2d 595, 603 [1979].

[...]Supreme Court erred in concluding that it lacked the authority to vacate its order directing an inquest under CPLR 5015 (a) (3). As we have previously recognized, "the fraud forming the basis for a CPLR 5015 motion may be either extrinsic or intrinsic".

42. Why did the Court, respectfully, invoke the doctrines of *res judaica* and *collateral estoppel*[9] to decide the merits of a proceeding, when the original proceeding was not fully and fairly litigated?

43. Why did the Court, respectfully, ignore that the rule that the doctrines of *res judaica* and *collateral estoppel don't preclude* newly-found evidence relating to the heart of the issue in dispute?

44. Why did the Court, respectfully, disregard the controlling law pertaining to whether an appellate agency tribunal has the authority to modify the grounds upon which the lower tribunal based its determination[10]. The Court cited, respectfully, an arguably-irrelevant, distinguishable authority from a lower court[11], which pertained to appellate deference on credibility of a witness:

"this conflicting evidence clearly presented a question of credibility for the Board to resolve" (Mtr. of Braband, 239 A.D.2d 627, N.Y. App. Div. 1997);

while ignoring the controlling precedent from the highest court:

"the alternative ground for her removal belatedly raised by the respondents and relied upon by the courts below may not serve to sustain her dismissal" (*Matter of Scherbyn v. Boces*, 77 N.Y.2d 753, Court of Appeals, N.Y. 1991).

---

[9] The Sanctions Order, Pages 1-2.

[10] Original Order, page 5, paragraph 2: "Contrary to petitioner's claim, the complaint to HPD was in the nature of an appeal from Breaking Ground's determination, and an administrative appellate tribunal has the authority to make findings different than the initial decision maker (see generally matter of *Braband vs Sweeney 239 AD2, 3rd Department (1997)*".

[11] Page 5, paragraph 2 of the Original Order: "Contrary to petitioner's claim, the complaint to HPD was in the nature of an appeal from Breaking Ground's determination, and an administrative appellate tribunal has the authority to make findings different than the initial decision maker (see generally matter of Braband vs Sweeney 239 AD2, 3rd Department (1997)".

45. Why did the Court set aside the well-established remedy pertaining to an agency's violations of CPLR 7804 (e), by omitting numerous material documents from the administrative record? In contrast, respectfully, to the well-established remedy of "reversal and remand[12]", the Court asserted that "where material should have been included in the administrative record but was not, the proper remedy is a motion in Supreme Court to amend or correct the record".

46. Why did the Court arriving at material and factual conclusions that are squarely refuted by the record? For example, the refuting admissions of Defendant Brenda Rosen and issuer of the first determination, Defendant Fong. Despite Mr. Fong admitting that the rejection based on *inconsistent information* had nothing to do with family gift income (rather, alleged hearsay reading business income), page 2 of the Court's Original Order Decision (dated August 16, 2019) attempts to rehabilitate Mr. Fong's rejection by an argument that is refuted by his own admission. See Exhibit A2 (second page) of Docket #9 of the Appellate Division, 04206-2019 on NYCSEF, page 20.  In the case of Respondent's CEO, the Court arrived at an erroneous conclusion by simply omitting the last words from Ms. Rosen's email: "at this point we await their decision". See Exhibit A10 of Docket #9 of the Appellate Division, 04206-2019 on NYCSEF, page 123.

47.  Why did the Court substantially, continually misrepresent the nature, scope, and substance of Plaintiff's specific allegations, and further- the hard evidence supporting said allegations?

48.  Why did the Court err by deprive Plaintiff of his right to adjudicate, in a limited manner appropriate for an article 78, triable issues of fact pertaining to the heart of the dispute[13]?

49. Why did the Court err by excusing without discussion Respondents rampage of application process violations?

---

[12] *Mtr. of Petty v. Sullivan*, 131 AD.2d 762 (2d Dep't 1987): "This court has consistently held that it is an error to pass on a question based upon such an incomplete record".

[13] As held in *Mtr. of Green v. Commissioner of Envtl. Conversation 94 A.D.2d 872 (N.Y. App. Div. 1983):* "in our view, CPLR 7804 was intended to continue all rights to jury trial set forth in section 1295 of the Civil Practice Act".

## IV.  _Why Did the Court To Which Defendants Steered This Case Repeatedly Set Aside Rules Pertaining to Due Process, Fairness, Proper Procedures and Judicial Impartiality_

50. Why did the Court- as well as Defendants- set aside the official rule stated on the official court website: when an original proceeding (101081/2019) is disposed of, the ensuing related proceeding (101960/2019) is assigned to a new judicial part?

51. Based on substantiated public records, the Court acquired, respectfully, property interests in five (5) affordable, HPD-affiliated apartments: three (3) at 33 Gold Street, one (1) at 116 Malcolm X Blvd in Manhattan, and one (1) unit at 116 Malcolm X Blvd in Brooklyn. At the time these property interests were acquired, none of the said apartments were listed on the market, nor was any rental or sale agreement filed. Is this fact not sufficient to reasonably call into question the Court's impartiality in a proceeding pertaining to HPD and affordable housing? Further, as it relates to rules governing the appearance of impropriety, should the Court have disclosed these interests to all parties?

52. On March 02, 2020, pursuant to the Plaintiff submitting evidence of Defendants fraudulent conduct, the Court, respectfully, abused its authority by: moving on its own motion, without warning, to impose on Appellant sanctions depriving the Appellant of numerous civil and constitutional rights[14]; revoking without warning Appellant's statutory poor person relief; barring, without warning, Appellant from making any further motions or related correspondence in any court in the State of the New York, and threatening Appellant with further sanctions. There has never been such an order in the more than 20 million pro se litigant cases filed in New York State since 1970. Why should Plaintiff be the first?

53. Why did the Court legitimize and endorse, rather than redress, the acknowledged incident on the first day of proceedings, July 18, 2019, in which the Court's court attorney used profanity (the F-word used twice), threatening body language, and yelling to berate and humiliate the Plaintiff in the presence of the opposing counsel (who stated that she had never, in her entire career, "seen

---

[14] Including but not limited to Appellant's constitutional rights to fair litigation and self-representation.

anything like that"), merely in response to Plaintiff inquiring about a possible schedule change? Further, was it proper for the Court to ignore that a court attorney's choice to verbally attack and publicly shame a pro se litigant, on his first day in court, reasonably calls into question the impartiality of the court attorney in these proceedings?

54. Based on substantiated public records, in conjunction with the Court issuing the Sanctions Order, and pursuant to Appellant's submitting related-incriminating data to the Department of Investigations ("DOI", both the Court's court attorney (with an affordable property at 248 West 105 St.), and his next door neighbor-moved out of affordable properties, which they unlawfully held for 34 and 35 years, respectively.

55.  As the court attorney and his next-door neighbor maintained primary residences in other properties- it was a breach of the law for them to hold onto said affordable properties for more than thirty (30) years.

56. Further,the Court Attorney's next-door neighbor is no other than the Honorable Appellate Justice to which the case at bar was steered, who based on public records has joint business ventures with the Court, who based on the Rules of Judicial Conflict should have recused himself, and who has already, respectfully, taken extraordinarily-improper, harmful measures against Plaintiff.

57. Accordingly, does the fact that the Appellate Justice and the Court's court attorney moved out of affordable properties, which they unlawfully held for 34 and 35 years, respectively, pursuant to Plaintiff filing incriminating evidence and the Court issuing an unprecedented Sanctions Order- not reasonably call into question the Court's impartiality?