=UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABRAHAM GROSS, NETTY GROSS,

        Plaintiffs,

                                    **SECOND AMENDED COMPLAINT**
                                    **CIVIL ACTION NO. 20-CV-4340**
                                    **JURY TRIAL REQUESTED**

        -against-

THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, LOUISE CARROLL, ANNA-MARIE HENDRICKSON, MARGARET BROWN, BABBA HALM, VICTOR HERNANDEZ, SHATARA PELL, MARK MATTHEWS, NICOLE LONDON, EDWIN LUGO, NIDIA DORMI, GABRIEL MOMBRUN, JAMES E. JOHNSON, HAROLD WEINBERG, NICK LUNDGREN, SAMANTHA SCHONFELD, HELEN ROSENTHAL, BREAKING GROUND, JEANNE-MARIE WILLIAMS, BRENDA ROSEN, TERRESA PALMIERI, VANESSA CUCURULO, STEPHANIE LABARTA and TRAVIS FONG.
                                     Defendants.

---

## PRELIMINARY STATEMENT

1. Respectfully, this complaint is a sad testament to American Jurisprudence, and the law enforcement community. It is the City of New York and its residents who continue to suffer from Defendants criminal enterprise. The City of New York should be the *Plaintiff in this action, not the Defendant.*

2. Public officials abusing their access to public property to further a billion-dollar scheme, who then use additional public property as bribes to protect their scheme, provide more-than-sufficient cause for law enforcement to intervene.

3. By virtue of the evidence attesting to Defendants pervasive criminal culture, it is unnerving that Plaintiff is the one forced to fill the void created by agencies with the resources and mandate to protect the public[1]. For example:

    i. As first exposed by Defendant HPD whistle-blower, Steven Werner[2], and as Defendant HPD publicly admitted before City Council[3], wealthy developers have- in fact- been nonchalantly stealing $100 million per year from the public[4], by collecting tax breaks without registering the affordable units as rent-stabilized[5].

    ii. The Brooklyn D.A.'s June 2019 admission[6] that bribery in Mitchell Lama affordable programs is likely the norm- not the exception.

    iii. The Department of Investigations ("DOI") Commissioner's admission[7] that Defendants systemically fail to honor their oversight mandate.

    iv. The overwhelming number of fraudulent affordable deeds readily available on ACRIS[8].

    v. Six (6) recent sworn affidavits of credible Defendant HPD whistle-blowers[9] , who were compensated prior to discovery, and who swore before The United States District Court for the Southern

---

[1] Demanding this of Plaintiff is particularly cruel, as the Defendants have proven their ability and willingness, time and time again, to render honorable courts of law into, respectfully, vessels in service of their cause.
[2] https://www.propublica.org/podcast/these-people-want-new-york-landlords-to-stop-ripping-off-tenants
[3] https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=458975&GUID=A4F32C2C-519F-4987-9A1E-CF0D66CA008B
[4] https://www.propublica.org/article/ny-state-data-indicates-even-more-landlords-duck-rent-limits
[5] https://www.propublica.org/article/nyc-landlords-flout-rent-limits-but-still-rake-in-lucrative-tax-breaks
[6] http://brooklynda.org/2019/05/21/three-luna-park-housing-corp-officials-indicted-for-conspiring-to-receive-bribes-forge-documents-to-corrupt-the-process-by-which-mitchell-lama-apartments-are-acquired/NYSCEF, Appl Div. First Department, 2019-04206, Docket # 49, page 10.
[7] Ibid, ibid.
[8] For example, NYSCEF, Appl Div. First Department, 2019-04206, Dockets # 9, EXHIBITS B-E.
[9] See below Par 16, Footnote (15).

District of New York ("the Honorable Court"), that the Defendants are engaged in outrageous criminal conduct.

vi.    The indictment of HPD Assistant Commissioner, Wendel Walters, three other HPD executives, and six others Developers on a 26-count indictment including charges of racketeering, conspiracy, bribery, extortion, wire fraud, and money laundering in excess of $22 million[10].

vii.   In the past five years alone, more than sixty (60) City housing employees, including numerous HPD employees, were indicted on charges of conspiracy, bribery, corruption, and fraud[11].

viii.  HPD's own internal audits from 2012-2017[12] revealing "serious irregularities" in affordable Mitchell Lama projects.

4.  At a minimum, the aforesaid should, independently and collectively, inspire the U.S. Attorney's Offices, the DOI, the F.B.I., the Office of the City Comptroller, the D.A.'s Offices to take uncompromising remedial measures to redress the root of Defendants criminal enterprise.

5.  Instead, the adjudicative aftermath that followed the aforesaid indictments, has only made crime seem more attractive to the culprits. If only Defendants were subject to minimal accountability- if only crime seemed like a risk not worth taking- the public and the Plaintiff would, respectfully, have been spared these atrocities.

## **NATURE OF THE ACTION**

6.  Abraham Gross ("Plaintiff") brings this action, *pro se*, to redress the catastrophic harm inflicted as result of Defendants violations of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§ 1961-1968 ("RICO").

7.  Plaintiff also brings this action pursuant to Defendants systemic deprivation of rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1981 ("Section 1981"); Title VIII of the Civil Rights Act of 1968 Fair Housing Act, 42 U.S.C. §§ 3601-19 ("Title VIII");

---

[10]https://archives.fbi.gov/archives/newyork/press-releases/2011/assistant-commissioner-of-nyc-departme nt-of-housing-preservation-and-development-indicted-for-racketeering-bribery-and-extortion.
[11]For example:
https://www.manhattanda.org/manhattan-das-office-doi-nypd-announce-arrests-and-criminal-charges-wid espread-briber/
[12] Quoted in Comptroller's Audit MJ06-134A, at page 10. Only two (2) out of the forty-three (43) projects audited did not show any irregularities.

Title VI of the Civil Rights Act of 1964 (nondiscrimination in federally assisted programs), 42 *U.S.C.* § 2000*d*-1 ("Title VI");

8. Article XVII of the New York State Constitution ("Article XVII")[13]; the 14th Amendment of the U.S. Constitution "14th Amendment")[14];

9. The New York State Human Rights Law as contained in New York State Executive Law § 296 ("NYSHRL"); the New York City Human Rights Law as contained in the Administrative Code of the City of New York § 8-107 ("NYCHRL"); Title 24 of the Code of Fed. Reg. Discriminatory Conduct Under the Fair Housing Act ("Title 24");

10. Executive Order 11063 (November 20, 1962) prohibiting discrimination in the rental of properties provided with federal funds ("Order 11063"); Executive Order 12898 (February 11, 1994), requiring federal agency programs to avoid discrimination in conducting activities that substantially affect public health ("Order 12898"). Hereinafter, the aforesaid Statutes and Executive Orders will be collectively referred to as "Protective Regulations".

11. In addition, Plaintiff brings this action pursuant to the applicable provisions detailed in Par. 21-30 (hereinafter: "Additional Relevant Provisions").

12. In addition, Plaintiff seeks to recover damages, declaratory relief, and other relief based on the applicability of alternate theories for recovery, as illustrated herein.

13. Plaintiff alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, as follows:

14. The Defendants and their co-conspirators, have hijacked New York City's affordable housing programs[15] to create a lucrative criminal enterprise motivated and enabled by: (a) insatiable greed of officials who view public property as though it were their own (b) discriminatory selection practices, featuring a by-default prejudice against all non-Hispanic applicants (c) a general intention to reject as many applicants as

---

[13] "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions".

[14] "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

[15] The public is likely unaware that there are anywhere between 168-216 affordable programs within the jurisdiction of City Housing Agencies, such as HPD, HDC, and NYCHA. Many of these programs pertain to developer tax breaks and construction bids worth billions of taxpayer dollars. Nevertheless, the "oversight" over these programs is, at best, a sad joke. A partial list includes: the 421-a Tax Incentive, 421-b Tax Incentive, 420-c Tax Incentive, 50/30/20 Mixed-Income, Housing+, Mitchell Lama, Inclusionary Housing, J-51 (A), Rent Controlled, Rent Stabilized, Third Party Transfer, Neighborhood Pillars, Mix and Match Income, Mixed Middle Income, Multifamily Disposition and Finance, Mutual Housing Association, and the Nehemiah Programs.

possible, such that more public property can be embezzled and/or converted to market rate, despite being designated as affordable (d) deliberate indifference and/or active participation of public agencies, who are mandated to protect the public interest, but refuse to do so[16].

15. The aforesaid Defendants, acting under color of law, in official capacity on behalf of the City of New York and affiliated agencies such as HPD, HUD, HDC, NYC Law Corporation Counsel, City Council and publicly-funded, Non-For-Profit organizations such as Defendant Breaking Ground, methodically and purposefully violated- and continue to violate- the Protective Regulations and the Additional Relevant Provisions.

16. In the past three years, the Honorable Court heard sworn testimonies[17] from six (6) aggrieved HPD whistle-blowers, who attested to a horrific culture of corruption, fraud, intimidation and discrimiantion. Not only were these testimonies deemed credible by the Honorable Court, the applicable Defendant rushed to settle with all six whistle-blowers prior to discovery (see below Par. 56).

17. As a direct and proximate result of Defendants violations and deprivations, Plaintiffs (as well as millions of other applicants) endured- and continues to endure- unfathomable harm, pain and suffering, including but not limited to: prolonged homelessness during the pandemic, monetary damages, humiliation, adverse effects to health, emotional trauma, and torment which is entirely unnecessary.

18. As it pertains to claims under RICO, Plaintiff alleges that Defendants constitute an enterprise engaged in criminal acts, which include: embezzlement of public property, wire fraud, bribery of public officials, spoliation of evidence, corruption of State-related proceedings pertaining to the judicial machinery, obstruction, perjury, intimidation of whistle-blowers, and discriminatory housing practices. Further, that Defendants alleged conduct is sufficiently pervasive to establish a pattern, pertains

---

[16] Sadly, the atrocities inflicted on Plaintiff and millions of others are only possible due the nauseating lack of oversight. Despite the fact that such agencies have sufficient resources to redress the Defendants criminal conduct, their indifference- in some cases, worse than indifference- has incentivized Defendants to view criminal conduct as a risk worth taking.

[17] Ms. Karina Rodriguez, Mr. Ricarte Echeveria, Ms. Sharon Lewis, Ms. Malinda Gonsalves, Mr. Raveen Seaton and Ms. Wanda Sinclair. See: SDNY Cases: 1:18-cv-01626, 1:17-cv-06073, and 1:17-cv-09996. The aforesaid are in addition to HPD Whistleblower, Mr. Steven Werner, who first reported this scam to his supervisors in 1993.

to State and Federal property, and continues to inflict extraordinary harm on Plaintiff and on the public, even as these words are written.

### JURISDICTION AND VENUE

19.  The Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state and city causes of action.

20. In addition to Defendants discriminatory practices based on the protected class of race, City affordable programs heavily rely on federal funding from HUD. The applicable HPD Handbook (see below Par. 26) incorporates all pertinent Federal and State law.

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because of the location of the subject property, Waterline Square, as well as the result of the aforesaid violations and deprivations, occurring within the Southern District of New York.

### ADDITIONAL RELEVANT PROVISIONS

22. _New York City Zoning Resolution Inclusionary Housing_: Under the Inclusionary Housing Program, as set forth in Section 23-90 of the New York City Zoning Resolution, in return for agreeing to keep developed properties permanently affordable, the developers ("Developers") receive significant tax breaks. Developers enter into an agreement with HPD ("Regulatory Agreement 1"). By entering this agreement, Developers pledge to comply with all applicable provisions, most notably, to provide affordable units to low-income New Yorkers. Instead, by HPD's own admission, the Developers consistently seek to collect the tax breaks, while fraudulently converting affordable units back to market rate[18], and/or awarding them to unqualified residents. It is estimated that by virtue of this scam, Developers unlawfully collect tax breaks to the tune of $100 million per year, or $3 billion for the past thirty years. Rather than redress a multi-billion fraud, the applicable

---

[18] In other cases, the Developers "forget" to register the apartments as rent-controlled. Up to 200,000 examples were revealed in 2016, by ProPublica. These units were never registered. See: https://www.propublica.org/article/ny-state-data-indicates-even-more-landlords-duck-rent-limits

Defendants resisted attempts to end the charade[19], effectively betraying the public interest they are sworn to protect.

23. _The Regulatory Agreement Between HPD and BG_ ("Regulatory Agreement 2"): Provides the applicable provisions of the subject property, such as under what grounds an applicant can be rejected, and the correct method to compute an applicant's income. These provisions were routinely disregarded by the Defendants.

24. _The HPD Marketing Handbook_: In 2018, HPD published the Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy ("the Handbook"), which contains the general policies, procedures, and requirements for the marketing and selection of residents for developments assisted by HPD. On page 70, the Handbook incorporates all applicable Federal and State laws.

25. _The Applicant Income Calculation Guide:_ ("the Income Guide"), published by HPD, this guide expands upon the income calculation method that HPD and BG should apply when evaluating an applicant's income. Regretfully, Defendants choose to disregard key provisions of the Income Guide[20]. For example, grocery expenses are not included in family gift income. In bad faith, Defendants rejected $10,000 from Plaintiff's income, under the false pretence it was above the limit, without bothering to take notice that Plaintiff's family gift income included grocery expenses which are precluded, and as such negate Defendants bad-faith determination. Even more egregious is that in January 2020, the Defendants quietly repealed the $10,000 requirement from family gift income altogether. Defendants did not bother to update their counsel or the Plaintiff of this critical development.

26. _The Freedom of Information Law ("the FOIL")_: As a direct result of Defendants corrupting the prior State-proceedings[21], Defendants were empowered to brazenly disregard their statutory obligations pursuant to the FOIL[22], and withhold information corroborating Plaintiff's allegations.

27. Pursuant to _Judiciary Law § 487 ("Judiciary Law")_: an attorney who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is subject to civil and criminal liability. Further, it is settled that

---

[19]

https://www.documentcloud.org/documents/2718945-Intro-152-a-543-1015-Testimony-Feb-2016-11pm.html
[20] NYSCEF, Appl Div. 1st Dep', 2019-04206, #9, Exhibits A6-A9.
[21] Plaintiff hereby incorporates all factual assertions pertaining to corruption of the judicial process by virtue of EXHIBIS F, G, and H.
[22]  Plaintiff hereby incorporates all factual assertions pertaining to his allegation re FOIL by virtue of EXHIBIT G.

Judiciary Law § 487 focuses on the attorney's intent to deceive, rather than the deceit's success[23].

28. <u>ABA Rules of Professional Conduct ("The ROC Rules")</u>: Rule 3.3 provides that attorneys are obliged to protect the courts from criminal or fraudulent conduct that undermines the integrity of the adjudicative process. Rule 3.4 prohibits an attorney from destroying or assisting another in destroying evidence pertaining to a case. As illustrated herein, the applicable Defendants (and their opposing counsel) corrupted the judicial process, *inter alia* by:

   a. Pursuant to a confidential protest from Plaintiff, who shared with opposing counsel incriminating data- Defendants counsel instantly communicated the said data to their clients, who then promptly moved to modify/destroy this evidence from official City databases, such as payroll records, and/or other platforms, such as credit reports.

   b. Pursuant to more incriminating information being presented, Defendants simply moved to retrospectively adjust the regulatory agreements with the sole purpose of concealing criminal acts. Most notable are Defendants repeated efforts to make it as hard as possible to track which of the apartments are designated as affordable.

   c. Defendants routeinly steered cases to favorable judges, most notably, to the Honorable Trial Court Part 56 ("the Court")[24]. The Court's calendar proves that at a given point five-month period in 2019, the Court was assigned twenty-five (25) times more cases involving pro se litigants (1 vs. the average of 25), nine (9) times more cases involving city agencies (39 vs. the average of 4), and eight (8) times more special proceedings (35 vs. the average of 4). Exacerbating the egregious nature of this discrepancy is the fact this anomaly occurred despite the Court itself being classified as a trial court, and the existence of City-specific parts, to which this case should have been assigned. Furthermore, the unbearable- if undisputed- fact is that pursuant to this statically-anomaly being protested by Plaintiff, *the discrepancy was adjusted.*

---

[23] *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).
[24] See NYSCEF, 2019-04206 # 9 EXHIBITS T, and Docket #27, and below paragraph (73).

29.  _The New York Bar Judicial Rules of Professional Conduct_ ("The RJC Rules") it is settled that an impartial decision maker is an essential right in civil proceedings[25]. A litigant's fundamental right to due process includes an impartial judge who will apply the law equally and fairly, avoid conduct rising to the appearance of impropriety, and recuse where the impartiality could be reasonably questioned[26]. Defendants habitual intervention in these proceedings- including the unlawful practice of steering cases- deprived Plaintiff's of the right to an impartial judiciary.

30. _Conflict of Law Statutes_ (collectively, "the COI Laws"): Federal conflict of interest statutes[27] prohibit public officials from personally benefiting from federal property, and/or engaging in conduct that creates a strong appearance of impropriety as it relates to federal property. In addition, HPD regulations[28] specify that HPD employees overseeing the integrity of the process are prohibited from entering relevant lotteries. Nevertheless, this conduct is rampant throughout HPD, whose employees abide by an unnerving credo: public property is a free-for-all-real-estate banquet, which Defendants are free to treat as private property, provided they take precautionary measures to conceal the crimes, and if caught- promptly delete incriminating data.

## THE PARTIES/PARTY-SPECIFIC FACTUAL ALLEGATIONS

31. **Plaintiff** is a law-abiding, Non-Hispanic, New York resident, who has been suffering from on-and-off homelessness since September 23, 2019 (EXHIBIT A1), pursuant to winning the lottery for the first time in a decade (priority number #103 out of 74,000 applicants) at Waterline Square, successfully completing the affordable housing application process ("the Process")[29], and then being maliciously rejected by the Defendants, based on shifting grounds, issued in four determinations[30].

32. Four of the justifications Defendants provided are explicitly barred Regulatory Agreement 1 and the Handbook[31] (EXHIBIT A2): unspecified inconsistent information (1st rejection); inconsistent information pertaining to hearsay on business income

---

[25] _Goldberg v. Kelly_, 397 US 254, 271 (1970).
[26] The New York Bar Judicial Rules of Professional Conduct.
[27] Such as the Hobbs Act, 18 U.S.C. § 1951; Foreign Corrupt Practices Act, 15 U.S.C. 2b § 78.
[28] The Official HPD Marketing Handbook, page 26.
[29] NYSCEF, Appl Div. First Department, 2019-04206, Dockets #9, EXHIBITS A1-A4, A6-A10.
[30]  Ibid, ibid.
[31] Ibid, ibid.

(1st rejection, post-facto clarification[32]); inconsistent information pertaining to family gift income (3rd rejection); and a missing signature (3rd rejection). A fifth justification issued the fourth and final HPD rejection, solely considered income from 2017 and 2018, while disregarding all income from 2019- in express violation[33] of Regulatory Agreement 2 (EXHIBIT A3).

33. The common denominator for all determinations is that they provided cryptic, conclusory numbers inconsistent with the 350 financial documents submitted and vetted from March 5, 2019- June 10, 2019.

34. As these words are written, more than a year later, Defendants have still refused to provide any explanation for the mathematical conclusions for the first three (3) determinations, nor did they comply with numerous FOIL requests to provide the underlying computations of Plaintiff's income[34].

35. **Co-Plaintiff Netty Gross** is Plaintiff's mother ("Mother"), who is chronically-ill with a severe movement disorder (cerebral ataxia) that impedes her ability to use her muscles. Until recently, Plaintiff was the primary care-taker of Mother, who is in a wheel-chair, and can barely speak- as witnessed by counsels for both Defendants.

36. During the recent Holiday of Rosh Hashanah- which was the 26th consecutive holiday that Plaintiff spent in isolation- Mother's condition deteriorated. She now is incapable of speaking, suffers from vivid nightmares and shakes uncontrollably. It is a sad testament for City agencies mandated to help the homeless population, that in response to Mother's desperate pleas for decency- Defendants have blindly adhered to callousness which is beyond human comprehension.

37. Mother had a vested property interest in Defendants lawful compliance and the honoring of Plaintiff's property interest, as the subject property, Waterline Square, is closer in proximity than any other affordable housing opportunity.

38. By depriving Plaintiff of his rights and denying him the apartment for which he is eligible, Defendants have prevented Plaintiff from providing Mother with the

---

[32] Page 13 of EXHIBIT H.
[33] NYSCEF, Appl Div. First Department, 2019-04206, Dockets #9, EXHIBITS A6-A10.
[34] Plaintiff respectfully asks the Honorable Court for specific declaratory relief pertaining to these violations of law.

support she desperately needs. As a direct result of Defendants callous actions, Mother is enduring substantial harm[35].

39. **Defendant the City of New York** ("City") is a municipal agency existing by virtue of the laws of the State, that employed Defendants #2-#15 through City agencies, including: HPD, Corporation Counsel, and City Council.

40. **Defendant the Department of Housing Preservation and Development** ("HPD") is a mayoral agency of Defendant City, established pursuant to Chapter 61 of the City Charter, which is mandated to oversee and protect the integrity of hundreds of affordable housing programs. HPD is a constituent agency of the City, with its principal place of business at 100 Gold Street, NY, NY, 10038.

41. **Defendants in paragraphs 43-80** are sued in their official and individual capacities, pursuant to violations of the Protective Regulations, violations to the Additional Relevant Provisions, breach of fiduciary duties to ensure a fair application process[36], refusal to exercise oversight, and disregard for various City Housing Laws, as applicable to each Defendant. For example, multiple Defendants unlawfully acquired affordable properties for which they are ineligible, while others reside simultaneously in numerous rent-stabilized apartments, in violation of City Housing laws. These violations aggravate  the damages caused by the Defendants as they hypocritically claim their decisions to be motivated by lawful compliance.

42. **Defendant GABRIEL MOMBRUN** ("Mombrun") was the HPD project manager at Waterline Square. A former investigator at DOI, Momburn was responsible for investigating fraud at HPD. Thereafter, he joined HPD, and launched his own criminal enterprise, featuring acts that he himself was trained to prevent.

43. Throughout the Process, Plaintiff had numerous conversations with Mombrun about the status of his application. On or about May 15, 2019, Mombrun was surprised to hear that Breaking Ground had not forwarded Plaintiff's application to HPD, considering the fact HPD had already processed many applications with inferior numbers. Momburn promised to email and inquire with Breaking Ground.

---

[35] Plaintiff respectfully asks how human beings- let alone public officials with the resources and mandate to help- be so cruel and indifferent?

[36] For example, the Defendants actively participate in a racially-discriminatory application process, skip the log order, and routinely award affordable properties to egregiously ineligible residents.

44. Critically, all communications originating from Mombrun were strategically omitted by Defendants both from the administrative record[37], and thereafter, from Defendants FOIL response (despite Mombrun being copied on many of the emails). Considering that Mombrun was the project manager, and his frequent correspondence with the Plaintiff, it is obstruction of justice and extrinsic fraud-(barring Plaintiff from effectively prosecuting his case) for Defendants to delete all of Mombrun's emails. Accordingly, Plaintiff asks the Honorable Court to order the immediate release of all of Mombrun's emails that were omitted from the FOIL- and which were due on December 05, 2019[38].

45. As it pertains to Mombrun's abuse of public property for his own gain (see EXHIBITS B), in 2011, Mombrun acquired through the NYC Housing Dev. Corporation, his first affordable property for $275,458, at 212 South Oxford.

46. Not only was Mombrun prohibited from abusing his position at HPD to apply for this subsidy, at the time, Mombrun already owned a property at 1329 E 36 St, Brooklyn, which would have disqualified him outright; the program is for first-time owners.

47. Furthermore, Mombrun cynically used an affordable apartment for which he was ineligible, as a platform to launch a ticketing business, in violation of law.

48. Even more egregious, in 2017, Mombrun nonchalantly embezzled apartment 12m at The Hub. The Hub was a Brooklyn-based, affordable 421 (a) project, similar to Waterline Square. In exchange for a massive tax break, the Developer was required to designate 150 affordable units.

49. (Regretfully, 150 units was the number released to the press, but the actual number seems to have fallen 47 units short- this is common practice for the developers of 421 (a) properties. Defendants, sadly, seem to take no issue with this practice).

50. These units were designated for the low-income population, to be awarded pursuant to a lawful Process. Defendant Mombrun- a project manager at HPD and former DOI investigator- had absolutely no right to acquire, or even to be associated with this apartment, effectively stealing it from a well-deserving applicant. To the contrary, the very purpose of his current job at HPD and past job

---

[37] In violation of CPLR 7804 (e) requiring a complete record.
[38] HPD must be held accountable for strategically omitting Mr. Mombrun's correspondence from the FOIL. The only rational reason HPD would do so is because Mr. Mombrun's correspondence contains
information corroborating Plaintiff's allegations.

at DOI was to ensure affordable apartments were granted to qualified applicants. Mombrun's conduct is the norm at HPD, not the exception. HPD executives feel that their access to public property comes with an invitation to embezzle public property.

51. Worse yet, when Plaintiff protested this unnerving breach of integrity to the DOI and to opposing counsel, Mombrun was instantly notified, pursuant to which he transferred his HUB property interest to his sister. It is respectfully shameful that Mombrun and his sister continue to nonchalantly reside in their respective embezzled apartments, while Plaintiff, and many others- continue to suffer. The judicial conscience should not tolerate such a callous assault on human decency.

52. **Defendant VICTOR HERNANDEZ** ("Hernandez") is the Director of Affordability Integrity and Oversight at HPD. Based on substantiated public records, Hernandez has been involved in an extraordinarily-high number of unlawful transactions pertaining to affordable properties[39].

53. Furthermore, Hernandez, as confirmed by an investigative agency, is currently living, simultaneously, in three affordable-housing apartments for low-income applicants (EXHIBITS C), as well as multiple rent-stabilized apartments. Hernandez's annual salary of $120,000, is above the maximum permitted for these affordable projects. Moreover, HPD's own rules (page 26 of the Handbook), bar any employee from participating, let alone the Director of the HPD Affordable Housing winning three such lotteries.

54. In 2018, Karina Rodriguez, one of six recent HPD whistleblowers revealed to the Honorable Court (EXHIBIT D) that HPD regularly discriminated against non-Hispanic applicants. As relevant here, Plaintiff is a non-Hispanic person. Ms. Rodriguez further accused Defendants Hernandez, Hendrickson and Pell of intimidation, retaliation, age-based discrimnation, abusive conduct and violence. As with other HPD whistleblowers, such as, Mr. Ricarte Echeveria, Ms. Sharon Lewis, Ms. Malinda Gonsalves, Mr. Raveen Seaton, and Ms. Wanda Sinclair, HPD rushed to settle the complaint prior to discovery.

55. Although a general rule, prior settlements cannot be not used to prove liability or invalidity of a claim, it is well-established such evidence is "otherwise discoverable"

---

[39] Illustrations in 2019-04206, Docket #9, NYSCEF, EXHIBITS B.

[40], and is not required to be excluded "solely because" it was presented during the course of compromise negotiations[41]. Further, admissibility of such evidence is not limited "when it is offered for another purpose[42]", such as to prove: (1) an existing racial bias (2) credibility of the decision-maker or witness (3) the decision maker was on notice to refrain from their prior misconduct or (4) acted in bad faith[43].

56. *As it pertains to Ms. Rodriguez's assertion re Discrmination,* public data pertaining to 1,360 newly-constructed affordable apartments demonstrates that more than 87% of those units are occupied by residents with Hispanic last names (such as Diaz, Acevedo, Maladano). Ms. Rodriguez's claim finds further support in recent lawsuits[44]. *Plaintiff respectfully asks how many more lives must be destroyed before the Honorable Court and the law enforcement community intervene to effectively stop HPD's lucrative criminal enterprise and discriminatory practices?*

57. **Defendant LOUISE CARROLL** ("Carroll") is the Commissioner of HPD, who has refused to respond to numerous *contact the commissioner* requests, nor did she provide any explanation as to Defendants conclusory determinations. Carroll and Defendant HPD have refused to comply with a FOIL request asking if Carroll has ever responded to a *contact the commissioner request,* and if so- why was Plaintiff repeatedly ignored. Caroll has also engaged in criminal practices pertaining to the modifications and amendments to regulatory agreements, with the sole intention of concealing the fact the Developers intention was to lease out affordable apartments at market rate.

58. Further, based on public records, Carroll continues to live in a low-income City-owned NYCHA public housing complex, located on the Lower East Side (RIIS 2). Upon information and belief, Caroll's annual salary disqualifies her from low-income housing. It is egregious for the commissioner of HPD to violate housing laws, nor can she claim to be an objective adjudicator, when she herself demonstrates contempt for the very laws she is designated to protect.

---

[40] *United States Vs. Austin 54 F.3d 394, 400 (7th Cir. 1995). United States Vs. Austin 54 F.3d 394, 400 (7th Cir. 1995). Towerridge Inc. V. T.A.O. Inc.11 F.3d 758, 770 (10th Cir. 1997).*
[41] *Ibid, ibid.*
[42] *Lyondell Chemical Co. v. Occidental Petroleum Corp. U.S. Court of Appeals, 608 F.3d 284 (5th Cir. 2010).*
[43] *Towerridge Inc. V. T.A.O. Inc.11 F.3d 758, 770 (10th Cir. 1997).*
[44] https://ny.curbed.com/2019/7/17/20696740/nyc-affordable-housing-lottery-segregation.

59.  **Defendant ANNA-MARIE HENDRICKSON** ("Henrdrickson") is the Deputy
Commissioner of HPD. In 2018, Hendrickson was accused by another HPD
whistle-blower, Mr. Ricarte Echevarria ("Echevarria"), of forcing him to grant
affordable-housing to an out-of-state relative who was ineligible on multiple
grounds (EXHIBIT E). When Echevarria protested to Hendrickson's supervisor, the
supervisor admitted to Echevarria that "she hated when Defendant Henderson did
stuff like that", but nevertheless proceeded to award the apartment. When
Echevarria further protested to DOI, he was threatened, instructed to delete
incriminating information, and fired. Tellingly, HPD and DOI, took no further action,
although HPD rushed to settle this case and pay off Echevarria, prior to discovery[45].

60.  **Defendants MARAGERET BROWN** and **BABBA HALM** are Deputy Commissioners
at HPD, and **Defendant MARK MATTHEWS** is a housing coordinator at HPD. Based
on public records, they have abused their positions to acquire property interests in
NYCHA or HPD-affiliated properties and/or resided in multiple rent-stabilized
properties.

61.  **Defendant NIDIA DORMI ("DORMI"),** is a senior policy advisor at HPD, who was
active in Plaintiff's rejection. Public payroll records show that Dormi started working
at HPD only in 2019, with a starting salary of 78k. Plaintiff alleges that Defendants
may be acting deceitfully, and calls for Defendants to clarify: how could a Dormi
become a senior policy advisor in her first year of employment?

62.  **Defendant SHATARA PELL ("PELL"), Assistant Deputy Director,** was active in
Plaintiff's rejection, verified HPD's answer in state-related proceedings. She also
committed perjury by denying in her sworn affidavit that she had ever had certain
conversations with the Plaintiff, whereas Plaintiff produced irrefutable audio
recordings of these conversations, in which Pell verified her identity.

63. Pell's perjury coupled by the Court's blind affirmation of Pell's affidavit as fact-
without discussion, despite clear refuting evidence in the form of her own written
admission, and despite her perjury- yet again- rewarded and enticed public officials
to commit perjury as they deem fit. Plaintiff requests Defendants to clarify why Pell

---

[45] *Plaintiff, as well as others who were aggrieved, beseech the Honorable Court not to continue
endorsing the notion that certain City executives are above-the-law, and free to engage in misconduct.
In the rare occasion that they are held accountable- they are still awarded favorable treatment that is
offensive to the interests of justice. This approach erodes public confidence in the integrity of its
governmental agencies.*

denied certain conversations for which Plaintiff provided irrefutable evidence, and whether Defendants maintain that it is permissible for public officials to commit perjury.

64. **Defendant EDWIN LUGO ("Lugo")** was also active in the unlawful rejection of Plaintiff's application. He also notarized Defendant Pell's perjurious affidavit, and HPD's perjurious answer in State-related proceedings. Furthermore, based on public records, Lugo resides simultaneously in three rent stabilized apartments, and has previously embezzled 6 other affordable properties[46].

65. **Defendant NICOLE LONDON ("London")** was claimed by Defendants to be the new project manager for Waterline Square, pursuant to replacing Mombrun for reasons Defendants refuse to disclose. Plaintiff asks Defendants to respond directly to the allegation that a search of City payroll databases show there is no HPD employee named Nicole London. Is Nicole London a real person? Plaintiff asks for Defendants to schedule London as the subject of Plaintiff's first deposition[47].

66. **Defendants SAMANTHA SCHONFELD, JAMES E. JOHNSON, HAROLD WEINBERG, NICK LUNDGREN**, are attorneys in the Corporation Counsel, HPD's Office of Legal Affairs, or HPD's FOIL Division (collectively "HPD Lawyers"). Plaintiff alleges that HPD Lawyers have seen ample evidence pertaining to HPD's criminal acts, but nevertheless set aside the ROC Rules.

67. Further, on October 02, 2019, Defendant Schonfled audaciously corrupted the judicial process by engaging in an ex-parte, post-proceeding consultation with the court attorney in the Appellate Division First Department, in a successful bid to change a valid order that was signed and delivered. By virtue of EXHIBIT F, all factual allegations pertaining to this breach are hereby incorporated into this complaint.

68. Upon information and belief, the improper influence included multiple phone conversations that were made from Defendants counsel to Defendants law firm, who then contacted two judges with vested interests, pursuant to which they intervened on Defendants behalf to influence the modification of a valid order that was already signed and delivered to all parties.

---

[46] Illustrations in NYSCEF 2019-04206, Docket #9, EXHIBITS C-H.

[47] Plaintiff hereby incorporates all factual assertions pertaining to this allegation by virtue of EXHIBIT J.

69. Respectfully, this allegation- once proven by substantiating evidence- is a colossal breach of the ROC rules. Further, irrespective of the aforesaid allegation, as a matter of law and court procedures, it is axiomatic that signed, delivered orders, with return and reply dates entered, cannot be modified in a backdoor, ex-parte consultations after proceedings concluded, by influencing a court attorney who has openly admitted her contempt for Plaintiff, who then morphs into an ad-hoc appellate tribunal, pursuant to which she morphs into an advocate for Defendants, who argues for modification of a valid in an ex-parte proceeding.

70. Furthermore, based on substantial evidence, certain HPD Lawyers were unlawfully awarded public property- including luxury affordable housing.

71. Furthermore, as stated above in Par 23, it is abundantly clear that someone (or multiple parties) within the offices of HPD Lawyers, systematically corrupted the process by which cases are to be randomly assigned from the Clerk's Office[48]. The nauseating statistical anomalies pertaining to the assignment of City cases to favorable judicial parts, despite their designation as trial parts, while the Civil Supreme Court's own rules designate such cases be assigned to specialized City parts- outweighs alternate theories that aim to sugar coat a breach of fundamental fairness, which no court of law should tolerate.

72. **Defendant Breaking Ground** ("BG") is a Not-For-Profit entity mandated to determine the eligibility of applicants to the Property based on applicable laws. In this capacity, BG is performing the traditional-state-function of eligibility evaluation for public housing.

73. Plaintiff realleges against Defendant BG every applicable allegation made against Defendant HPD and visa-versa. BG regularly utilized causes for rejection that are blatantly-unlawful (inconsistent information, missing signature); refused to provide a full and specific explanation for its bewildering conclusions (in violation of page 28 of the Handbook); refused to redress Defendant Fong's saboteur efforts, and refused to transfer Plaintiff's application pursuant to two rejections, as required.

74. **Defendant Brenda Rosen** ("Rosen") is the current CEO of BG, who, based on public records, violated her fiduciary duties by acquiring affordable property interests (at times with advance knowledge the properties were soon to become affordable), and residing simultaneously in multiple rent stabilized apartments. Rosen has also

---

[48] NYSCEF, Appl Div. First Department, 2019-04206, Dockets #9, EXHIBITS T.

engaged in criminal practices pertaining to the modifications and amendments to regulatory agreements, with the sole intention of concealing the fact the Developers intention was to lease out affordable apartments at market rate.

75.  **Defendant Terasa Palmieri** ("Palmieri"), current Director of Leasing at BG, Defendant Vanessa Cucurullo ("Cucurullo"), current Assistant Director of Leasing at BG, issued Plaintiff's 3rd rejection, **Defendant Stephanie Labarta** ("Labarta"), senior analyst at BG, issued Plaintiff's 2nd rejection. The aforesaid Defendants have refused to provide any explanation whatsoever to their bewildering mathematical conclusions. Defendant **Travis Fong** ("Fong"), intake specialist at BG, applied pressure on Plaintiff to withdraw from the application process, lied about deadlines, took active measures to have Plaintiff rejected, and then issued Plaintiff's 1st rejection based on "inconsistent information".

76.  **Defendant Jeanne Marie Williams** ("Williams") is an attorney for BG, who sadly continues to turn a blind eye to overwhelming evidence of criminality. On multiple occasions, Defendant Williams recognized her ethical duties to report to the authorities illegal conduct, and promised to do so. Despite being provided with ample evidence attesting to criminal conduct, she has disregarded her ethical obligations as a lawyer pursuant to the ROC Rules. Defendant Williams is a partner at the law firm, Kellner, Herlihy, Getty, and Friedman, with an address at 470 Park Avenue South, NY, NY, 10016.

77.  **Defendant Helen Rosenthaul** ("Rosenthal") is a City councilmember on the Public Housing Committee. Her address is 250 Broadway Suite 1744, New York, NY 10007.

78.   In July 2019, pursuant to a fourth, cryptic determination which concluded Plaintiff's self-employment income was $0, despite 350 documents to the contrary, Plaintiff turned to Rosenthal for help.

79.  Initially, upon the senior advisor in her office, Ms. Vivian Riviera, reviewing Plaintiff's supporting documents, Ms. Riviera agreed that the rejections were conclusory, lacked any underlying computations, and ignored Plaintiff's substantive claims. Specifically, Ms. Viviera made the following statement: "why aren't they explaining to you how they got from *here* to *there*?"[49]  Further, Ms. Riviera attested to the fact

---

[49] Plaintiff notes that *here* refers to the 350 documents he provided, and *there* refers to the Defendants cryptic conclusions.

that she has seen numerous cases where HPD and BG rejected applicants without providing a complete explanation, as required by law.

80.  In a follow-up phone consultation, Rosenthual vowed to do what any reasonable constituent would expect from a councilmember on the Public Housing Committee: demand that HPD and BG explain their cryptic determinations.

81.  Thereafter, an ominous shift occurred. Without warning, Rosenthual terminated all communication with Plaintiff. Her staff scheduled a follow-up conference call on Friday, which Rosenthal never made. She did not respond to follow up calls and emails, inquiring why she hadn't called as promised.

82.  Prior to being forced into a shelter on September 23, 2019, Plaintiff attempted to reach out one last time. Rosenthaul refused to speak to Plaintiff, instead, instructing her Chief of Staff, Ms. Marissa Mack- per the account of Ms. Mack- to tell Plaintiff that *"the best thing for you to do is go into public shelter. HPD can't help you."* No explanation was offered as to why HPD continued to violate the law requiring them to provide a full explanation for four cryptic rejections.

83.  At the brink of the pandemic, Plaintiff returned to Rosenthal's office and asked her to do, yet again, what any public official of integrity and/or decent human being should do in such extenuating circumstances: reach out to HPD in light of the pandemic.

84.  Due to the pandemic, Rosenthal refused to allow Plaintiff into her office. Instead, they had a brief conversation over the phone, in which Plaintiff begged for Rosenthal's help. Rosenthal promised to follow up with Defendant HPD and get back to Plaintiff within a few days.

85.  When she had failed to do so- again- Plaintiff came back to Rosenthal's office. This time, she refused to have a conversation altogether. Instead she asked Plaintiff to write her on a piece of paper and slip it under the door. Plaintiff did so, sharing with Rosenthal newly-discovered evidence that Defendants had awarded countless apartments to unqualified Hispanic applicants. Plaintiff begged Rosenthal to follow up. For the fourth time, Rosenthal disregarded her promise to follow up.

86.  Plaintiff alleges that based on substantiated public records, at the very same time Rosenthal severed all communication, and backed out of her promise to help, she also became the beneficiary of a property interest in the luxury complex adjacent to Waterline Square- owned jointly by the same developer of Waterline Square, and

with affordable apartments managed by Defendant BG: apartment #2404, at 60 Riverside Blvd. Critically, this apartment was not on the market in July 2019. Further, when Rosenthal first communicated with Plaintiff, she was not familiar with the subject property.

87. Even more disturbing is that upon Plaintiff protesting the legitimacy of Rosenthal's new real-estate acquisition, she instantly modified her housing records on her credit report. Regretfully, this is the overwhelming pattern backed by hard evidence so disturbing - it has legitimately caused Plaintiff to start fearing for his life. Plaintiff asks the Court to order an in-camera review of this evidence.

**PLAINTIFF FEARS FOR HIS SAFETY PURSUANT TO HIS COMPUTER BEING HACKED**

88. Plaintiff's legitimate fear for his safety was exacerbated when, in May 2020, Plaintiff's bank detected and notified him that an offer was made on the dark web to steal Plaintiff's identity, pursuant to which Plaintiff's computer was hacked.

89. This allegation was confirmed by a paid cyber security consultant, who is willing to testify. Alarmingly, the only information that was stolen and deleted was related to this lawsuit. No financial information was compromised. Upon information and belief, it is irrational for anyone without a vested interest in these proceedings, to hire a hacker on the dark web, solely to steal information relating to Defendants fraudulent property transfers.

**BACKGROUND ALLEGATIONS: DEFENDANTS CULTURE OF CORRUPTION CONTINUES TO HARM THE PUBLIC**

90. In 2014, the developable land in Manhattan was estimated to be worth $1.74 trillion[50]. By a vast disparity, the City is the biggest property owner in the five boroughs[51]- with a massive 362.1 million square feet to its name[52].

---

[50] That figure- which excludes the combined value of Brooklyn, Queens, Staten Island, Bronx, as well as, the aggregate value of all parks, roads, and highways- is significantly larger than the combined market capitalization of the world's three largest corporations in 2014. See: https://www.journals.elsevier.com/regional-science-and-urban-economics/ https://www.bloomberg.com/news/articles/2018-04-24/manhattan-s-land-value-is-an-incredible-1-74-trillion.

[51] https://therealdeal.com/issues_articles/who-owns-all-of-new-york/

[52] That is more than one and a half times what the top  private developers- such as Vorando, Blackstone, Tishman Speyer, Extell, SL Green Realty- own combined.

91. A substantial portion of the City's public property is designated for affordable housing, in programs managed by Defendant HPD and its many affiliated entities, including Defendant Breaking Ground[53]. Officially, the purpose is to help low/mid level income New Yorkers find housing solutions.

92. By virtue of the City's enormous assets, it is imperative for the Defendants and its affiliated parties- such as marketing agents, and developers granted permits for public housing projects- to act with integrity, transparency, and the recognition that public property must serve to benefit the public.

93. Nevertheless, over the past fifty years, Defendants, Developers and their co-conspirators, have and continued to betray the public, by corrupting the hundreds of affordable programs with lucrative, mind-bending scams, the worst of which- shameless embezzlement of affordable properties to enrich themselves and their co-conspirators.

94. This breach is supported and facilitated by the purposeful lack of oversight exercised by those mandated to protect the public. Considering credible evidence that this scam has exceeded hundreds of billions of dollars, and that has been going on for five decades- no judicial conscience of integrity could ever view the lack of oversight as accidental. Rather, it is intentional, and in all likelihood, motivated by the insatiable greed of above-the-law public officials.

95. A growing number of members of the public have gained first-hand knowledge of the sinister truth perverting the City's affordable housing programs. Further, many public officials in positions of power- including Honorable members of the bench are, respectfully, aware of this reality. Nevertheless, the absence of remedial measures continues to empower the Defendants to destroy lives.

96. To protect their interests, the culprits have harnessed access to City's public property as a limitless resource to bribe any public official, law enforcement or oversight agency that dares challenge. The scam is untouchable. Granted, blanket denials of these serious allegations are expected- most certainly from those who desire to protect corruption, and/or are directly benefiting. Nonetheless, a sensible judicial conscience cannot turn a blind eye. The credible evidence of corruption, fraud, and embezzlement is overwhelming to any reasonable mind. Respectfully,

---

[53] For reasons unknown, the precise breakdown is concealed from the public.

these crimes will carry on unfettered, as long as oversight agencies and the Judiciary abide by the laissez faire approach.

97.  Whereas no words suffice to fully capture Defendants pervasive breach of fundamental public integrity, a limited number of illustrations follow:

*October 2011: HPD Assistant Commissioner, Wendel Walters, two other HPD executives, and six others Developers are indicted on a 26-count indictment including charges of racketeering conspiracy, bribery, extortion, wire fraud, and money laundering in excess of $22 million*

98. At the press release, United States Attorney Ms. Loretta Lynch stated:

> "New Yorkers relied on these defendants for the safe haven of affordable housing. Instead, the defendants allegedly put their own greed over the needs of low, moderate- and middle-income New Yorkers. As detailed in the government's indictment and other court filings, the defendants corruptly lined their own pockets by stealing millions of dollars in public funds dedicated to affordable housing. In doing so, they undermined HPD's mission and cheated the taxpayers, who ultimately fund that mission."

99. Many members of the public are deeply distrubed by, respectfully, the fraud-tolerant consequences the culprits faced. Due to the highly-sensitive nature of the evidence pertaining to this issue, Plaintiff respectfully asks the Honorable Court for an in-camera review.

*January 1970-Present: ACRIS Contains Thousands of Transfer Deeds of Affordable Properties to HPD Executives, Privileged Parties, Fictitious Entities, or Parties That Were Deceased*

100.   In many cases, it is *Defendant HPD* (alongside *City Hall and the NYC Law Department*) who facilitated the transfers. Some of the deeds even include a sworn proclamation that a public hearing was held, pursuant to which a public auction was held, and that the property was awarded to the *highest bidder at this auction.* The breach of administrative integrity  is two-fold: *first*, the *highest bid recorded rationally demonstrates no such bid was ever held*, as it is implausible the highest bid for a property worth between $500,000-$6,200,000 was in the $1-$2500 range. *Second*, equally concerning is the reference to public hearings and public auctions, which are nowhere to be found on official City databases.

101. When an affordable property is awarded to anyone- let alone, a privileged party- it is imperative that the hearings precipitating the transfer, must be held in the open.

*Not behind closed doors.* Records of these transfers must be readily accessible. The unconscionable terms, coupled by the suspicious similarity in some of the signatures, coupled by the lack of transparency cast a heavy shadow on the legitimacy of these transfers.

102.    In the interests of protecting the public, Plaintiff respectfully requests the Honorable Court to order that the Defendants provide in a timely manner full disclosure pertaining to the following transactions:

103.     On October 03, 2008, why did Defendants authorize, notarize, and sign off on the sale of an affordable, city-owned property to Lash Kocovic for the highest bid of $1000- a fraction of its market value? And why is the record of the hearing absent from the City Council public hearing database?

104.    On July 06, 2011, why did Defendants authorize, notarize, and sign off on the sale of an affordable, city-owned property at Decatur Ave to Decatur Properties LLC, for the highest bid of $2254- a fraction of its market value? And why is the record of the hearing absent?

105.    Similarly, on July 07, 2011, why did Defendants authorize, notarize, and sign off on the sale of an affordable, city-owned property to Mohinder Bahanot, as the highest bid of $1040-  a fraction of its market value? And why is the record of the hearing absent?

106.    Similarly, on January 15, 1995, why did Defendants authorize, notarize, and sign off on granting the same Mohinder Bahanot a city-owned, affordable property at Sutphin Blvd, Queens for $0 dollars?

107.    Similarly, on July 13, 2011, why did Defendants authorize, notarize, and sign off on the sale of an affordable, city-owned property to the BT Family Trust for the highest bid of $1,300- a fraction of its market value. Further, who exactly are the parties in the BT Family Trust? And why is the record of the hearing absent?

108.    Similarly, on August 10, 2011, why did Defendants authorize, notarize, and sign off on the sale of an affordable property valued at $690,000 for the highest bid of $250? Why is the record of the hearing absent?

109.    Similarly, between 2004-2018 why did Defendants authorize, notarize, and sign off on the sale of thirteen (13) affordable properties at Chester Park, Bronx, to Lovely Meah, as the limit is one affordable unit per person, and many applicants were rejected. Furthermore, how did Lovely Meah- a city employee school helper with an

annual salary of $17,000- and Nadir Ahmed- a fraud investigator for the Department of Homelessness ("DHS") with an annual salary of $40,000- finance the purchase of thirteen (13) affordable apartments? Do Defendants not recognize that this fraud is an egregious breach of the public's trust?

110. As it related to the subject property, Waterline Square, and adjacent properties at Riverside Blvd 40-60, why have Defendants awarded affordable apartments ineligible Hispanic applicants including but not limited to: Tatayana Maldeno, Jason C Rivera, Jason M Rivera, Hadith Narine, Kim Bevan, Stephanie Perez, Luis Brito, Adriana Salazar, Rosa Mendoza, Rosura Mendez, Edwardo Campanella (who was awarded an apartment after his confirmed death), Angie Acosta, Michael Acevedo, and Maria Martinez[54]?

*May 2019: The Luna Park Scandal*[55]

111. The Brooklyn D.A. arrested and indicted three women in connection with a bribery scam at the Luna Park Affordable Housing Mitchell-Lama Complex. The accused allegedly committed fraud, forgery and had taken $875,000 in bribes that enabled unqualified parties to skip the waiting list.

112. At the official press conference, the Brooklyn D.A., stated that the D.A. suspects the scam to be the norm. In turn, the Commissioner of DOI stated:

> "Protecting affordable housing in New York City is not just about building more units but also preserving fair access to the ones we have. These defendants undercut that effort by manipulating the rules on access to affordable housing apartments in return for hundreds of thousands of dollars in bribes, according to the indictment. The corruption vulnerabilities DOI found during this investigation are being addressed with the City's Department of Housing Preservation and Development, which has already begun strengthening its oversight of City-supervised Mitchell-Lama developments. DOI thanks the Brooklyn District Attorney's Office for their partnership and commitment in this important investigation".

113. In fact, many alarmed members of the public have wondered why HPD - who is mandated and has extensive resources (in fact- an entire division) to detect the fraud. Plaintiff alleges that this criminal conduct is induced, inter alia, by the culprits conviction they will avoid detection, due to lack of oversight; and that the public will

---

[54] Plaintiff hereby incorporates by reference NYSCEF, Appl. Div. 04206-2019, Document # 58, Exhibit J2.
[55] http://brooklynda.org/2019/05/21/three-luna-park-housing-corp-officials-indicted-for-conspiring-to-rec eive-bribes-forge-documents-to-corrupt-the-process-by-which-mitchell-lama-apartments-are-acquired/

continue to be aggrieved, as long as certain entities- such as wealthy Developers and Defendants HPD enjoy above-the-law status.

*2014-2018: ProPublica- Developers Steal $100 Millions Dollars Per Year*

114. In a shocking series of articles published between 2014-2018, investigative journalists Cezary Podkul and Marcelo Rochabrun, exposed the catastrophic harm inflicted on the public, which goes to the heart of the harm inflicted on Plaintiff. Simply put, for decades, numerous Developers have audaciously cheated the public, by claiming tax breaks but refusing to provide affordable housing. Despite collecting tax breaks over $100 million per year, these articles demonstrated that 200,000 affordable units which were required to be registered as rent-stabilized, were never registered to begin with, or in some cases, fraudulently converted back to market rate, in express violation of Regulatory Agreement 1.

115. The sinister factor enabling this breach was on full display when Defendant Hendrickson, and other HPD executives, testified before City Council, in a special hearing that was prompted by Pro Publica's expose. It is baffling to observe Defendant Hendrickson's resistance to any meaningful proposal aimed at redressing this travesty, such as claiming back the stolen $100 million. It is apparent that the breach of their statutory oversight mandate- failed to make any impression.

*The Defendants stunning press release on May 30, 2020, that they are holding a second lottery for Waterline Square.*

116. Based on Defendant HPD's own rules as illustrated in the HPD handbook, prior to holding a second lottery- which is not mentioned in any regulatory agreement- the Defendants must first process all applicants from the original lottery. Thus, in effect, Defendants are claiming that in the first lottery, they disqualified 73,773 applicants out of 74,000 applicants to Waterline Square as ineligible, and that as result of disqualifying 99% of the application pool, 22 apartments remained vacant. This unnerving admission supports the nucleus of this complaint.

117. The Defendants callous conduct is demonstrative of a cruel and unusual disregard for Plaintiff's life, as he continues to struggle to survive the pandemic, while facing unsafe living conditions, on-and-off homelessness, pursuant to 353 days of unjustified torment, while the last twenty-two (22) apartments for which he is

eligible- even according to Defendants cryptic, conclusory calculations- are given away to unqualified applicants.

*February 2015: HPD Employees Indicted Based on 26 Housing Bribery Schemes*

118. Pursuant to the indictment of 16 employees in HPD and the Department of Buildings, in connection with 26 separate bribery schemes, the Manhattan D.A. stated[56]:

> "These accused individuals put their own enrichment ahead of their duty and moral obligation to keep New Yorkers safe. Working with the Department of Investigations, we have re-inspected every property possibly touched by this fraud to ensure their safety and hold owners and contractors responsible for following the law".

## DEFENDANTS CONTINUE TO DELETE INCRIMINATING EVIDENCE FROM ACRIS, CREDIT REPORTS, CITY PAYROLL DATABASES[57]

119. Under Federal Rules of Civil Procedure Rule 37 possible sanctions are: dismissal of the wrongdoer's claim, entering judgment against the wrongdoer; excluding expert testimony; and application of adverse inference rule. Title 18 of United States Code Sections 1503-1519 prohibits a party from destroying or assisting another in destroying evidence, and provides for criminal prosecution against the wrongdoer.

120.    Plaintiff alleges that upon commuting to opposing counsel, or filing with the courts incriminating evidence, the Defendants have instantly moved to modify, or delete incriminating evidence.

121. Upon Plaintiff submitting to the Court incriminating evidence on February 03, 2020, proving, *inter alia*, the fraudulent transfer of Properties through the fictitious straw parties, such as, Meah Lovely, Meah Lovely T, Nader Ahmed, and Ahmed Nader[58], Defendants abused their authority by logging in to official city payroll databases, and deleting these profiles. Further, upon Plaintiff protesting the alteration of official records, the deleted employee profiles were instantly restored.

---

[56] https://commercialobserver.com/2015/02/50-arrested-through-building-inspection-investigation/
[57]   Plaintiff hereby incorporates all factual assertions pertaining to these allegations by virtue of EXHIBIT K.
[58]NYSCEF Appl. Div., Docket #9, 04206, EXHIBIT B-E.

122.    Further, the Defendants have removed from ACRIS numerous regulatory agreements pertaining to 421 -a from numerous Inclusionary Zoning Affordable Properties. As a matter of law, these regulatory agreements must be accessible to the public.

123.    Further, upon Plaintiff releasing to Defendants counsels, on June 28, 2020, a list of unlawful residents at Waterline Square, Defendants and/or their co-conspirators promptly removed, on June 29, removed incriminating information credit reports.

124.    Further, in immediate response to Plaintiff submitting such incriminating evidence, multiple judges (trial and appellate) and court attorneys that decided Plaintiff's case, released property interests that were unlawfully obtained (for example, simultaneously residings in multiple rent-stabilized apartments), and which were held onto- in some cases- for over thirty-five years.

125.     That simultaneously with the release of these interests, the Court proceeded to issue, on its own motion, a draconian gag order which, *inter alia*, barred Plaintiff from submitting any further such evidence, while setting aside the well-established percent and due process (NYSCEF Appl. Div 04206-2019 # 27).

### FACTUAL ALLEGATIONS REGARDING THE APPLICATION PROCESS

126.    The subject property is a residential complex in Manhattan with 1132 housing units, developed by the Developers, GID Group and Extell. Of these units, 269 units are designated by the relevant statutes as affordable housing units for applicants whose annual income is between $37,578-$43,860. In ten years of applying to affordable housing, Plaintiff never received a number low enough to advance him past the initial lottery stage.

127.  Plaintiff filed a timely application in July 2018, for a one-bedroom or studio apartment at the Property. Over 74,000 applicants applied to the Property.

128.     For the first time in ten years of applications, Plaintiff received an extremely favorable priority, placing him in the 0.9987% priority percentile. For the first time in ten years of applications, this number effectively guaranteed Plaintiff an apartment, permitting he passed the income calculation phaze[59].

---

[59] Plaintiff's actual log number/number of applicants = 103/74,000 = 0.9987%.
Plaintiff's *raw log number* was #5695- the lowest (and as such- most favorable) number he ever received. Considering the Developer was mandated by law to give applicants from Community Board 7 a 50% preference (Plaintiff lived in Community Board 7), Plaintiff's *actual log number*- as confirmed by the specific property manager, Mr. Gabrial Mombrun- was #103. Per Mr. Mombrun's account,

129.     On March 05, 2019, Plaintiff was called in for an initial (first-ever) interview at the BG offices. In this meeting, Plaintiff furnished all documents that were required of him. From March 05, 2019 to June 07, 2019, Plaintiff complied in a timely manner with eight additional requests for hundreds of additional sensitive financial documents.

130.     Throughout this entire period, Plaintiff was subjected to the admittedly-unlawful conduct[60] of Defendant Fong, who violated lawful procedure and deprived Plaintiff of various rights, including the right for a fair application process by: (1) applying pressure on Plaintiff to withdraw his application; (2) threatening to reject Plaintiff for infractions such as redacting sensitive information, or sending files in the wrong format; (3) taking active measures to have Plaintiff rejected, for example, demanding new files hours before a critical deadline; (4) lying to Plaintiff in emails about the time of a critical deadline. There was no reason, no justification for Fong's outrageous conduct, which remains unexplained.

### I.     June 7, 2019: Plaintiff Is Notified of Qualification

131. On June 07, 2019, at 11:53am, after undergoing an excruciating, eight-month application process that featured countless violations of law, Fong notified Plaintiff his application was approved, and that he would be coming to sign a lease on the week of June 10, 2019.

### II.     June 10, 2019: Fong Issues 1st Rejection

132.     Upon politely protesting a disturbing attempt to sabotage his application by Fong, Plaintiff was sent a cryptic 1st rejection letter, based on the unauthorized and unlawful-per-se cause of 'inconsistent information'.

133.     The rejection letter sent to a good-faith after a grueling, eight-month application process, did not reveal what information was allegedly inconsistent.

134.     Critically, the Handbook and the Regulatory Agreement- as the relevant authorities- specifically prohibited a rejection based on such a cause. Till this day, nearly nine months later, neither Defendant, nor their respective counsel, offer any justification for this unlawful 1st rejection.

---

were Plaintiff to pass the income evaluation phaze, his low log number effectively guaranteed him an apartment.
[60] Plaintiff presented to Defendants counsels' hi-quality audio recordings, in which Fong's manager, Labarta, apologized for Fong's unlawful conduct.

135.     Worse yet, the bitter truth is that once that first rejection is issued, the applicant is doomed. No matter how baseless, both Defendants will stop at nothing to affirm the original determination, even if they have to *discover novel justifications to reject the affordable housing applicant.*

136.     We know this for three reasons: (a) HPD's spokesperson admitted this fact with an investigative journalist[61] who authored a paper illustrating the stomach-turning injustice inflicted on millions of affordable housing applicants; (b) due to the dismal number of determination reversals; (c) alas, it is also rational: rather than exposing an arbitrary and capricious determination, Defendants are motivated to appear competent by *discovering new post-facto justifications that gives credence to a baseless prior rejection.*

137. On first appeal, Defendant Labarta, senior manager at BG, apologized for the rejection and the unlawful conduct of Fong. Labarta immediately reversed the determination. Defendant Labarta then required Plaintiff to undergo a second evaluation of documents which had already been vetted and given three months prior, in violation of law[62].

138.     In recorded conversations, Labarta promised that in an effort to remedy the torture Fong had unjustly inflicted, that *she would reach out to Plaintiff regarding any questions she would have- prior to issuing a second rejection.*

139.     The ensuing events:

    i.     June 28, 2019: Defendant Rosen Lies about File Being Transferred.

    ii.     June 11-July 03, 2019: Defendant Pell's Shows Indifference to her oversight obligations[63].

    iii.     July 03, 2019: Defendant Cucurullo Issues 3rd Rejection, copy-pasting Defendant Labarta Issues 2nd Rejection, and adding a new cause of unlawful-per-se inconsistent information, different than the original.

---

[61] EXHIBITS A3-A4 of Docket # 9 on NYSCEF, Appl. Div 1st Dep. 2019-04206.

[62] Page 5 of the Handbook specifically requires the application process to be fair. Forcing an applicant to undergo a second evaluation of documents that were already approved, is anything but fair.

[63] On June 11, 2019, Plaintiff contacted Pell. Pell did absolutely nothing to enforce the blatant violations of the Handbook. HPD's FOIL response demonstrates that not a single internal HPD communication showed any concern about a marketing agent rejecting applicants based on fictitious justifications.

      iv.    July 9, 2019: Pell Issues 4th Rejection based on a different income calculation method that is specifically refuted by the Regulatory Agreement, and a series of astounding conclusory numbers that are refuted by hundreds of financial documents.

## I.    <u>Defendants Deprived Plaintiff's Right for a Fair Application Process</u>

140.    Page 5 of the Handbook states:

> The primary objective of the marketing, lease-up and sales effort is to ensure that the process is fair and provides equal opportunity to all applicants, regardless of race, color, religion, gender, sexual orientation, gender identity or expression, national origin, age, genetic information, disability, or veteran status. s and within the neighborhood, and by providing applicants with mobility, vision, or hearing disabilities that require accessible/adaptable units.

By virtue of this provision, Plaintiff (and all other applicants) were granted the right to a fair application process. And yet, denial of Plaintiff's right for fairness is the common thread prevalent throughout all of the deprivations stated herein.

## II.    <u>Defendants Deprived Plaintiff's Right Not to Be Denied of a Valid Property Interest Without Due Process</u>

141.  The 14th Amendment states that[64]:

> [...] nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

142.    It is long-established[65] that due process limitations on deprivation or frustration of valid property interests extend beyond the *strict taking of property* defined by the 5th Amendment[66]. Procedural due process includes "the right to be heard at a meaningful time and in a meaningful manner[67]".

---

[64] U.S. Const. amend. XIV, § 1.
[65] *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Goss v. Lopez*, 419 U.S (1979); *Barry v. Barch* 443 U.S. 55 (1979); O'Bannon v. Town Court Nursing Center, 447 U.S. 773 (1980), and the Second Department decision in *Fred F. French Inv. Co. v City of New York*, 39 NY2d (1976).
[66] *Fred F. French Inv. Co. v City of New York*, 39 NY2d, 593 (1976).
[67] *Mathews v Eldridge*, 424 US 319, 333 (1976).

143.     Plaintiff acquired a valid, tangible, concrete property interest in the Property, under federal and state law by virtue of:

     i.   Receiving a priority number in the 0.9987% percentile to rent a one-bedroom apartment, for life, at a below-market, rent-stabilized rate.

     ii.   In this regard, the extraordinary economic value, coupled by the rare probability of such an occurrence support the acquisition of a tangible property interest. In similar fashion, the purchaser of a winning lottery ticket rationally acquires a tangible property interest in the lottery winnings.

     iii.   Paying a non-refundable background/credit check fee.

     iv.   Completion of the grueling application process, pursuant to furnishing hundreds of personal financial documents, and compiling with eight additional requests for additional personal information.

     v.   Being promised by BG on June 07, 2019 that he would be signing a lease the following week.

Nevertheless, Defendants repeatedly denied Plaintiff's pleadings to be heard. As such, Plaintiff's property- as a valid property interest-was unlawfully deprived.

144.     As further support, in *Goldberg*, the Supreme Court held that the termination of a benefit that could result in a *devastating loss of food and shelter*, required a *pre-deprivation* hearing. In the case at bar, Plaintiff is not seeking a *pre-deprivation* hearing, rather, merely to address the glaring calculation errors, discrepancies in the determinations, and rampant violations of lawful procedure, in a *post-deprivation* hearing.

145.     In addition, it is well-established[68] that deprivation pursuant to a quasi-judicial tribunal[69] determination requires a fair, impartial, adversarial hearing. Defendants determination process arguably constituting  a quasi-judicial determination, further supports Plaintiff's right to receive a fair, post-deprivation hearing[70].

---

[68] For example: Mtr. of Sowa v. Looney, 23 N.Y.2d 329, 333 (1968); Mtr. of Atkins v. Goord, 16 AD.3d 1011 (3d Dep't 2005); and Mtr. of Fuchino v. Herbert, 255 A.D.2d 914 (4th Dep't 1998).

[69] Defined as a: "non-judicial that has powers and procedures resembling those of a court of law, and is obliged to objectively determine facts and draw conclusions from them so as to provide the basis of an official action", in West's Encyclopedia of American Law, First Edition, Vol. 12.

[70] To reiterate, Plaintiff's argument for deprivation of due process is- respectfully- valid regardless of whether Defendants constituted a quasi-judicial tribunal by virtue of the other reasons stated herein.

146.    It has been more than a year and half since Plaintiff was rejected for "*undisclosed inconsistent information*", a series of unexplained mathematical errors, and 4 rejections based on 5 shifting reasons. Procedural due process, the fairness requirement[71], the gravity of these determinations, all the aforesaid and forgoing reasons all weigh in favor of Plaintiff being granted a fair, adversarial hearing by an impartial tribunal.

### III.    Defendants Deprived Plaintiff's Right Not to Be Subjected to Arbitrary and Capricious Decision Making

147. As a matter of law[72]: "an applicant shall not be rejected for any reason that is not consistent with the rejection criteria stated in the Marketing Plan and Agency Selection policies". By virtue of this provision, Plaintiff had a right not to be rejected based on a cause inconsistent with the rejection criteria.

148.    Defendants first ("*unspecified inconsistent information*") and third ("*inconsistent information*") rejections deprived Plaintiff of this right and violated lawful procedure by invoking an unlisted, unlawful-per-se cause. In doing so, Defendant BG violated Plaintiff's rights pursuant to the Handbook[73].

149.    Furthermore, the first rejection letter did not specify what information was inconsistent, thereby crippling Plaintiff from understanding why he was rejected and from being able to file a meaningful appeal.

150.    Furthermore, the post-facto written admission given by Defendant BG claimed the "*undisclosed inconsistent information*" was related to something heard over a phone conversation. Defendant's official company policies (as admitted), as well as common sense, require rejections to be based on the written record, rather than speculative hearsay.

### IV.    Defendants Deprived Plaintiff of the Right to Clarify and/or Cure Questions Re Income

151. As a matter of law[74], if questions regarding income arise the Marketing Agent "*must conduct further review* to determine whether the highest calculation is also the most accurate. Marketing Agents may request additional documentation from applicants or third party sources". In addition, the fairness requirement necessitates that the decision maker, at the very least, take into account clarifying information on the

---

[71] Page 05 of the Handbook.
[72] Section 4.4.A(I), page 23 of the HPD Handbook.
[73] Page 5 of the Handbook requires fairness. Page 28 prohibits rejections based on unauthorized causes.
[74] Pages 47, 56 of the Handbook.

record. Here, all four rejections violated these provisions, and consequently deprived Plaintiff of his right for further review.

**V.   Defendants Deprived Plaintiff of the Right to Specific and Detailed Reason Why The Applicant Cannot Be Approved**

152.    The Handbook[75] states: "if the Marketing Agent finds the application still to be ineligible after the appeal review, the appeal rejection notice *must provide specific and detailed reason* why an applicant cannot be approved". Accordingly, Plaintiff had a statutory right to be given a specific and detailed reason. All four determinations miserably missed the mark.

153.    The first determination failed to give any reason at all beyond a vague- and unlawful per se, as illustrated- "*undisclosed inconsistent information*".

154.    The second and third determinations showed four conclusory numbers, without properly providing the underlying computations, aside from a single, misleading reference. Illustrating the misleading nature of this reference, is that it caused the Court to incorrectly infer *Extreme Reach* was a reference to Plaintiff's rent capabilities, when in truth, *Extreme Reach* was the name of Plaintiff's employer.

155.    Despite Plaintiff repeatedly protesting the glaring mathematical errors prevalent in all four determinations, all three of the "appeals" utterly ignored Plaintiff's clear illustrations of errors, and refused to remedy, or even address these errors in subsequent rejections. Similarly, it is likely not a coincidence all the decision makers simply chose to ignore subsequent emails asking for clarification.

**VI.   Defendants Deprived Plaintiff of the Right for Application to be Processed With Minimal Competency**

156.    The Handbook requires all marketing agents- to include BG- to undergo extensive training in order to master knowledge of the Handbook. Common sense also supports this considering BG had access to sensitive financial information of hundreds of thousands of applicants. It is axiomatic that such knowledge includes the (a) legitimate reasons for rejecting an applicant (b) correct method of income calculation.

157. In the 1st rejection, Defendant Fong invoked the unlawful rejection cause of "*unspecified inconsistent information*". *In* the second rejection Defendant Cucurullo invoked unlawful cause of "*inconsistent information*". Both of these causes are arbitrary, capricious per se.

---

[75] Page 28 of the Handbook.

158.    Furthermore, BG apologized in a recorded conversation for Fong's violations of BG policy  by continuously applying pressure on Plaintiff to withdraw his application.  In addition, BG acknowledged in a sworn affidavit that all of its employees- including senior management- Cucurullo, Labarta, and Palmieri- all applied an erroneous calculation method that substantially differs from the correct calculation according to HPD's sworn affidavit. Coupled with other outrageous, material violations, it is quite clear that BG lacks the most basic training.

159.    Had BG complied with the training requirement, Plaintiff's income would not have been miscalculated, his application would not have been mishandeld, and Plaintiff would have been spared indescribable pain and suffering. Had HPD properly complied with its oversight mandate, BG would be obligated to familiarize its employees with essential matters, such as the correct method for income calculation, and legitimate reasons to reject an applicant. This failure is another shameful illustration of HPD's utter disregard for its statutory obligations.

### VII.    Defendants Deprived Plaintiff of the Right for his Income to be Calculated Objectively and Based on the Entire Record

160.    Not only are each of the numbers in the four determinations conclusory and unsubstantiated, they are also erroneous and inconsistent by any objective, honest review of the *entire record.* By refusing to examine the *entire record*, clarifying documents, and in some cases-deliberately misconstruing Plaintiff's income, Defendants deprived Plaintiff of his right for a fair Process.

161. For example: (a) the figure stated for unemployment gift income ($12,754.62) is arbitrarily at odds with the official unemployment award document that was provided ($11,284.00); (b) the self employment income arbitrarily disregards more than $16,000 in proven income for no apparent reason supported by dozens of documents;  (c) the second rejection does not even bother explaining why $10,000 of family gift income was ignored, while the 3rd determination states that no proof was provided, whereas Plaintiff provided the exact proof that was requested by BG; Magnifying the egregious nature of the first three determinations is the fact both decision makers, Labarata and Cucurullo, ignored subsequent emails merely requesting to understand their bewildering conclusions.

162.    Furthermore (d) the fourth determination is based on a different calculation method (without any explanation for the discrepancy), and avoids explaining why it

determined Plaintiff's income to be 0. Amplifying the egregious nature of the fourth determination is the fact the decision maker, Pell, ignored subsequent emails merely asking to apprehend her puzzling conclusions.

163.     Furthermore (e) HPD's cryptic assertion that Plaintiff's self employment income in 2018 was 0 is irrational, unreasonable, and easily refuted by dozens of documents. Plaintiff submitted ample documentation showing sales exceeding $18,875, as well as documentation showing his average business expenses. Based on the single error[76] in Plaintiff's tax return, his business expenses had to be north of $24,000 to justify a loss of $4526. If the review system was honest and/or unbias, the discrepancy between the declared business expenses and $24,000 would have raised a red flag for HPD. It did not. Rather, Pell pounced on the opportunity to falsely conclude that Plaintiff's income from self-employment was 0, based on a mistake which is glaring to any objective auditor. In doing so, Defendant HPD, once again, deprived Plaintiff of his right for fairness.

## CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS

(1) _Deprivation of a Valid Property Interests Without Due Process in violation of the 14th Amendment of the U.S. Constitution_

164.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

165.     By virtue of paying non-refundable background and credit check fee, receiving a once-in-a-lifetime, favorable lottery number for the first time in ten years (Plaintiff's community board priority log number/number of applicants = #103/74,000 = 0.9987%), completing an eight-month application process, furnishing hundreds of sensitive financial documents, compiling with eight additional requests for information, completing the Process, being promised that he would be signing a lease on the week of July 10, 2019, and, Plaintiff acquired a valid property interest under federal and state law in the Manhattan-based subject property.

166.     Plaintiff was deprived of this property interest without an opportunity to be heard, and by Defendant's continuous refusal to address conclusory numbers and glaring computational errors. Defendant's deprivation of Plaintiff's property interests is aggravated by the fact that Defendant's determinations arguably constituted a quasi-judicial determination. As such, Defendants have deprived

---

[76] This single error has since been corrected at the behest of Defendant HPD, to no avail. Under the new calculation, Plaintiff qualifies even according to the disputed, incomplete reasons Defendants asserted.

Plaintiff of a property interest without due process of law, in violation of the 14th Amendment to the United States Constitution.

*(2) Defendants Breach of Contractual (or Quasi-Contractual) Obligation to Abide by their Own Rules in Violation of Common Law Contract Theory*

167.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above. Page 5 of the Defendant HPD Handbook states: "the primary objective of the marketing, lease-up and sales effort is to ensure that the process is **fair** and **provides equal opportunity** to all applicants, regardless of **race**, color, religion, gender, sexual orientation [...] in addition, the process should affirmatively further fair housing by promoting racial, ethnic, income, and geographic diversity among residents and within the neighborhood". By overwhelming evidence, Defendants have **rendered this provision null and void- breaching their contractual obligation for a fair Process and disregarding their fiduciary duties.**

168.     Common law elements for a valid contract are: valid offer, acceptance, mutual assent and consideration. Here, the factual allegations stated herein support Plaintiff's case for a prima-facie case for a valid contractual, or at least, a quasi-contractual relationship[77] that was breached by Defendants baseless rejections and related deprivations.

169.     By virtue of the aforesaid, Defendants were contractually obligated to abide by their own rules, first and foremost- to conduct a fair Process. This breach has caused Plaintiff harm, pain and suffering.

*(3) Breach of Fiduciary Duties to Ensure of Fair Process and Abide by Protective Regulations*

170.      Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

171.  Defendants both violated their fiduciary duties that were established by virtue of their obligation to oversee a fair application process, abide by their own rules, the Protective Regulations, and refrain rejecting applicants based on arbitrary and/or racially discriminatory reasons.

*(4) Deprivations of rights secured by Civil Rights Act of 1871, 42 U.S.C. § 1981*

172. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

---

[77] *Henry S. Bloomgarden, Appellant, v. Charles B. Coyer et al, 479 F.2d 201 (D.C. Cir. 1973).*

_(5)Deprivations of rights secured the Civil Rights Act of 1968 Fair Housing Act, 42 U.S.C. §§ 3601–19_

173. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. Based on whistleblower testimony and on public records, Defendants have discriminated against all non-Hispanic applicants, by awarding a disproportionate number of apartments to Hispanic applicants. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

_(6)Deprivations of rights secured by Title VI of the Civil Rights Act of 1964 (nondiscrimination in federally assisted programs), 42 U.S.C. § 2000d-1_

174. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

_(7) Deprivations of rights secured by Article XVII of the New York State Constitution_

175. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein

176.   Plaintiff is a citizen of the United States, and at all relevant times, has been domiciled in New York City. As such, Plaintiff is entitled to (and limited by) the rights, privileges, duties, protections, and freedoms granted by decrees, laws, and provisions of New York City, New York State and the U.S. Constitution.

177. The right for adequate shelter is well-established[78] in New York State and New York City, which arguably offer the most comprehensive shelter rights in the United States. The New York State Constitution specifically obligates the state to care for those in need:

> The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine[79].

178. Due to the pandemic, public shelters are not adequate.

179.   In the landmark First Department *Callahan* case[80], New York State and New York City were obliged to recognize the right of every homeless man to receive shelter and board. In *Eldredge*[81], the *Callahan* holding was expanded to apply to homeless

---

[78] *Callahan v. Carey*, No. 79–42582 (Sup. Ct. N.Y. County, Cot. 18, 1979);  *Eldredge v. Kock*, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983); *McCain v. Koch*, 511 N.E. 2D 62 (N.Y. 1987).
[79] Article XVII, Section 1 of the New York State Constitution.
[80] *Callahan v. Carey*, No. 79-42582 (Sup. Ct. N.Y. County, Cot. 18, 1979).
[81] *Eldredge v. Kock*, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983).

women, and in *McCain*[82], the *Callahan* holding was expanded to include homeless families.

180. Due to the pandemic, public shelters are not adequate. They are life threatening.

181. As a resident of New York State, Plaintiff has a right for adequate shelter. After applying for ten years to affordable housing, Plaintiff finally was promised- after a long application process- a once-in-a-lifetime-opportunity[83] for permanent housing. Permanent housing is in itself a valued public interest, as evident by the very concept of affordable housing. Defendants should, as a matter of law, equity, and common sense, utilize the express authority granted to them[84] to cure the harm caused by their outrageous mishandeling of Plaintiff's application[85].

(8)    *Violations The New York State Human Rights Law as contained in New York State Executive Law § 296*

182. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

(9) *Violations Title 24 of the Code of Fed. Reg. Discriminatory Conduct Under the Fair Housing Act ("Title 24");*

183. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

(10) *Violations of Executive Orders 11063, and Executive Order 12898*

---

[82] *McCain v. Koch*, 511 N.E. 2D 62 (N.Y. 1987).

[83] Defendant HPD claims Plaintiff can't demonstrate that he won't be able to find a similar apartment. This cynical and irrational argument is equivalent to telling the winner of the state powerball lottery that he can't prove he won't the lottery a second time.

[84] The Court's settlement recommendation, the minimum income waiver for DHS referral pursuant to page 40 of the Handbook, the authorization granted pursuant to extenuating circumstances provisions on pages 41, 42, and 56, and the fairness requirement on page 05, *inter alia*, heavily support the grant of a limited injunction.

[85] Defendant BG is clearly incompetent of processing thousands of applications containing sensitive financial information. Counsel has done everything possible to sugarcoat this fact, conjuring up a flurry of post-facto rationalizations. Shattering to pieces these bad-faith attempts is the correspondence from the decision maker at HPD to BG, which was omitted from the administrative record, and reluctantly exposed in the heavily-redacted FOIL request (EXHIBIT B2 of the Motion).

184.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein. *As result of Defendants unlawful practices aforesaid, Plaintiff has suffered severe harm and loss.*

<u>(11-21) Criminal Conduct in Violation of the RICO</u>

185.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein, including EXHIBIT F, EXHIBIT G, EXHIBIT H.

186.    As direct and proximate result of Defendants embezzlement of public property, wire fraud, bribery of public officials, spoliation of evidence, corruption of State-related proceedings pertaining to the judicial machinery, obstruction, perjury, intimidation of whistle-blowers, and discriminatory housing practices, and other practices to be pursuant to an in-camera review with the Honorable Court, Plaintiff continues to endure extraordinary harm, monetary damages, prolonged homlessness, humiliation, severe emotional distress, mental and physical anguish and suffering, and damages to be determined at trial.

187. Further, the threat to the public's welfare strongly supports treble damages pursuant to the RICO. Throughout the hell Plaintiff endured, he has met dozens of other wrongfully-rejected, low-income, affordable-house applicants. In addition to those, hundreds of detailed horror stories from other aggrieved applicants are available on-online. These applicants - some of whom are verified by the official apology posted by the oversight agency- detail a sickening corruption in an application process that is mandated by law to be fair and transparent.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully prays for relief as follows:

I.    Limited relief to escape the suffering of homelessness, based on the merits and the compelling evidence of an inexpressible misscarriage of justice.

II.    Alternatively, temporarily issue a stay of the Waterline Square application process, such that the Defendants will not be able to give away the last apartment, prior to discovery.

III.    Award of damages, according to proof, including compensatory, treble and liquidated damages, to be paid by Defendants, in an amount to be determined at trial.

IV.    Declaratory relief as articulated in this Complaint, and has been articulated in Plaintiff's pending orders to cause on the dockets.

V.    As an equitable remedy for the sickening ways Plaintiff's basic rights for due process of law were set aside in State proceedings, time and time again[86], may the Honorable Court consider hiring a pro bono attorney in some capacity.

VI.    Due to the sickening breach of administrative integrity of top NYC public officials and the corruption of the judicial process, may the Honorable Court consider ordering an investigation from a federal investigative agency that has no ties or affiliation to the practice of transferring properties for free.

VII.    Any further legal and equitable relief that the Honorable Court deems appropriate and just. I, hereby affirm under the penalty of perjury that the forgoing is true and accurate to the best of my knowledge and belief.

Respectfully submitted,

Abraham Gross



---

[86] Appl. Div. NYSCEF, 04-206, #27, and pages 1- EXHIBIT H11.