# EXHIBIT H

# PLAINTIFF'S SECOND AMENDED COMPLAINT

## RE: CORRUPTION OF STATE PROCEEDINGS

### HEREINAFTER,
### AND TO THE EXTENT
### APPLICABLE IN OTHER EXHIBITS

### "APPLLENAT"="PLAINTIFF"
### "RESPONDENTS=DEFENDANTS"

EA
8/20/19
F

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    HON. JOHN J. KELLEY _____    PART    IAS MOTION 56EFM

                                  Justice

------------------------------------------------------------X

In the Matter of                                        INDEX NO.    101081/2019

ABRAHAM GROSS,                                   **MOTION DATE**    08/06/2019

                          Petitioner,            **MOTION SEQ. NO.**    001

                - v -

AFFORDABILITY OVERSIGHT PROGRAM OF
DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT, BREAKING GROUND, RCB1            **DECISION, ORDER, and**
RESIDENTIAL FOR SALE, LLC, RCB3 RESIDENTIAL FOR    **JUDGMENT**
SALE, LLC, and RCB4 RESIDENTIAL FOR SALE, LLC,

                          Respondents

------------------------------------------------------------X

**FILED**

AUG 2 3 2019

COUNTY CLERK'S OFFICE
NEW YORK

AUG 2 3 2019

COUNTY CLERK'S OFFICE
NYS SUPREME COURT - CIVIL

| The following papers, numbered 1 _____ -9 _____ , were read on this application to/for | | CPLR ART 78 |
|---|---|---|
| Notice of Motion/ Petition/ OSC - Affidavits - Exhibits | No(s) | 1-4 |
| Answering Affidavits - Exhibits | No(s) | 5-8 |
| Replying | No(s) | 9 |

In this CPLR article 78 proceeding, the petitioner, Abraham Gross, seeks judicial review

of a July 9, 2019, New York City Department of Housing Preservation and Development (HPD)

determination that his income was insufficient to qualify him for a subsidized apartment at the

Waterline Square apartment complex in Manhattan. The petition is denied and the proceeding

is dismissed.

By interim order dated July 18, 2019, the court, pending hearing of the petition, stayed

the respondents from leasing out any studio or one-bedroom apartment covered by the housing

lottery in which the petitioner participated to anyone with a less favorable lottery number than

the petitioner. The court directed the petitioner to file and serve an amended petition adding the

building's marketing agent and owners as respondents. It further directed him to articulate

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 1 of 6

Printed: 8/23/2019

specific instances supporting his allegations the marketing agent's representative, Travis Fong, engaged in wrongful conduct and that the denial of the petitioner's application was rendered in retaliation for his complaints about Fong. At oral argument on August 6, 2019, the court extended the stay pending further order of the court.

The petitioner amended the petition to add marketing agent Breaking Ground and the owners of Waterline Square as respondents. The court directed all respondents to answer the amended petition on or before August 9, 2019, and the HPD to file the administrative record. The court permitted the petitioner to serve and file reply papers, and he did so.

Where an application for subsidized affordable housing is denied on the ground that the applicant does not meet the required income criteria, a court's review is limited to whether the determination was arbitrary and capricious, and whether the criteria and methodology employed by the decision maker were rational (*see Matter of Ozdoba v Chelsea Landmark, LLC*, 74 AD3d 555, 556 [1st Dept 2010]).

Here, the approval of the petitioner's application was conditioned upon his submission of proof satisfactory to Breaking Ground, and ultimately to the HPD, that his income qualified him for participation in the Inclusionary Housing Program codified at section 23-90 of the New York City Zoning Resolution (ZR). For a studio apartment, the program required the petitioner to establish that he had an average minimum income of $37,578 and an average maximum income of $44,820 over the two tax years prior to the submission of the application. For a one-bedroom apartment for one person, the program required an average minimum income of $40,252 and an average maximum income of $44,820 over that two-year period. The HPD rationally concluded that the petitioner did not satisfy the minimum two-year average.

The petitioner provided numerous documents to Breaking Ground, as it was the entity tasked with the initial review of the petitioner's financial qualifications. In an application letter dated March 1, 2019, the petitioner reported to Breaking Ground that his income for the year 2016-2017 was $27,900, that his income for 2017-2018 was $41,300, and that his income for

2018-2019 was projected to be $42,300. On June 10, 2019, Breaking Ground sent a rejection letter to the petitioner, indicating that his application was being denied because he provided inconsistent information on his application and supporting documentation. Although the petitioner characterized the rejection letter as providing no basis for the conclusion that his application contained inconsistent information, the record reflects that the petitioner provided four different figures for his annual gift income---$8,000, $8,333.33, $10,000, and "upwards of" $12,000, with no proof in admissible form that he was receiving any of those amounts. Rather, the first figure was set forth on a bank statement that did not indicate from what source the amount originated or to whom it was tendered. The second figure was set forth in handwriting at the top of the bank statement. The third figure was set forth in the petitioner's letters. The fourth figure was calculated based on an unsigned, unsworn email from the petitioner's father, in which he stated that he had provided the petitioner with gifts in the sum of "upwards of" $1,000 per month. The court notes that, in his application for poor-person relief, the petitioner asserted that his gift income was $800 per month, or $9,600, yet another figure.

After the petitioner submitted further documentation to Breaking Ground, it rejected the petitioner's application by letter dated June 20, 2019. In that letter, Breaking Ground concluded that the petitioner's qualifying annual income was $16,379.58, thus rendering him ineligible for a subsidized apartment. Specifically, Breaking Ground calculated his unemployment insurance income as $12,754.62 and his net income from self-employment as $2,627.66. It further determined that any gift income that he allegedly received was not proven with documentary evidence, and that he could only afford an "extreme reach" monthly rent of $997.63. The petitioner appealed that rejection. In a determination dated July 3, 2019, Breaking Ground denied the petitioner's appeal, again calculating his annual income as $16,379.58.

In accordance with HPD's procedures, the petitioner filed a complaint with HPD, as the municipal agency that manages the affordable housing program to which he applied. Based on his income tax returns, HPD determined that the petitioner's 2017 income was $9,565.00, all of

which was in the nature of wages, and that his 2018 income was $30,850.00, representing $18,685.00 in wage income, $2,600.00 in unemployment insurance income, and $0 in self-employment income, inasmuch as he reported a business loss of $4,506.00 on his 2018 tax return. Moreover, HPD calculated the petitioner's gift income for 2018 as $12,000.00, based on his father's email letter explaining that he provided "upwards of" $1,000.00 per month in gifts to the petitioner; because $12,000.00 exceeded the maximum permissible gift income of $10,000.00, no gift income was included in HPD's calculation. Taking the petitioner's average annual income over the 2017-2018 tax years, HPD calculated his qualifying income as $15,425.00, well below the required minimum annual income of $37,578.00.

The petitioner, in effect, contends that HPD should have included in its calculations the sum of $10,000.00 in gift income for 2018 and an additional $10,037.00 in "other income" that he reported on his 2018 tax return in connection with his activities re-selling artwork. He thus essentially asserts that his income for 2018 should have been calculated as $50,887.00. The court concludes that the HPD's calculation of the petitioner's income without these income streams was rational and not arbitrary and capricious. The relevant Marketing Handbook for HPD-subsidized apartments provides that "households receiving gift income exceeding $10,000/year are not eligible unless they would be income eligible with or without gift income." Inasmuch as the HPD rationally concluded that the petitioner's gift income exceeded $10,000 per year, that the petitioner would not be income eligible with or without gift income, and that he would remain ineligible even if the HPD accepted his contention that he only received $10,000 in gift income during 2018, its rejection of the petitioner's application was not arbitrary and capricious.

Even had the HPD accepted the petitioner's 2018 numbers, the petitioner's average annual income for 2017-2018 would only have been $30,226.00, and thus below the minimum annual income requirement. Moreover, the court notes that the petitioner reported two streams of self-employment income on his 2018 tax return---one in which he reported a $4,506.00 loss

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                                    Page 4 of 6

Printed: 8/23/2019

and the other, totaling $10,037.00, that was incorrectly reported as "other income," rather than self-employment income. Hence, the petitioner should have reported $5,531.00 in self-employment income for 2018. Nonetheless, even if the HPD should have deemed the petitioner's 2018 self-employment income as $5,531.00, rather than $0, the petitioner's total income for that year would have been $36,381.00, making the 2017-2018 average $22,973.00, a figure still insufficient to qualify the petitioner for an apartment in Waterline Square.

Contrary to the petitioner's contention, the respondents did not first approve of his application for an apartment and then rescind the approval. There is nothing in the administrative record establishing that his application was ever formally and fully approved. In any event, the doctrine of estoppel will not create eligibility for inclusion in a program where, by statute---here the ZR---a person clearly does not qualify (*see Matter of Heil v New York State & Local Retirement Sys.*, 125 AD3d 1088, 1089 [3d Dept 2015]; *see also West Midtown Mgt. Group, Inc. v. State of N.Y., Dept. of Health, Off. of Medicaid Inspector Gen.*, 31 NY3d 533 [2018]). Moreover, the fact that the HPD calculated the petitioner's income differently from Breaking Ground does not establish that its ultimate rejection of his application was arbitrary and capricious. Rather, the complaint to HPD was in the nature of an appeal from Breaking Ground's determination, and an administrative appellate tribunal has authority to make findings different from the initial decision maker (*see generally Matter of Braband v Sweeney*, 239 AD2d 627 [3d Dept 1997]).

A court's review of administrative determinations is limited to the record made before the decision maker (*see Matter of Featherstone v Franco*, 95 NY2d 550 [2000]; *Matter of Levine v New York State Liquor Auth.*, 23 NY2d 863 [1969]; *Matter of Pascazi v New York State Bd. of Law Examiners*, 151 AD3d 1324 [3d Dept 2017]). The petitioner provided the court with recordings of several telephone conversations that he had with representatives of Breaking Ground. Although the court considered them in camera, they are not properly part of the administrative record, as they were not submitted to the HPD before that agency made its final

Extraction

determination. Hence, they may not properly be considered in connection with this proceeding. Even if they could properly be considered, they do not support the petitioner's contention that Breaking Ground admitted or conceded that it had retaliated against him for his complaints about its intake representative, Travis Fong. Rather, they contain mostly the petitioner's complaints about Fong, and sympathetic responses that it would have been inappropriate had Fong actually said what the petitioner contended. In any event, when requested to specify the particulars of Fong's allegedly wrongful behavior in his amended petition, the most that the petitioner alleged was that Fong told him that his application would be rejected if he did not fully submit all of the financial documentation required by Breaking Ground, misfiled the documentation, or missed a filing deadline, which is hardly a threat to deny the application for no reason at all.

Accordingly, it is,

ORDERED that the petition is denied; and it is,

ADJUDGED that the proceeding is dismissed; and it is further,

ORDERED that the stay set forth in the court's interim order dated July 18, 2019, and continued on August 6, 2019, is dissolved and vacated.

This constitutes the Decision, Order, and Judgment of the court.

FILED

8/16/2019
DATE

AUG 2 3 2019

COUNTY CLERK'S OFFICE
NEW YORK

JOHN J. KELLEY, J.S.C.
HON. JOHN J. KELLEY
J.S.C.

CHECK ONE:          [X] CASE DISPOSED          [ ] NON-FINAL DISPOSITION
                    [ ] GRANTED    [X] DENIED   [ ] GRANTED IN PART    [ ] OTHER
APPLICATION:        [ ] SETTLE ORDER            [ ] SUBMIT ORDER
CHECK IF APPROPRIATE: [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT  [ ] REFERENCE

Milton A Tingli
Clerk

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT          Page 6 of 6

Printed: 8/23/2019

. Index No. 101081/19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ABRAHAM GROSS,

Petitioner,

-against-

THE DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT (HPD),

-and-

BREAKING GROUND,

-and-

RCB1 RESIDENTIAL FOR SALE LLC,
RCB3 RESIDENTIAL FOR SALE LLC,
RCB4 RESIDENTIAL FOR SALE LLC,

Respondents.

**JUDGMENT**

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Respondent HPD*
*100 Church Street, Room 5-184*
*New York, N.Y. 10007*

*Samantha Schonfeld*
*Assistant Corporation Counsel*
*Tel: (212) 356-2183*
*Fax: (212) 356-2019*

FILED

AUG 23 2019
AT 11:45 AM
N.Y., CO. CLK'S OFFICE

Printed: 8/23/2019

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    **HON. JOHN J. KELLEY**                          PART        **IAS MOTION 56EFM**

*Justice*

------------------------------------------------------------X

In the Matter of                                            INDEX NO.        101081/2019

ABRAHAM GROSS,                                              MOTION DATE      12/04/2019

Petitioner,                          MOTION SEQ. NO.    006

- v -

AFFORDABILITY OVERSIGHT PROGRAM OF THE
DEPARTMENT OF HOUSING PRESERVATION AND              **DECISION + ORDER ON
DEVELOPMENT (HPD), BREAKING GROUND, RCB1                MOTION**
RESIDENTIAL FOR SALE LLC, RCB3 RESIDENTIAL FOR
SALE LLC, RCB4 RESIDENTIAL FOR SALE LLC

Respondents.

------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 006) 44, 45, 46, 47, 48,
49, 50, 51, 52, 53, 54, 55, 56, 57, 61, 62

were read on this motion to/for                   _____RENEWAL_____.


In this CPLR article 78 proceeding, the petitioner sought judicial review of a July 9, 2019

New York City Department of Housing Preservation and Development (HPD) determination that

his income was insufficient to qualify him for a subsidized apartment at the Waterline Square

apartment complex in Manhattan. By order dated July 18, 2019, the court temporarily stayed

the respondents from leasing out certain apartments at Waterline Square pending hearing of the

petition. By order and judgment dated August 16, 2019, and entered August 23, 2019, this

court denied the petition on the merits and dismissed the proceeding, concluding that HPD's

determination that the petitioner's income was insufficient was not arbitrary and capricious. It

also rejected the petitioner's contention that he was denied due process. The stay was

thereupon dissolved. By order dated November 20, 2019, as amended, this court denied the

petitioner's motion for leave to reargue. It also declined to sign several proposed orders to

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT
Motion No. 006

Page 1 of 7

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 10 of 80

show cause, pursuant to which the petitioner sought leave to reinstitute the stay that had been dissolved when the petition was denied.

The petitioner now moves for leave renew the petition, contending that newly discovered evidence requires the court to vacate the order and judgment and thereupon grant the petition. Specifically, he asserts that certain correspondence and a generic housing applications report should have been included in the administrative record, but were not, and that, had the court considered those documents, it would have been compelled to conclude that the HPD's determination was arbitrary and capricious or denied him due process.  The respondents oppose the motion, contending that these documents were not properly part of the administrative record but that, even if they were, consideration of their contents would not compel a different outcome.  The motion is deemed to include a request to amend or correct the administrative record and is granted to the extent that the administrative record is amended and corrected so as to include copies of email correspondence annexed as Exhibits B2 and B3 to the petitioner's affidavit in support of the motion. The motion is otherwise denied.

Renewal is only warranted where the movant presents "new facts not offered on the prior motion that would change the prior determination," or demonstrates that "there has been a change in the law that would change the prior determination"  (CPLR 2221[e][2]; see Foley v Roche, 68 AD2d 558, 567 [1st Dept. 1979]).  A movant must also present "a reasonable justification for the failure to present" any such new facts on the prior motion (CPLR 2221[e][3]). "A motion for leave to renew is not a second chance freely given to parties who have not exercised due diligence in making their first factual presentation" (Joseph v Simmons, 114 AD3d 644, 644 [2d Dept 2014], quoting Elder v Elder, 21 AD3d 1055, 1055 [2d Dept 2005]).

Renewal is not warranted here since, even if the documents identified by the petitioner were actually part of the administrative record, and the petitioner had a reasonable excuse for failing to submit or refer to them in connection with the initial petition, the court's consideration of those documents would not have changed the outcome of the proceeding.

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT
Motion No.  006

Page 2 of 7

2 of 7

In the first instance, "[d]isposition of the proceeding is limited to the facts and record adduced before the agency when the administrative determination was rendered" (*Matter of Fanelli v New York City Conciliation & App. Bd.*, 90 AD2d 756, 757 [1st Dept 1982], *affd* 58 NY2d 952 [1983]; *see Matter of Featherstone v Franco*, 95 NY2d 550, 554 [2000] [court may not "consider evidentiary submissions as to circumstances after the [agency] made its determination"]; *Matter of Yarbough v Franco*, 95 NY2d 342, 347 [2000]; *Matter of Quinones v New York City Hous. Auth.*, 99 AD3d 473, 474 [1st Dept 2012] ["petitioners' arguments and documentation submitted in support of their CPLR article 78 petition are not reviewable as they were not part of the administrative record"]; *Matter of Regional Action Group for the Environment v Zagata*, 245 AD2d 798, 801 [3d Dept 1997]; *Matter of Raqiyb v Coughlin*, 214 AD2d 788, 789 n [3d Dept 1995]; *Matter of For-Med Med. Group v New York State Ins. Fund*, 207 AD2d 300, 301 [1st Dept 1994] ["proof outside the administrative record should not be considered"]; *Matter of Tilles v Williams*, 119 AD2d 233, 241 [2d Dept 1986] [same]; *Matter of Celestial Food Corp. v New York State Liquor Auth.*, 99 AD2d 25, 26-27 [2d Dept 1984]).

The evidence that the petitioner characterizes as "newly discovered" consists of various emails and letters from HPD to the petitioner and emails from HPD to marketing agent Breaking Ground discussing the status of the petitioner's application, as well as a building-wide "Applications Report" for Waterline Square that lists applicants' names, unit, log number, dates that applications were received, and dates applications were "proceeded." The petitioner asserts that these documents should have been included in the administrative record filed with the court but were not; he further contends that, had they been included, the court would have been constrained to grant the petition and annul HPD's determination.

Where material should have been included in the administrative record but was not, the "proper remedy is a motion in Supreme Court to amend or correct the record" (*Matter of Raqiyb v Coughlin*, 214 AD2d at 799 n, citing 10 Carmody-Wait 2d, NY Prac § 70:199, at 204; *see Matter of Regional Action Group for the Environment v Zagata*, 245 AD2d at 801 [affirming

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT   Page 3 of 7
Motion No. 006

3 of 7

denial of motion to amend the administrative record]). Prior to the instant motion, the petitioner did not avail himself of this remedy. Nonetheless, the court deems the petitioner's instant motion to include a request to amend the administrative record to add copies of the documents annexed as Exhibits B2, B3, B4, B5, B6, B7, B8, C5, and C6 to his affidavit in support of the motion to renew.

It is not clear from the petitioner's submissions when he first learned of the existence of the documents that he now identifies; certainly, he knew and was in possession of the email and letter correspondence between the respondents and himself prior to the oral argument on the initial petition. He had the opportunity to review the administrative record filed by the HPD with the court prior to oral argument. He also had the opportunity to object that the record was not complete and request the court to amend or correct the administrative record at that time to add the correspondence that he possessed. His failure to do so renders untimely any present request to add, to the administrative record, emails and letters between the respondents and him. The petitioner does not provide a reasonable excuse as to why he did not earlier move to amend or correct the administrative record with documents that he claims are relevant and were in his possession as of July 9, 2019. Hence, the documents annexed as Exhibits B4, B5, B6, B7, and B8 to the petitioner's affidavit will not be added to the administrative record.

Since two of the emails between HPD and Breaking Ground were or could have been generated prior to the final determination, and the petitioner might not have known of their existence prior to oral argument on the petition, the court grants the petitioner's request to amend and correct the administrative record so as to add copies of the emails annexed as Exhibits B2 and B3 to his affidavit. The court notes that an appeal from the order and judgment dated August 16, 2019 is pending. The petitioner is referred to the Clerk of the Appellate Division, First Department, for the rules applicable to the filing a supplement record on appeal with that Court.

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 4 of 7
Motion No. 006

4 of 7

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 13 of 80

In any event, even if the petitioner could show that he only learned of any of this correspondence after oral argument on the petition was conducted, it supports neither his claim of bad faith nor his contention that, had the court reviewed them, it would have concluded that HPD's determination was arbitrary and capricious or deprived him of due process.

There is no merit to the petitioner's argument that the emails proved that HPD only reviewed his application for a maximum of three hours on July 9, 2019 before it issued its adverse determination later that day, and that Breaking Ground lied to him about when his application was forwarded to HPD. As Breaking Ground correctly notes, Exhibit B3 to the petitioner's affidavit confirms that HPD had been reviewing petitioner's file at least as of July 5, 2019. On that date, a Senior Policy Analyst for HPD had reviewed his file and observed that the initial ineligibility letter was not included in the file sent to HPD by Breaking Ground.

Breaking Ground also correctly notes that, to the extent that the email annexed as Exhibit B2 to the petitioner's motion even referred to the petitioner's file (the copy annexed to the petitioner's affidavit has the applicant's name redacted), it merely expresses the frustration of the HPD Deputy Director that the file that was the subject of the email was not organized properly. The rhetorical question asking, "does Breaking Ground review the files they send to us" refers to the observation that the file itself was "out of order with skewed documents," and not to an error in Breaking Ground's factual review.

Even if the court included Exhibits B4 to B8 in the administrative record, the outcome of the proceeding would not be affected. The June 28, 2019 email from Breaking Ground to the petitioner, attached as Exhibit B4 to the petitioner's motion papers, simply states that "your file is currently under review by the outside regulatory agency," which is consistent with the fact that the petitioner had complained to HPD on June 21, 2019. Although the June 28, 2019 email did not indicate when the file was made available to HPD it did not preclude concurrent review of the digital or paper files by both Breaking Ground and HPD, nor did it establish that HPD only conducted a cursory review of the petitioner's file on July 9, 2019. Exhibit B5 to the petitioner's

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                          Page 5 of 7
Motion No.  006

affidavit includes correspondence returning the money order that the petitioner had remitted to pay for a background check, following Breaking Ground's rejection letter. It appears that the letter was prepared on June 27, 2019, and then held back when the petitioner continued to appeal. That it misstates the log number and was mailed later than the date stated on the letter is irrelevant and immaterial to this proceeding. The series of emails sent to the petitioner from "HPD Compliance" on July 9, 2019 (annexed as Exhibits B6 to B8 to the petitioner's affidavit), first indicating that his application had not been reached, and then that it had been reached, are clearly in the nature of automated responses, and do not establish that HPD engaged only in a cursory review of the petitioner's file.

The Applications Report identified by the petitioner, annexed as Exhibits C5 and C6 to his affidavit, was irrelevant to the review of the petitioner's application for an apartment, the evaluation of his income, or to any due process concerns that he raised in connection with the review of his application. It thus does not constitute evidence that was required to be included in the administrative record. Nor does it support the petitioner's motion for leave to renew. To the extent that the petitioner contends that the report establishes that Breaking Ground violated the intent of this court's July 18, 2019 temporary restraining order by continuing to review applications in the underlying housing lottery involving more than 70,000 applicants, that contention is irrelevant to whether HPD's income determination was arbitrary and capricious, as it post-dated the determination. In any event, the court notes that the order restrained only the leasing of any relevant apartment, but not the review of applicant eligibility.

To the extent that the petitioner seeks review of an adverse determination of his request for agency records from HPD under the Freedom of Information Law, that request is not properly before the court on this motion.

Accordingly, it is,

ORDERED that the petitioner's motion for leave to renew the petition is deemed to include a request to amend or correct the administrative record filed with the court by the New

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT
Motion No. 006

Page 6 of 7

York City Department of Housing Preservation and Development, so as to add copies of

documents annexed to the petitioner's affidavit in support of the motion as Exhibits B2, B3, B4,

B5, B6, B7, B8, C5, and C6; and it is further,

ORDERED that the motion is granted to the extent that the administrative record is

amended and corrected by adding thereto the documents annexed to the petitioner's affidavit in

support of the motion as Exhibits B2 and B3, and the motion is otherwise denied.

This constitutes the Decision and Order of the court.

<u>1/7/2020</u>
DATE

JOHN J. KELLEY, J.S.C.

| CHECK ONE: | X | CASE DISPOSED | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT**
Motion No. 006

Page 7 of 7

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 16 of 80

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x
ABRAHAM GROSS, NETTY GROSS,

                         **Petitioners/Plaintiffs,**

                                           **PETITIONER'S
                                           AFFIRMATION**

         -against-
THE DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT (HPD), HPD EMPLOYEES: SHATARA PELL,
VICTOR HERNANDEZ, LOUISE CARROLL,
BREAKING GROUND (BG), BG EMPLOYEES: BRENDA ROSEN,
VANESAA CUCURULLO, TERESA PALMIERI,
TRAVIS FONG, and STEPHANIE LABARTA,
------------------------------------------------------------------------x

       I, Abraham Gross, Petitioner-Plaintiff ("Petitioner"), hereby affirm
under the penalty of perjury the following is true and accurate to
the best of my knowledge and belief. As always, this Affirmation
("Affirmation") is written from a place of humility and respect for
the Honorable Supreme Court Part 56 (hereinafter "the Court").

PETITIONER'S PRAYER FOR INTERVENTION

1. Your Honor, respectfully, as these words are written, a deadly
   coronavirus is threatening to erupt in NYC. Thus far, there have
   been over 111,753 cases, and 3,888 confirmed deaths.

2. This week, March 05, 2020, marked one year since Petitioner
   handed Breaking Ground ("Respondent", and together with "HPD",
   "Respondents") 90 pages that illustrated his eligibility for Waterline
   Square, before being rejected based on a blatantly-unlawful
   "inconsistent information" cause, and four conclustory numbers

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 17 of 80

that were so cryptic, they even managed to confuse the Honorable Court.

3. The indescribable stressors of prolonged homelessnes have taken a serious toll on Petitioner's health and immune system, putting Petitioner at an increased of contracting the virus.

4. The sensible choice that is supported by the law- as illustrated in the recent Order to Show Cause- is for this Honorable Court to order temporary relief, in the interest of saving a human life, and in the interest of condemning corrupt conduct, and a sickening abuse of power.

5. As these words are written, Respondents have access to thousands of vacant apartments that are designated for a state of emergency, including but not limited to Waterline Square.This Honorable Court has the authority and discretion to intervene in the interests of justice.

6. Petitioner is an aggrieved party who: (1) continues to suffer unbearable hardships; (2) presented to the court overwhelming evidence demonstrative of the outrageous disregard for laws pertaining to the application process; (3) presented irrefutable evidence that Respondents continue disregarding their obligations under the Freedom of Information Law ("FOIL"); (4) presented irrefutable evidence demonstrative of Respondents sickening practices which cannot and must not be sugar-coated; (5) presented irrefutable evidence that key decision makers reside in, own, and/or sell for-a-profit-through-fictitious-third-parties multiple affordable

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 18 of 80

housing units; (6) presented evidence that in immediate response to notifying Respondent of incriminating evidence, Respondent maliciously logged in the Official City Payroll database, and deleted incriminating evidence; (7) presented evidence that Petitioner's due process rights have been shamefully disregarded, time and time again, to include an Appellate Division Court Attorney who violated the impartiality of proceedings.

7. Your Honor, in the last Order to Show Cause which was rejected with no explanation, Petitioner merely asked for five minutes of the Court's time to present, in the presence of all parties, irrefutable evidence of the shameful manner HPD and Breaking Ground are engaged in criminal conduct.

8. It is wrenching for this Honorable Court to refuse considering this evidence, particularly because of the life-threatening danger Petitioner faces. The Honorable Court seemed to indicate that it is sensitive to the pain and suffering Petitioner endures. If so, respectfully, is it fair to muzzle Petitioner and not even give him five minutes to present clear evidence of Fraud on the Court?

9. Respectfully, indifference also sends a crippling message to Respondents: "you are free to continue ignoring the freedom of information law, free to deprive Petitioner of his basic rights, free to commit perjury, free to steal affordable housing units from applicants, free to actively destroy incriminating evidence, free to violate the application process rules, free to break any law as you

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 19 of 80

deem fit. There will be no consequences". Respectfully, this message inflicts on Petitioner a stomach-turning injustice.

10.     In light of the aforesaid, in light of the fact there are vacant apartments as these words are written, and in light of the serious danger of irreversible harm Petitioner is in, why must this Honorable Court continue choosing judicial indifference?

11.     For all these reasons, Petitioner is begging the Honorable Court to award temporary relief, today, Monday, March 09, 2020, or at the very least a chance to present clear evidence of fraud.

Respectfully Submitted, Abraham Gross

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:**   HON. JOHN J. KELLEY                    **PART**      **IAS MOTION 56EFM**

*Justice*

-----------------------------------------------------------X

In the Matter of                                            **INDEX NO.**        101081/2019

ABRAHAM GROSS,                                              **MOTION DATE**      _____

                                    Petitioner,             **MOTION SEQ. NO.**  _____

                    - v -

THE DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT (HPD), BREAKING GROUND, RCB1                           **ORDER**
RESIDENTIAL FOR SALE LLC, RCB3 RESIDENTIAL FOR
SALE LLC, and RCB4 RESIDENTIAL FOR SALE LLC,

                                    Respondent.

-----------------------------------------------------------X

   An appeal from the judgment entered in this proceeding is pending before the Appellate

Division, First Department.  The court, on its own motion, hereby enjoins the petitioner from

filing any additional motions, petitions, applications, and correspondence in connection with this

proceeding, or addressed to the judgment previously entered herein, unless he obtains prior

written approval from a justice or justices of the Appellate Division, whether such motions,

petitions, applications, or correspondence are sought to be filed in this proceeding or in the

related hybrid action and proceeding entitled *Gross v Department of Hous. Preservation &

Devel.*, pending in this court under Index No. 101960/19.  The court further enjoins the petitioner

from commencing any new actions or proceedings in any court within New York State seeking

to challenge, or obtain relief with respect to, the July 9, 2019 New York City Department of

Housing Preservation and Development (HPD) determination that his income was insufficient to

qualify him for a subsidized apartment at the Waterline Square apartment complex in

Manhattan.  These directives are, however, without prejudice to the petitioner's right to exhaust

the appellate process in this proceeding or to continue the prosecution of the pending hybrid

action and proceeding, including appeals, to the extent that his submissions do not challenge

HPD's July 9, 2019 determination beyond the allegations he has already made in the hybrid action and proceeding pending in this court under Index No. 101960/19.

The petitioner entered a lottery to obtain affordable housing at Waterline Square in connection with the Inclusionary Housing Program created by New York City Zoning Resolution § 23-90 and 23-911, and the guidelines promulgated thereunder. After he received a favorable lottery number, the respondent Breaking Ground, which acted as the marketing agent for the lottery and project, requested the petitioner to submit proof that his annual income fell within a minimum and maximum two-year average range that qualified him for a subsidized apartment. After Breaking Ground determined that the petitioner did not qualify, he filed a complaint with HPD, requesting it to review Breaking Ground's calculations and the reasons for its adverse determination. On July 9, 2019, HPD recalculated the petitioner's income, but found that, even upon recalculation, he did not qualify, as his income was insufficient.

On July 12, 2019, the petitioner commenced, as a poor person, this CPLR article 78 proceeding against HPD and Breaking Ground, seeking to review the HPD's July 9, 2019 determination. The justice who reviewed the order to show cause initiating the proceeding declined to issue a temporary restraining order prohibiting HPD and Breaking Ground from marketing, showing, and leasing out relevant apartments in Waterline Square. That justice set August 20, 2019 as the return date of the petition. The petitioner orally requested that this court, to which the matter was ultimately assigned, reconsider the denial of the temporary restraining order and expedite the return date of the proceeding; in connection with those requests, the petitioner additionally requested permission to appear in court for oral argument. The court heard oral argument on July 18, 2019. The court agreed to issue a limited restraining order that prohibited the respondents, pending hearing of the petition, from leasing out any studio or one-bedroom apartment that was subject to the lottery, and sought by the petitioner, to any lottery applicant with a less favorable lottery position than the petitioner's. The court agreed to advance the return date, in accordance with the petitioner's request, to July 30, 2019, which

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 22 of 80

was the earliest available date on the court's motion calendar.  Just as the parties were leaving

the court on July 18, 2019, the petitioner informed the court that he could not appear on July 30,

2019 because he was sitting for the New York State Bar Examination in Albany.  Although the

petitioner provided no explanation as for why he had forgotten that engagement, the court

agreed to reschedule the return date of the petition from August 20, 2019 to August 6, 2019.

The court thereupon issued an order, dated July 18, 2019, amending the order to show

cause by advancing the return date to August 6, 2019; the court also restrained the respondents

from leasing apartments as described above, and directed the petitioner to amend the petition to

add, as respondents, three entities that either owned or managed Waterline Plaza.  The court

also directed the petitioner to more particularly articulate specific instances and occurrences

that supported his contention that Breaking Ground denied his application in retaliation for

complaints he made about its employees.

The three ownership and management entities were joined as respondents, and all the

respondents answered the petition, with HPD serving and filing the administrative record.  Prior

to argument, the petitioner, although having access to that filing, did not move to correct or

supplement the administrative record.  Rather, he made ex parte telephone calls to the court,

complaining that he had more information that was not included in the record.  He submitted to

the court, ex parte, a flash drive that included recordings of telephone conversations between

Breaking Ground employees and himself that he had apparently recorded without Breaking

Ground's knowledge.  The parties appeared for a lengthy oral argument on August 6, 2019.  At

the conclusion of oral argument, the court extended the temporary restraining order pending

further order of the court.

In a decision, order, and judgment dated August 16, 2019, and entered August 23, 2019,

this court denied the petition on the merits and dismissed the proceeding.  The temporary

restraining order was thus dissolved.

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT
Page 3 of 11

3 of 11

Shortly thereafter, the petitioner submitted papers denominated as a "motion to reargue" to chambers, without having served them upon the respondents, filed them with the County Clerk, or uploaded them to the electronic filing system. The court informed all parties in writing that any motions addressed to the petition and judgment had to be properly served and filed. The petitioner thereafter sent at least five personal letters to this court and filed numerous documents that were already a part of the administrative record, as well as an amended tax return that post-dated the judgment. On August 23, 2019, the petitioner properly served and filed a motion, under Sequence 002, that was denominated as one for leave to renew and reargue the petition.

On August 27, 2019, while the renewal and reargument motion was pending, the petitioner submitted a proposed order to show cause, pursuant to which he sought leave to move to reinstate the July 18, 2019 temporary restraining order that had been dissolved when the proceeding was dismissed on August 16, 2019 (SEQ 003). He requested the right to appear for oral argument in support of his request to reinstate the TRO. The court denied the request and declined to sign the proposed order to show cause.

While the renewal and reargument motion remained pending, and in response to the petitioner's telephone call to chambers informing the court that he believed that the respondents were amenable to settling his claim, the court scheduled a settlement conference for September 6, 2019. When the respondents appeared, they informed the court that they had neither the authority nor the intention to settle the matter. The court nonetheless directed them to explore settlement possibilities and report back to the court. It informed the parties that it would be of assistance if required, but that, failing any progress, the pending renewal and reargument motion would be decided on papers, without any oral argument. In subsequently filed papers, the petitioner repeatedly asserted that the respondents were obligated to settle the matter because the court suggested that settlement might be warranted or possible.

On September 12, 2019, the petitioner filed a notice of appeal from the judgment.

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT          Page 4 of 11

4 of 11

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 24 of 80

On or about September 16, 2019, the petitioner called the court and represented that he had again spoken with the respondents, and that he thought that there might be progress in convincing them to settle his claim. The court reached out to the respondents and, based on their representations that there was no such progress, declined to schedule a settlement conference.

On October 2, 2019, a justice of the Appellate Division granted a temporary restraining order that prohibited the respondents from leasing out one particular studio apartment and one particular one-bedroom apartment in Waterline Plaza to persons who had a less favorable lottery position than the petitioner, pending that Court's determination of the petitioner's motion for a preliminary injunction pending appeal.

On October 12, 2019, the petitioner submitted a proposed order to show cause, pursuant to which he again sought leave to reargue the petition (SEQ 004), even though the initial motion for leave to renew and reargue was pending under Sequence 002. In that proposed order to show cause, the petitioner also again sought to reinstate the broader restraining order that this court had issued on July 18, 2019 and thus supersede the narrower temporary restraining order issued by the Appellate Division. The court heard oral argument on the application for a restraining order on October 17, 2019. At the argument, the petitioner complained that, after conferring with both the respondents and him, the court attorney for the Appellate Division justice considering the TRO application improperly amended it so as to limit it to one studio and one one-bedroom apartment, rather than all such apartments, thus depriving him of the most favorable apartments in the complex. He asked this court to intervene in the Appellate Division's proceedings by reinstating the now-dissolved July 18, 2019 stay. The court declined to do so and declined to sign the proposed order to show cause.

In an order dated November 20, 2019, as amended, this court deemed the motion pending under Sequence 002 to be one only for reargument, as no "new facts" were identified, and thereupon denied the motion.

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 5 of 11

By Decision and Order dated December 5, 2019, a panel of the Appellate Division denied the petitioner's motion for a preliminary injunction pending appeal and dissolved the limited October 2, 2019 temporary restraining order.

On November 29, 2019, the petitioner submitted a proposed order to show cause, pursuant to which he, in effect, sought leave to move to compel discovery in connection with the now-disposed CPLR article 78 proceeding (SEQ 005). On December 19, 2019, the court determined to decline to sign the proposed order to show cause, explaining that "[t]his case has been disposed and the court no longer has jurisdiction over this matter. To the extent that this a discovery request, it is not permitted in special proceedings. To the extent that this is a request for agency records, the petitioner is referred to [the] F[reedom] O[f] I[nformation] L[aw]."

On December 3, 2019, while the petitioner's request to conduct discovery was pending, he submitted a notice of motion with supporting papers, seeking leave to renew (SEQ 006). The respondents opposed the motion. By order dated January 7, 2020, this court denied the motion to renew, concluding that there were no new facts that had not been presented to the court that would have altered the outcome of the proceeding. It nonetheless permitted the petitioner to correct the administrative record to include two e-mails that antedated the challenged HPD determination, as the petitioner allegedly was not aware of their existence prior to oral argument on the petition. The court permitted this correction so that the petitioner would be able to amend the record on appeal in his pending appeal before the Appellate Division.

While the petitioner's appeal from the judgment was pending, he submitted a FOIL request to HPD. The HPD apparently granted the request in part and denied it in part on December 5, 2019. On December 24, 2019, the petitioner commenced, under Index No. 101960/19, a hybrid CPLR article 78 proceeding seeking judicial review of that determination (SEQ 001) and action, among other things, for a judgment declaring that HPD's July 9, 2019 determination deprived him of property without due process and violated its own handbook. On January 13, 2020, this court issued an interim order calendaring the special proceeding portion

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 6 of 11

6 of 11

of the matter for submission and fixing a briefing schedule (SEQ 001). On January 15, 2020, the petitioner filed an amended petition/complaint. On February 7, 2020, the petitioner filed a second amended petition/complaint. On February 13, 2010, this court issued a second interim order recalendaring the petition and fixing a new briefing schedule. The return date of the matter is now scheduled for March 31, 2020.

On March 2, 2020, the petitioner filed, in the pending hybrid proceeding and action, a proposed order to show cause, pursuant to which he sought leave one more time to move to set aside the judgment entered in the disposed CPLR article 78 proceeding (SEQ 002). This time, he alleged that the judgment was secured by fraud and misconduct, and sought mandatory temporary equitable relief that would compel the respondents to house him at Waterline Plaza. Specifically, he alleged that one or more of the respondents fraudulently created profiles in the New York City employment database for fictitious persons whose false credentials were used in an affordable-housing scam, but deleted the profiles before they were caught.

On March 6, 2020, the court declined to sign the proposed order to show cause on the ground that vacatur of a judgment pursuant to CPLR 5015(a)(3) only applies to a party's commission of extrinsic fraud in the methods employed in securing a judgment or order, that is, conduct that deprives a party of full and fair consideration of his or her claims or defenses (*see Wells Fargo Bank Minn., N.A. v Coletta*, 153 AD3d 756, 757 [2d Dept 2017]; David D. Siegel, Practice Commenataries, McKinney's Cons Law of NY, C5015:8 [2016]), such as a "device, trick, or deceit" that defeated the petitioner's ability to prosecute this proceeding (*LaSalle Bank, N.A. v Oberstein*, 146 AD3d 945, 945 [2d Dept 2017]). Here, however, the petitioner moved, in the later-commenced hybrid proceeding and action, to vacate the judgment in the earlier proceeding on the basis of "intrinsic fraud," that is, substantive conduct of a fraudulent nature that was integral to the subject matter of the lawsuit or proof that the allegations in the answers were false (*see Deutsche Bank Natl. Trust Co. v Karlis*, 138 AD3d 915 [2d Dept 2016]). A party may not employ an allegation of intrinsic fraud collaterally to attack a judgment entered in an

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                                    Page 7 of 11

7 of 11

earlier proceeding.  Rather, such a motion must be made in the proceeding in which the

judgment was entered (*see generally Oppenheimer v Westcott*, 47 NY2d 595, 603 [1979]; *NY*

*Prime Holding, LLC v Nationstar Mortgage, LLC*, 2019 NY Slip Op 30857[U] [Sup Ct, N.Y.

County, Mar. 27, 2019]).

Had the petitioner raised those allegations in this proceeding, as it is the proceeding in

which the challenged judgment was entered, the court nonetheless would be constrained to

deny the motion to vacate the judgment.  Even if the petitioner's allegations were true, they are

irrelevant to whether the respondents' calculation of his income was irrational or whether the

procedure they employed in evaluating his income was improper.  The petitioner's allegations

amount to nothing more than an assertion that the respondents are somehow corrupt or bad

people, and the assertions have no bearing on his own case, as there is nothing in his

contentions connecting the denial of his own application to such alleged misconduct.  The court

reminds the petitioner, once again, that its authority is limited to reviewing, under statutorily

limited legal standards, the determination that his income was insufficient to qualify him for a

subsidized apartment; it has no authority to launch an investigation into the petitioner's

allegations of corruption within the HPD or Breaking Ground.

The court notes, moreover, that, in virtually every submission made to the court in

connection with both lawsuits, the petitioner has alleged that the respondents' conduct has been

egregious, outrageous, criminal, and tragic, and that his rights have been "obliterated" because

of the respondents' criminal behavior, fraud, misconduct, conspiratorial maneuvers, and the like.

He has repeatedly called the court ex parte to request relief, even one time requesting that this

court recuse itself from further consideration of the hybrid proceeding and action because it

rendered a determination adverse to him in the initial matter.  It is apparent that, regardless of

the facts or the court's reasoning, the petitioner will continue to submit what the court concludes

are meritless requests for reconsideration despite the fact that he has a pending appeal, and will

commence new proceedings or actions when his initial theories and requests for relief are

101081/2019  GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 8 of 11

8 of 11

rejected. The petitioner has also demonstrated that, each time someone in the course of the dispute has rendered an adverse determination, he will accuse that person of outrageous, improper, or biased conduct, rather than addressing the substance or merits of why the determination was in fact adverse to him.

"[P]ublic policy mandates free access to the courts" (*Board of Educ. of Farmingdale Union Free School Dist. v Farmingdale Classroom Teachers Assn., Local 1889, AFT AFL-CIO*, 38 NY2d 397, 404 [1975]). Nonetheless, in an appropriate case, a court may enjoin a party from continuing to litigate certain claims without prior approval of the court "to prevent use of the judicial system as a vehicle for harassment, ill will and spite" (*Matter of Sud v Sud*, 227 AD2d 319, 319, 642 NYS2d 893 [1st Dept 1996]; *see Komolov v Segal*, 96 AD3d 513, 514 [1st Dept 2012]).

The petitioner properly availed himself of his right to challenge the initial adverse HPD determination rendered against him by commencing this CPLR article 78 proceeding. While he certainly had a right to seek renewal or reargument in connection with an adverse judicial decision, he may not continue to seek the same relief over and over again under different guises, except through the appropriate appellate process, which is pending in any event. Similarly, while the petitioner appropriately requested agency records under FOIL, and properly commenced a proceeding to challenge the perceived denial of his request, he may not employ a FOIL proceeding once again to revisit the appropriateness of the initial HPD determination. While the court sympathizes with the petitioner's current economic condition, and his inability to secure an affordable apartment, he is not the only person who fits that description. Contrary to what the petitioner may believe, the court may only determine the relevant issues that are presented to it in the context of an appropriate action or proceeding. In this regard, the petitioner's continued motions, petitions, letters, applications, telephone calls, and email messages subsequent to the denial of reargument are frivolous and vexatious, as they constitute continuing complaints about his inability to obtain housing in New York City, academic

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT        Page 9 of 11

9 of 11

arguments as to whether HPD had previously complied with the now-dissolved temporary restraining orders, the brusqueness with which people in positions of authority have allegedly treated him, and the alleged misfeasance, corruption, and bad faith of all who disagreed with him. These matters, while not insignificant other contexts, are simply irrelevant to whether HPD's determination of his income was irrational or whether the procedures employed by HPD or Breaking Ground in reaching their determinations were legally improper.

Since the petitioner's appeal is pending, and this court has yet to rule on the pending hybrid proceeding and action now before it, the court will not interfere with the petitioner's right to litigate those matters to conclusion. Nonetheless, in light of the foregoing, it is,

ORDERED that, on the court's own motion, the petitioner be, and hereby is, permanently enjoined from filing any additional motions, petitions, applications, or correspondence in connection with this proceeding or that are addressed to the judgment herein, and from making any telephone calls or sending e-mails to the court that are addressed to the judgment herein, unless he obtains prior written approval from a justice or justices of the Appellate Division, whether such motions, petitions, applications, correspondence, telephone calls, or e-mails are sought to be filed, made, or sent in this proceeding or in the hybrid action and proceeding entitled *Gross v Department of Hous. Preservation & Devel.*, pending in this court under Index No. 101960/19, except to the extent that his submissions are relevant to the allegations that he has already made in that hybrid action and proceeding; and it is further,

ORDERED that, on the court's own motion, the petitioner be, and hereby is, permanently enjoined from commencing any new actions or proceedings in any court within New York State seeking to challenge, or obtain relief with respect to, the July 9, 2019 New York City Department of Housing Preservation and Development (HPD) determination that his income was insufficient to qualify him for a subsidized apartment at the Waterline Square apartment complex in Manhattan; and it is further,

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                    Page 10 of 11

10 of 11

ORDERED that, on the court's own motion, the petitioner shall, with respect to any future motion or application that he is permitted to file in accordance with this order, be responsible for paying the filing fee required by CPLR 8020(a), unless he establishes to the court's satisfaction that he remains entitled to prosecute this matter or the matter pending under Index No. No. 101960/19 as a poor person; and it is further,

ORDERED that the petitioner's failure to comply with this order may result in the imposition of appropriate sanctions.

This constitutes the Decision and Order of the court.

3/9/2020
DATE

JOHN J. KELLEY, J.S.C.

| CHECK ONE: | X | CASE DISPOSED | | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | | GRANTED IN PART | X | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

101081/2019   GROSS, ABRAHAM vs. AFFORDABILITY OVERSIGHT                                Page 11 of 11

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 31 of 80

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. JOHN J. KELLEY**          PART        **IAS MOTION 56EFM**

*Justice*

-------------------------------------------------------------------X

ABRAHAM GROSS and NETTY GROSS,

               Petitioners/Plaintiffs,

        - v -

DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT (HPD), SHATARA PELL, VICTOR
HERNANDEZ, LOUISE CARROLL, BREAKING GROUND
(BG), BRENDA ROSEN, VANESAA CUCURULLO,
TERESA PALMIERI, TRAVIS FONG, and
STEPHANIE LABARTA,

               Defendants/Respondent.

-------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 101960/2019 |
| MOTION DATE | 05/02/2020 |
| MOTION SEQ. NO. | 001, 003 |

**DECISION, ORDER, AND JUDGMENT and ORDER OF TRANSFER**

The following e-filed documents, listed by NYSCEF document number 1 (Motion 001) and 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, and 98 (Motion 003)

were read on these respective motions to/for _____ CPLR ART 78 and DISMISSAL _____.

       This is a hybrid action to recover damages and for related relief, alleging violation of civil and constitutional rights under color of state law pursuant to 42 USC § 1983, negligence, breach of contract, and breach of fiduciary duty, and proceeding pursuant to CPLR article 78 to review a December 5, 2019 HPD determination allegedly denying, in part, the plaintiff/petitioner's request for agency records pursuant to the Freedom of Information Law (Public Officers Law § 84, *et seq*.; hereinafter FOIL).  By order to show cause dated December 31, 2019 (Friedman, J.), the plaintiff/petitioner requested the court to grant the CPLR article 78 petition seeking relief under FOIL and, inter alia, stay the defendants/respondents from, among other things, leasing out certain apartments at the Waterline Square apartment complex in Manhattan that had been the subject of an HPD affordable housing lottery (MOT SEQ 001).

1

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 32 of 80

The defendants/respondents HPD, Shatara Pell, Victor Hernandez, and Louise Carroll (collectively the HPD defendants) move pursuant to CPLR 3211(a)(7) to dismiss the amended complaint insofar as asserted against them (MOT SEQ 003). The defendants/respondents Breaking Ground, Brenda Rosen, Vanesaa Cucurullo, Teresa Palmieri, Travis Fong, and Stephanie Labarta (collectively the Breaking Ground defendants) separately move under the same motion sequence to dismiss the complaint insofar as asserted against them.

The motion for a stay is denied, so much of the complaint/petition as seeks review of HPD's FOIL determination pursuant to CPLR article 78 is denied, and the portion of this matter constituting a CPLR article 78 proceeding is dismissed. The remaining causes of action are severed, those causes of action together are deemed to constitute a severed action, and the severed action and pending motions to dismiss the complaint in the severed action are transferred to a City Part of this court for disposition.

This dispute arises from the HPD's July 9, 2019 determination that the plaintiff/petitioner's income was insufficient to qualify him for a subsidized apartment at the Waterline Square apartment complex in Manhattan that were the subject of an apartment lottery. By decision, order, and judgment dated August 16, 2019, this court denied the plaintiff/petitioner's CPLR article 78 proceeding challenging that determination, concluding that the HPD's determination had a rational basis that was supported by the administrative record. The plaintiff/petitioner appealed that decision, order, and judgment to the Appellate Division, First Department. The appeal remains pending.

While his appeal was pending, the plaintiff/petitioner made several applications to this court to revisit its decision, order, and judgment, and to reinstitute a limited stay that prohibited HPD, as well as the owners of the Waterline complex and Breaking Ground, as marketing agent, from leasing out certain apartments pending hearing of the CPLR article 78 proceeding. This court denied all of those applications. On October 2, 2019, a justice of the Appellate Division granted a temporary restraining order that prohibited Waterline's owners and Breaking

2

Ground from leasing out one particular studio apartment and one particular one-bedroom apartment in Waterline Plaza to persons who had a less favorable apartment lottery status than the plaintiff/petitioner, pending that Court's determination of his motion for a preliminary injunction pending appeal. By Decision and Order dated December 5, 2019, a panel of the Appellate Division denied the plaintiff/petitioner's motion for a preliminary injunction pending appeal, and dissolved the limited October 2, 2019 temporary restraining order.  This court thereafter declined to entertain his subsequent requests to reinstate any type of stay.

On December 24, 2019, the plaintiff/petitioner commenced the instant hybrid action and proceeding.  On or about February 9, 2020, the petitioner served and filed an amended petition/complaint and motion.  The amended petition/complaint asserts seven causes of action. The first through third and fifth causes of action seek to recover damages pursuant to 42 USC § 1983 for alleged deprivation of due process and other violations of constitutional rights.  The fourth cause of action seeks to recover damages for negligence and pursuant to 42 USC § 1983 for additional alleged violations of constitutional rights.  The sixth cause of action seeks to recover damages for breach of contract.  The seventh cause of action seeks to recover damages for breach of fiduciary.  Although none of the causes of action specifically seeks a review of the HPD's FOIL determination, the plaintiff/petitioner requests such relief in the body of the petition/complaint.

In their motion, the HPD defendants submit documentation and a certification establishing that they fully responded to the subject FOIL request.  HPD thus discharged its duty pursuant to FOIL and 22 NYCRR 1401.2(b)(7)(ii) by certifying that "the records of which the agency is a custodian cannot be found after diligent search" (*see Matter of Rattley v New York City Police Dept.*, 96 NY2d 873 [2001]; *Matter of Lopez v New York City Police Dept. Records Access Appeals Officer*, 126 AD3d 637 [1st Dept 2015]).  Although the plaintiff/petitioner "must show by more than speculation that all responsive documents were not produced" (*Matter of Mitchell v Slade*, 173 AD2d 226, 227 [1st Dept 1991]; *see Matter of Morgan v Nassau County*

3

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 34 of 80

*Police Dept.*, 197 AD2d 579 [2d Dept 1993]; *Matter of Wood v Ellison*, 196 AD2d 933 [3d Dept

1993]), he has not done so here. Hence, so much of the complaint/petition as sought to annul

the HPD defendants' determination with respect to the plaintiff/petitioner's request for

documents must be denied (*see Matter of Taylor v New York City Police Dept. FOIL Unit*, 25

AD3d 347 [1st Dept 2006]; *Matter of Tellier v New York City Police Dept.*, 267 AD2d 9 [1st Dept

1999]).

The remaining causes of action all seek money damages from the HPD defendants and

the Breaking Ground defendants. HPD is an agency of the City of New York and the HPD

defendants are represented by the New York City Corporation Counsel. Thus, regardless of

whether the remaining claims state a cause of action, are barred by the doctrine of res judicata,

or cannot be pursued against the HPD defendants because the plaintiff/petitioner failed to serve

a timely notice of claim, the proper course of action for this court to take is to sever those

causes of action, deem them to constitute a severed action, and transfer both the action and

pending motions to dismiss the complaint in the severed action to a City Part of this court for

disposition.

That branch of the plaintiff/petitioner's motion seeking to reinstitute the dissolved stay

must be denied, as the Appellate Division has already dissolved an even more limited stay, this

court has no authority to second guess the Appellate Division, and the assertions made and

evidence submitted by plaintiff/petitioner do not warrant the issuance of a new stay.

Accordingly, it is

ORDERED that so much of the complaint/petition as sought judicial review of the

December 5, 2019 New York City Department of Housing Preservation and Development HPD

determination allegedly denying, in part, the plaintiff/petitioner's request for agency records

pursuant to the Freedom of Information Law is denied (SEQ 001); and it is

ADJUDGED that so much of the hybrid action and proceeding as constituted a CPLR

article 78 proceeding to review the December 5, 2019 New York City Department of Housing

4

Preservation and Development HPD determination allegedly denying, in part, the

plaintiff/petitioner's request for agency records pursuant to the Freedom of Information Law, is

dismissed (SEQ 001); and it is further,

ORDERED that the first, second, third, fourth, fifth, sixth, and seventh causes of action in

the amended complaint/petition are severed and together shall constitute a severed action; and

it is further,

ORDERED that the County Clerk shall assign a new index number to the severed

action, and the plaintiff/petitioner shall not be required to pay an additional index number fee or

RJI fee; and it is further,

ORDERED that the severed action, as well as the pending motions to dismiss the

amended complaint/petition in the action, are remitted to the Trial Support Clerk, who is directed

to transfer the matter to a City Part of this court; and it is further,

ORDERED that the defendants/respondents shall serve a copy of this order with notice

of entry upon both the County Clerk and the Trial Support Clerk; and it is further,

ORDERED that the defendants/respondents shall serve the notice required by CPLR

8019(c) and a completed Form EF-22 upon the County Clerk and the Trial Support Clerk, and

file the same with the County Clerk, and the Trial Support Clerk shall thereupon amend the

court records accordingly; and it is further,

ORDERED that, upon the Clerk's issuance of a new index number to the severed action,

the defendants/respondents shall file an RJI under that index number, without the need for the

payment of any new RJI fee, and shall re-notice the motions to dismiss the amended

complaint/petition in the severed action under that index number.

Case 1:20-cv-04340-RWL   Document 65-2   Filed 10/15/20   Page 36 of 80

This constitutes the Decision, Order, and Judgment and Order of Transfer of the court.

5/8/20
**DATE**

**JOHN J. KELLEY, J.S.C.**

| | | | | |
|---|---|---|---|---|
| **CHECK ONE:SEQ 001** | X CASE DISPOSED | | NON-FINAL DISPOSITION | |
| | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| **APPLICATION:** | SETTLE ORDER | | SUBMIT ORDER | |
| **CHECK IF APPROPRIATE:** | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

| | | | | |
|---|---|---|---|---|
| **CHECK ONE:SEQ 003** | CASE DISPOSED | | X NON-FINAL DISPOSITION | |
| | GRANTED | DENIED | GRANTED IN PART | X OTHER |
| **APPLICATION:** | SETTLE ORDER | | SUBMIT ORDER | |
| **CHECK IF APPROPRIATE:** | X INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

## **Preliminary Statement**

1.  It takes an unconscionable degree of cruelty, respectfully, to observe another suffering inexpressibly, and choose indifference over compassion[1] and common sense[2]:

    i.  https://www.youtube.com/watch?v=kDldhmdIv7I

    ii. https://www.youtube.com/watch?v=kADsSjmIj7o

    iii. https://www.youtube.com/watch?v=c_fS2pBc3fw&t=39s







---

1

https://www.nytimes.com/1964/03/27/archives/37-who-saw-murder-didnt-call-the-police-apathy-at-stabbing-of.html; https://www.psychologytoday.com/us/basics/bystander-effect.
[2] https://journals.sagepub.com/doi/abs/10.1177/1745691616679465?journalCode=ppsa
https://www.psychologytoday.com/us/basics/bystander-effect.

2. In Mtr. of Oliver[3], the Court refused indifference as a response to homelessness: "Reviewing the within undisputed facts [...]which has indisputably led to the homelessness of petitioner Oliver and her two disabled children, shocks the judicial conscience, and must therefore be vacated".

3. In stark contrast to the aforesaid decision is the callousness that designated public officials continue to show towards Appellant's chronically-ill mother, and Appellant, a law-abiding, tormented, aggrieved, low-income, pro se litigant, whose life has been devastated solely to further a shameful criminal enterprise, who has suffered excruciating harm to include on-and-off homelessness during the pandemic, despite: the existence of readily-available solutions; Respondents sadistic press releases about the importance of helping the homeless population during the pandemic and relaxation of application guidelines; and overwhelming evidence of a criminal enterprise that makes Boss Tweed's seem like kindergarten- is, respectfully, repugnant to the human conscience.



**William M. Tweed**

Tweed in 1870



4. It is disturbing, respectfully, when that which appalls the human conscience fails to move the judicial conscience.

---

[3] In Matter of Oliver v Cestero, Sup. Crt Supreme Court Hon. Ling-Cohan (2013).

5. Dozens of human beings, as well as experienced legal minds, have meticulously reviewed the record. The unanimous response is bewilderment and confusion. For example: How could the Honorable Appellate Division First Department ("the Appellate Court") be so indifferent to the suffering of prolonged homlessness during the pandemic?

6. How could the Appellate Court turn a blind eye to the fact Respondents admitted rejecting 99.9% of the applicants, while awarding countless apartments to egregiously-unqualified applicants, family and friends (Docket #58, EXHIBIT J2), and while- Appellant continues to suffer?

7. Why was the well-established law from the Court of Appeals utterly disregarded time and time again by the Honorable Trial Court?

8. Why is the Appellate Clerk's Office granted the right to maliciously sabotage the cases of litigants it publicly declares are "a pain the neck" and "without merit"?

9. Why is Respondents multi-billion scam protected by those sworn to protect the public from such scams?

10. How could the Appellate Court disregard the sickening reality- proven by hard evidence on ACRIS- in which Respondents routinely grant to family and friends, such as Nadir Ahmed and Lovely Meah (two City employees with a combined salary under $60,000 and who seem to have identical hand-writing) thirteen (13) affordable apartments, as Appellant continues to suffer?





| Key Data | |
| --- | --- |
| Year | 2018 |
| Full Name | Lovely Meah T |
| Job Title | F/T School Lunch Helper |
| Get F/T School Lunch Helper Salary Statistics › | |
| State | New York |
| Employer | Dept Of Ed Hrly Support Staff |
| Annual Wage | $16,770 |
| Monthly Wage | $1,398 |

11. Why is the Appellate Court willing to tolerate a blatant assault on a pro se litigant's constitutional rights? The list of unnerving questions gets longer every day.

12. If there is such a thing as a judicial conscience, respectfully, it has never been more absent than in these proceedings. All it would take for this gruesome injustice to end is for four honorable members of the Appellate Court to take an honest look at the totality of the evidence readily available on NYSCEF/ECF. The evidence is sufficiently pervasive.




13. Pursuant to the 14th Amendment of the US Constitution: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws". Due process includes[4] the right to an impartial judge who will apply the law equally and fairly, avoid conduct rising to the appearance of impropriety, and recuse themselves from proceedings where their impartiality could be reasonably questioned.

14. By virtue of CPLR 321 (a) a pro se litigant has the right to self represent in the State of New York. No judge, court attorney, court clerk, opposing counsel or any other public official has the authority to deprive a pro se litigant of due process, to include the right to an impartial tribunal.

---

[4] The New York Bar Judicial Rules of Professional Conduct.

15. CPLR 321 (a), the 14th Amendment, the soul of American jurisprudence, and universal human decency- all unequivocally protect a pro se litigant from being berated, humiliated, cursed at, subjected to malicious sabotage, treated like dirt, deprived and cheated of his civil and constitutional rights.

16. Nevertheless, in the case at bar, at every turn, Appellant was subjected to the said conduct and then some. The aforesaid protective provisions were -and still are- rendered into a cruel fantasy-beyond-reach, as Appellant continues to be deprived- of the minimal fairness promised by any civilized system of law.

17. When Appellant respectfully and timely submitted to relevant authorities- including judicial authorities- irrefutable evidence substantiating his allegations, Appellant was forced to watch in horror as those with the mandate and resources to protect the public, chose instead to reaffirm Respondents above-the-law credo, by, *inter alia,* providing post-facto justifications for Respondents, utterly ignoring the well-established precedent- and even going as far as imposing draconian sanctions and a gag order on Appellant, barring him from further protesting Respondents blatant betrayal of the public's trust.

---

**FIRST ARGUMENT: Based on Substantial Evidence[5], the Respondents Corrupted the Judicial Process By Steering The Case at Bar to a Court That Consistently Set Aside the Well-Established Law Without Any Justification. Appellant is entitled to the Application of the Well-Established Precedent. It Does not Honor American Jurisprudence to Conjure Unpersuasive Explanations as to Why Appellant Should be Denied Equal Protection Under the Law. The Appellate Court Should Respectfully Vacate-In-Part and Reverse-In-Part the Orders that are Irreconcilable with the Well-Established Precedent, End the Sickening Torture of an**

---

[5] See: Appellate Division 1st Dep, Case No. 2019-04206, Docket # 9, Exhibits T, pages 370-415.

**Aggrieved Pro Se Litigant, Award Reasonable Costs and Other Relief, as the Appellate Court Deems Just and Proper.**

**<u>SECOND ARGUMENT:</u> By Virtue of Respondents Corruption of the Random Process by which Cases Are to Be Assigned, the Burden of Persuasion Must Shift onto Respondents to Justify Each Instance in Which the Court Deviated from the Well-Established Precedent and Every Instance in Which Due Process was Violated.**

---

## <u>POINT ONE: Endorsement of Respondents Contempt for the Law</u>

18. Did the honorable trial court ("the Court") err in adopting the stance that Respondent The Department of Housing Preservation and Development ("HPD"), Respondent Breaking Ground ("BG"), and Respondent RCB1, RCB3, RCB4 Residential For Sale LLC ("Developers", and collectively, "Respondents") are above-the-law, and, in fact, at liberty to set aside their statutory obligations pursuant to the specific applicable authorities:

    i. The regulatory agreement between HPD and BG ("Regulatory Agreement 1");

    ii. The regulatory agreement between Developers and HPD ("Regulatory Agreement 2");

    iii. The HPD marketing handbook ("the Handbook")[6];

    iv. The HPD income guide: ("the Income Guide")[7];

    v. CPLR § 7804 (e) as well as to the general applicable authorities:

---

[6] In 2018, HPD published the Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy, which contains the general policies, procedures, and requirements for the marketing and selection of residents for developments assisted by HPD. On page 70, the Handbook incorporates all applicable Federal and State laws. See: Sup Crt. 101960/2019 Docket # 20 for illustrations of the aggressive manner the Respondents set aside the Handbook.

[7] Published by HPD, it expands upon the income calculation method that HPD and BG should apply when evaluating an applicant's income. Regretfully, Respondents disregarded key provisions of the Income Guide. See: NYSCEF, Appl Div. 1st Dep, 2019-04206, #9, Exhibits A6-A9.

vi.    The 14th Amendment of the U.S. Constitution ("14th Amendment")[8];

vii.   Article XVII of the New York State Constitution ("Article XVII")[9];

viii.  The Civil Rights Act of 1871, *42 U.S.C. § 1981* ("Section 1981");

ix.    The Freedom of Information Law ("FOIL")[10];

By virtue of the Court's first ("Original Order"), second ("Renewal Order"), third ("Sanctions Order"), and fourth ("Transfer Order") orders (EXHIBITS A1-A4), the Court answered-  No.

## POINT TWO: Intrinsic Fraud

19. Did the Court err, respectfully, by asserting[11] that: "vacatur of a judgment pursuant CPLR § 5105 (a) (3) only applies to a party's commission of extrinsic fraud"[12], by referencing two cases[13] which are irreconcilable, respectfully, with the Court's argument. The Court argues these cases to hold that:

> On March 6, 2020, the court declined to sign the proposed order to show cause on the ground that vacatur of a judgment pursuant to CPLR 5015(a)(3) only applies to a party's commission of extrinsic fraud in the methods employed in securing a judgment or order, that is, conduct that deprives a party of full and fair consideration of his or her claims or defenses (*see Wells Fargo Bank Minn., N.A. v Coletta*, 153 AD3d 756, 757 [2d Dept 2017]; David D. Siegel, Practice Commentaries, McKinney's Cons Law of NY, C5015:8 [2016]), such as a "device, trick, or deceit" that defeated the petitioner's ability to prosecute this proceeding (*LaSalle Bank,*

"5015 (a) (3) only applies to a party's commission of extrinsic fraud".

---

[8] "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

[9] "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions".

[10] For the egregious illustration of the manner the Court set aside the Freedom of Information Law ("FOIL"), the clear precedent from the Court of Appeals, and the Court's own application of this precedent, see:  See Appl. Div. First Department, 2020-03673, Docket # 1. Respectfully, the Court's proven agenda in the context of Respondents fraud, alteration of documents and other criminal acts, as it pertains to the FOIL- must shock the judicial conscience.

[11] The Sanctions Order, Page 11.

[12] The Sanctions Order, Page 11.

[13] LaSalle Bank N.A. v Oberstein, 146 AD3D (2017); Wells Fargo V. Colletta, 153 AD3D (2017).

Contrary to the Court's stance, respectfully, the first case held[14]:

> "In any event, the appellant failed to demonstrate a
> reasonable excuse for the default, which is required when a
> CPLR 5015 (a) (3) motion alleges intrinsic fraud" *(LaSalle*
> *Bank N.A. v Oberstein, 146 AD3D, 2017).*

> 55 AD3d 765; Aames Capital Corp. v Davidsohn, 24 AD3d 474). In any event, the appellant failed to demonstrate a
> reasonable excuse for the default, which is required when a CPLR 5015(a)(3) motion alleges intrinsic fraud, i.e., that the
> allegations in the complaint are false (see Deutsche Bank Natl. Trust Co. v Karlis, 138 AD3d 915, 916; U.S. Bank, N.A. v
> Peters, 127 AD3d 742, 742-743; New Century Mtge. Corp. v Corriette, 117 AD3d 1011, 1012), rather than "extrinsic fraud,"
> which is "a fraud practiced in obtaining a judgment such that a party may have been prevented from fully and fairly
> litigating the matter" (Shaw v Shaw, 97 AD2d 403, 403; see U.S. Bank, N.A. v Peters, 127 AD3d at 742-743; Bank of N.Y. v
> Lagakos, 27 AD3d 678, 679; Tamimi v Tamimi, 38 AD2d 197). Contrary to the appellant's contention, it failed to

And the second case held:

> "thus, the appellants were required to show a reasonable
> excuse for their default" *(Wells Fargo* V. Colletta, 153 AD3D
> (2017).

> Rather, they alleged that the plaintiff committed
> "intrinsic fraud, i.e., that the allegations in the
> complaint are false" *(LaSalle Bank N.A. v*
> *Oberstein,* 146 AD3d at 945; *see Deutsche Bank*
> *Natl. Trust Co. v Karlis,* 138 A.D.3d 915 [2016]; *U.S.*
> *Bank, N.A. v Peters,* 127 AD3d at 742; *New Century*
> *Mtge. Corp. v Corriette,* 117 A.D.3d 1011 [2014];
> *Bank of N.Y. v Stradford,* 55 AD3d at 765; *Bank of*
> *N.Y. v Lagakos,* 27 AD3d at 679).

> Thus, the appellants were required to show a
> reasonable excuse for their default (*see EMC Mtge.*
> *Corp. v Toussaint,* 136 AD2d at 862-862; *U.S.*

Furthermore, the Appellate Division[15] referenced the said

cases as follows:

> "5015 (a) (3) applies to a party's commission of both
> extrinsic fraud and intrinsic fraud", except that the latter
> requires "a defendant to demonstrate a reasonable excuse for
> her default and a potentially meritorious defense[16]".

And critically, the Court of Appeals itself held[17]:

> [...]Supreme Court erred in concluding that it lacked the
> authority to vacate its order directing an inquest under CPLR
> 5015 (a) (3). As we have previously recognized, "the fraud

---

[14] *LaSalle Bank N.A. v Oberstein, 146 AD3D (2017);*

[15] *Bank of N.Y. Mellon Trust Co., N.A. v Ross, 170 AD3d 931 (2019).*

[16] *Bank of N.Y. Mellon Trust Co., N.A. v Ross, 170 AD3d 931 (2019)*

[17] *Wilson Vs. Galicia, 36 AD3d 695, 2008 quoting Oppenheimer v Westcott, 47 NY2d 595, 603 [1979].*

forming the basis for a CPLR 5015 motion may be either extrinsic or intrinsic".

First, Supreme Court erred in concluding that it lacked the authority to vacate its order directing an inquest under CPLR 5015 (a) (3). As we have previously recognized, "the fraud forming the basis for a CPLR 5015 motion may be either extrinsic or intrinsic" (Oppenheimer v Westcott, 47 NY2d 595, 603 [1979], citing Third Prelim Rep of Advisory Comm on Prac & Pro, at 204 [1959]; see Weinstein-Korn-Miller, NY Civ Prac ¶ 5015.09).

Miller, N Y Civ Prac, par 5015.08, p 50-234). Though the Advisory Committee notes make clear that the fraud forming the basis for a CPLR 5015 motion may be either extrinsic or intrinsic (Third Preliminary Report of Advisory Comm on Practice Procedure, p 204 [1959]), and the removal of that troublesome distinction has been applied by analogy to an independent action to set aside a judgment (*Levine v O'Malley*, 33 A.D.2d 874), it is by no means clear that an independent action can be based upon misrepresentation or misconduct, as can a motion under CPLR 5015 (subd [a], par 3).

## **POINT THREE: Res Judicata and Collateral Estoppel**

20. Did the Court err, respectfully, by invoking[18] the doctrines of *res judaica* and *collateral estoppel* to decide the merits of a proceeding, when the original proceeding was not fully and fairly litigated, as demanded by the well-established, fifty-year precedent from the Court of Appeals[19] (*Schwartz Vs. Public Administrator* 24 N.Y.2d 65 (N.Y. 1969) and the many cases that reaffirmed?

---

[18] The Sanctions Order, Pages 1-2.
[19] Schwartz Vs. Public Administrator 24 N.Y.2d 65 (N.Y. 1969).

> Although we have not previously said so, it is now evident that New York has adopted the full and fair opportunity test in applying the doctrine of collateral estoppel. ( *Zdanok* v. *Glidden Co.,* 327 F.2d 944, 956 [2d Cir., FRIENDLY, J.], cert. den. 377 U.S. 934; *Graves* v. *Associated Transp.,* 344 F.2d 894, 900 [4th Cir.]; *Teitelbaum Furs* v. *Dominion Ins. Co.,* 58 Cal.2d 601 [following through on Chief Justice (then Justice) TRAYNOR'S seminal decision in *Bernhard* v. *Bank of America,* 19 Cal.2d 807]; *Ordway* v. *White,* 14 A.D.2d 498, 500-501 [HALPERN, J., concurring], *supra;* see, also, Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan. L. Rev. 281; Currie, Civil Procedure: The Tempest Brews, 53 Calif. L. Rev. 25, 31; Polasky, Collateral Estoppel — Effects of Prior Litigation, 39 Iowa L. Rev. 217, 250.) New York Law has now reached the point where there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.

21. Further, did the Court err, respectfully, by disregarding[20] the well-established law that *res judaica/collateral estoppel do not preclude newly-found evidence relating to the heart of the issue in dispute*[21]?

> petitioner's own delay. Therefore, the transit authority should have been provided an opportunity, which it never has had, to establish the reasonable period within which the criminal action ordinarily would have been disposed of and to show that any delay beyond that period was due entirely to the petitioner or his counsel. Unless it can be established that the disposition of the criminal action would have ordinarily taken this much time, the petitioner should not be rewarded for his successful delay of the criminal action. It is for these reasons that I vote to reverse the award

## POINT FOUR: Agency Invoking Alternate Grounds

22. Did the Court err, respectfully, by disregarding[22] the controlling law[23] pertaining to whether an appellate agency tribunal has the authority to modify the grounds upon which the lower tribunal based its

---

[20] The Sanctions Order, Pages 1-2.

[21] J-*Mar Serv. Ctr., Inc. v. Mahoney, Connor & Hussey*, 45 A.D.3d 809, 809; *Matter of Yeampierre v. Gutman*, 57 A.D.2d 898, 899 (2d Dept. 1977).

[22] Original Order, page 5, paragraph 2.

[23] *Matter of Scherbyn v. Boces*, 77 N.Y.2d 753, Court of Appeals, N.Y. (1991).

determination. The Court cited[24], respectfully, an arguably-irrelevant, distinguishable authority from a lower court, which pertained to appellate deference on credibility of a witness:

> "this conflicting evidence clearly presented a question of credibility for the Board to resolve" *(Mtr. of Braband, 239 A.D.2d 627, N.Y. App. Div. 1997)*;

while ignoring the controlling precedent from the highest court:

> "the alternative ground for her removal belatedly raised by the respondents and relied upon by the courts below may not serve to sustain her dismissal" *(Matter of Scherbyn v. Boces, 77 N.Y.2d 753, Court of Appeals, N.Y. 1991)*.

## POINT FIVE: Remedy For Agency Violation of CPLR 7804 (e)

23. Did the Court err, respectfully, by setting aside[25] the well-established remedy pertaining to an agency's violations of CPLR 7804 (e), by omitting numerous material documents from the administrative record? In contrast, respectfully, to the well-established remedy of "reversal and remand[26]", the Court asserted that "where material should have been included in the administrative record but was not, the proper remedy is a motion in Supreme Court to amend or correct the record".

> clerk of the court. This court has consistently held that it is error to pass on a question based upon such an incomplete record (*see*, CPLR 7804 [e]; *Matter of Jacob v Winch*, 121 A.D.2d 446; *Matter of Dupree v Scully*, 100 A.D.2d 966, 967). Absent compliance with the statute, we refuse to consider the transcript submitted by the respondents for the first time in their brief on appeal.

---

[24] Original Order, page 5, paragraph 2: "Contrary to petitioner's claim, the complaint to HPD was in the nature of an appeal from Breaking Ground's determination, and an administrative appellate tribunal has the authority to make findings different than the initial decision maker (see generally matter of *Braband vs Sweeney* 239 AD2, 3rd Department (1997)".

[25] Renewal Order, page 7.

[26] *Mtr. of Petty v. Sullivan*, 131 AD.2d 762 (2d Dep't 1987): "This court has consistently held that it is an error to pass on a question based upon such an incomplete record".

## **POINT SIX: Material Conclusions Refuted by Written Admissions**

24. Did the Court err, respectfully, by arriving at material, factual conclusions that are squarely refuted by the record? For example, the refuting admissions of Respondent BG (CEO of BG, Brenda Rosen) and issuer of the first determination, Travis Fong (intake specialist at BG). Despite Mr. Fong admitting that the rejection based on *inconsistent information* had absolutely nothing to do with family gift income (rather, he alleged it was based on hearsay pertaining to business income, in express violation of the rule determinations must be on the record- not hearsay), page 2 of the Court's Original Order Decision (dated August 16, 2019) attempts to rehabilitate Fong's rejection by advancing an argument that is refuted by Fong's own admission: the Court suggests that the inconsistent information referred to family gift income. See Exhibit A2 (second page) of Docket #9 of the Appellate Division, 04206-2019 on NYCSEF, page 20.





2018-2019 was projected to be $42,300. On June 10, 2019, Breaking Ground sent a rejection letter to the petitioner, indicating that his application was being denied because he provided inconsistent information on his application and supporting documentation. Although the petitioner characterized the rejection letter as providing no basis for the conclusion that his application contained inconsistent information, the record reflects that the petitioner provided four different figures for his annual gift income—$8,000, $8,333.33, $10,000, and "upwards of" $12,000, with no proof in admissible form that he was receiving any of those amounts. Rather, the first figure was set forth in a bank statement that did not indicate from what source the amount originated or to whom it was tendered. The second figure was set forth in handwriting at the top of the bank statement. The third figure was set forth in the petitioner's letters. The fourth figure was calculated based on an unsigned, unsworn email from the petitioner's father, in which he stated that he had provided the petitioner with gifts in the sum of "upwards of" $1,000 per month. The court notes that, in his application for poor-person relief, the petitioner asserted that his gift income was $800 per month, or $9,600, yet another figure.

25. In the case of Respondent BG's CEO, the Court arrived at an erroneous conclusion by maliciously omitting and misstating the last words from Ms. Rosen's email: "at this point we await their decision". Respectfully, to substantiate the Court's predetermined conclusion that Ms. Rosen's said statement didn't preclude the possibility BG would continue analyzing Appellant's application- the Court simply edits-out the very words which contradict the Court's conclusion. These are two examples from a long list of factual assertions squarely refuted by the record. See Exhibit A10 of Docket #9 of the Appellate Division, 04206-2019 on NYCSEF, page 123:

the proceeding would not be affected. The June 28, 2019 email from Breaking Ground to the petitioner, attached as Exhibit B4 to the petitioner's motion papers, simply states that "your file is currently under review by the outside regulatory agency," which is consistent with the fact that the petitioner had complained to HPD on June 21, 2019. Although the June 28, 2019 email did not indicate when the file was made available to HPD it did not preclude concurrent review of the digital or paper files by both Breaking Ground and HPD, nor did it establish that HPD only conducted a cursory review of the petitioner's file on July 9, 2019. Exhibit B5 to the petitioner's

Your file is currently under review by the outside regulatory agency that we work with; th erred, your determination may be changed. At this point we await their decision.

Thank you, again, for your patience and understandable questions.

Kind regards,
Brenda

### POINT SEVEN: Depriving Appellant of his Right to Litigate Material Issues of Fact

26. Did the Court err, respectfully, by depriving Appellant  of his right to adjudicate, in a limited manner appropriate for an article 78, triable issues of fact pertaining to the heart of the dispute? As held in *Mtr. of Green v. Commissioner of Envtl. Conversation 94 A.D.2d 872 (N.Y. App. Div. 1983):* "in our view, CPLR 7804 was intended to continue all rights to jury trial set forth in section 1295 of the Civil Practice Act".

### POINT EIGHT: Disregarding Procedures Stated on the Court's Website Pertaining to Assignment of Related Cases

27. Did the Court err, respectfully, by refusing to honor the official rule stated on the official court website[27]: when an original proceeding (101081/2019) is disposed of, the ensuing related proceeding (101960/2019) is assigned to a new judicial part: "If the earlier case has been disposed, the clerk will assign the case at random".



**D. RELATED CASES**

In an effort to conserve judicial resources and avoid inconsistent rulings, the filing counsel must check off on the RJI whether a related case exists. If the new case is designated as related, it will automatically be assigned to the Justice who was assigned the earlier case provided that that case has not already been disposed of. If the earlier case has been disposed of, the Clerk will assign the case at random. Although the conclusion of the previous case will ordinarily preclude the assignment of the later case on the basis of relatedness, the filing attorney is free to argue to the Justice to whom

### POINT NINE: Disregarding Procedures Stated on the Court's Website Pertaining to Random Assignment of Cases

28. Further, did the Court err, respectfully, by ignoring the fact Respondents corrupted the process by which cases are to be randomly assigned? As stated on the Court's website?[28]: "The naming of the City or a City agency or official as a party and the case-type designation, together with whether the Corporation Counsel's Office appears for the City or not, will determine the assignment of City cases, which is done at random by computer among Justices assigned to the category of case involved".

---

[27] http://ww2.nycourts.gov/courts/1jd/supctmanh/RJIs-Assignments.shtml
[28] http://ww2.nycourts.gov/courts/1jd/supctmanh/RJIs-Assignments.shtml

29. Nonetheless, the Court's calendar proves that at a given point eight-month period between 2019-2020, the Court was assigned twenty-five (25) times more cases involving pro se litigants (1 vs. the average of 25), nine (9) times more cases involving city agencies (39 vs. the average of 4), and eight (8) times more special proceedings (35 vs. the average of 4).

30. Exacerbating the egregious nature of this discrepancy is the fact this anomaly occurred despite the Court itself being classified as a Trial Part, and the existence of City-specific parts, to which this case should have been assigned. Furthermore, the unbearable- if undisputed- fact is that pursuant to this statically-anomaly being protested by Appellant, *the discrepancy was adjusted.*

## POINT TEN: Misrepresenting Appellant's Allegations and his Supporting Evidence

31. Did the Court err, respectfully, by substantially and repeatedly misrepresenting the nature, scope, and substance of Appellant's specific allegations, and further- the hard evidence supporting said allegations?

## POINT ELEVEN: Unprecedented Sanctions Order Irreconcilable with Well-Established Precedent

32. On March 09, 2020, pursuant to the Appellant submitting evidence of Respondents fraudulent conduct, did the Court err and abuse its discretion, respectfully, by moving on its own motion, without warning[29], to impose on Appellant draconian sanctions depriving the Appellant of numerous civil and constitutional rights[30]; revoking without warning Appellant's statutory poor person relief and valid property interest without granting a chance to be heard; barring, without warning, Appellant from making any further motions or related correspondence in any court in the State of the New York, and threatening Appellant with further sanctions.

33. The Sanctions Order is unnerving for many reasons. Imposing sanctions that deprive a litigant of a constitutional right to file a motion based on newly-found evidence that irrefutably proves the heart and soul of the petition, and furthermore, revoking a property interest without due process is a flagrant, highly-suspect departure from decorum and well-established law.

34. For example, the Second Circuit has repeatedly stated: "the unequivocal rule in this circuit is that the district court may not impose a filing injunction on a litigant sua sponte without providing the litigant with notice and an opportunity to be heard" *(Moates Vs. Barkley, 147 F.3d 207 (2d Cir. 1998)*. As another example, in *Jordan v Bates Advertising Holdings, Inc. Sup. Crt* 118785/99 (2006), the Hon. Presiding Appellate Justice Acosta issued five warnings, before reluctantly ordering limited sanctions.

35. Further, it is well-established that deprivation of a property interest, such as a poor person's right to file a motion supporting his claim, necessitates

---

[29] See *Jordan v Bates Advertising Holdings, Inc. Sup. Crt 118785/99.*
[30] Including but not limited to Appellant's constitutional rights to fair litigation and self-representation.

the right to be heard[31]. Why is the Court, yet again, depriving a pro se litigant of his constitutional rights, of which the Court is well-aware?

36. Out of an estimated 21 million cases filed by pro se litigants in New York State, since 1970, no such order exists. Why, respectfully, should Appellant be the first in fifty years to suffer from abuse of judicial power?

### POINT TWELVE: The Court Minimized the Breach of Impartiality Arising from the Court Attorney's Profanity, Beratement, Humiliation, Abuse of Proper Decorum, and Affordable Housing Conflict of Interest

37. Did the Court err, respectfully, by legitimizing and endorsing, rather than redressing, the acknowledged incident on the first day of proceedings, July 18, 2019, in which the Court's court attorney used profanity (the F-word used twice), threatening body language, and yelling to berate and humiliate the Appellant in the presence of the opposing counsel (who stated that she had never, in her entire career, "seen anything like that"), merely in response to Appellant inquiring about a possible schedule change?

38. Further, was it proper for the Court to ignore that a court attorney's choice to verbally attack with profanity and publicly shame a pro se litigant on his first day in court, coupled by his removal of an unlawfully-held affordable property interest from his credit report, after 35 years, immediately pursuant to the Court's draconian Sanctions Order- does absolutely call into question the impartiality of the court attorney in these proceedings?

FILED: NEW YORK COUNTY CLERK 03/09/2020 04:36 PM   INDEX NO. ...

NYSCEF DOC. NO. 64                                    RECEIVED NYSCEF: 03/0...

was the earliest available date on the court's motion calendar.  Just as the parties were leaving

the court on July 18, 2019, the petitioner informed the court that he could not appear on July 30,

2019 because he was sitting for the New York State Bar Examination in Albany.  Although the

petitioner provided no explanation as for why he had forgotten that engagement, the court

agreed to reschedule the return date of the petition from August 20, 2019 to August 6, 2019

---

[31] (Mtr. of Sowa v. Looney, 23 N.Y.2d 329, 333 (1968); Mtr. of Atkins v. Goord, 16 AD.3d 1011 (3d Dep't 2005); and Mtr. of Fuchino v. Herbert, 255 A.D.2d 914 (4th Dep't 1998).

## POINT THIRTEEN: Depriving Appellant of the Right to an Impartial Judiciary Whose Impartiality Cannot be Reasonably Questioned

39. Based on substantiated public records, the Court acquired, respectfully, property interests in five (5) affordable, HPD-affiliated apartments: three (3) at 33 Gold Street, one (1) at 116 Malcolm X Blvd in Manhattan, and one (1) unit at 116 Malcolm X Blvd in Brooklyn. At the time these property interests were acquired, none of the said apartments were listed on the market, nor was any rental or sale agreement filed. Is this fact not sufficient to reasonably call into question the Court's impartiality in a proceeding pertaining to HPD and affordable housing? Further, as it relates to rules governing the appearance of impropriety, should the Court have disclosed these interests to all parties?

40. Based on substantiated public records, in conjunction with the Court issuing the Sanctions Order, and pursuant to Appellant's submitting related-incriminating data to the Department of Investigations ("DOI"), both the Court's court attorney (with an affordable property at 248 West 105 St.), and his next door neighbor- moved out of affordable properties, which they unlawfully held for 34 and 35 years, respectively.

41. As the court attorney and his next-door neighbor maintained primary residences in other properties- it was a breach of the law for them to hold onto said affordable properties for more than thirty (30) years.

42. Further, the Court Attorney's next-door neighbor is no other than the Honorable Appellate Justice to which the case at bar was steered, who based on the Rules of Judicial Conflict should have recused himself, and who has already, respectfully, taken extraordinarily-improper, harmful measures against Appellant .

43. Accordingly, does the fact that the Appellate Justice and the Court's court attorney moved out of affordable properties, which they unlawfully held for 34 and 35 years, respectively, pursuant to Appellant filing incriminating evidence and the Court issuing an unprecedented Sanctions Order- not reasonably call into question the Court's impartiality? Is it fair,

respectfully, for the Appellate Court to continue disregarding the disturbing ease with which the Rules of Judicial Conduct are abused?

## POINT FOURTEEN: Why Should Respondents Be Entitled to Freely Corrupt the Judicial Process?

44. Pursuant the Judiciary Law § 487 an attorney who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is subject to civil and criminal liability. Further, it is settled that Judiciary Law § 487 focuses on the attorney's intent to deceive, rather than the deceit's success[32].

45. Rule 3.3 of the ABA Rules of Professional Conduct ("The ROC Rules") provides that lawyers are obliged to protect the courts from criminal or fraudulent conduct that undermines the integrity of the adjudicative process.

46. This includes the prohibition against destroying/modifying evidence as well as turning a blind eye to a client's engagement in such conduct. The ROC Rules also provide that once a lawyer becomes aware of their client's criminal or fraudulent- they are obligated to share such information with the court, rather than continue protecting the criminal or fraudulent conduct.

47. The pervasive manner in which the Respondents and their co-conspirators have- and continue to- nonchalantly defy and render the aforesaid provisions of law null and void should horrify the judicial conscience. Rather than protect the Respondents by offering post-facto justifications, the Appellate Court, respectfully, should demonstrate a zero-tolerance stance visa-vi Respondents willingness to corrupt the judicial process.

## POINT FIFTEEN: Respondents Egregiously Corrupted the Judicial Process on October 02, 2019, by Colluding with Ms. Holmes, and Denying Appellant of Due Process

---

[32] *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

48. On October 02, 2019, upon due consideration of the motion papers
submitted to the Appellate Court, the Honorable Appellate Justice Webber
("Justice Webber") issued an order that renewed the Temporary
Restraining Order ("TRO") first issued by the Court on July 18, 2019. The
TRO temporarily barred the Respondents from leasing out additional
apartments in Waterline Square to applicants with a lower priority than
Appellant.



49. At that point in time, Respondents had admitted that they were processing
applicants with much lower priorities than Appellant's priority #103 out
of 74,000 (accounting for the community board 7 preference, as stated
and confirmed by Defendant Gabriel Mombrun- project manager at
Waterline Square).

50. Thus, renewal of the TRO would effectively stop Respondents from leasing
out any additional one bedroom apartments. Accordingly, it would be
highly implausible for Respondents to continue to deny Appellant of the
only affordable opportunity he ever qualified for.

51. In fact, if the Respondents were willing to freeze the entire lease-up process solely to deny Appellant, such action would substantiate Appellant's argument that Respondents fierce, irrational opposition to Appellant has nothing to do with the official excuses conjured. Furthermore, Respondents Counsel admitted on multiple occasions that more than anything, her clients did not want to freeze the lease-up process, and if the TRO was reinstated, the Respondents would rationally look to settle.

52. As such, it is critical to appreciate the relief, joy, vindication and gratitude Appellant experienced when Justice Webber, upon due consideration, reinstated the TRO.

53. At that time, Appellant was coping with public shelters during the Jewish holiday of Succot. Appellant  knew that this decision put him inches from the outcome that Appellant argues was- and still- heavily warranted as a matter of law and equity.

54. Had the Respondents not egregiously corrupted the judicial process, Appellant would likely have been spared from the hell he endured, as of October 02, 2019.

55. Prior to the Appellate Court Attorney, Ms. Lauren Holmes ("Ms. Holmes") taking the motion papers to Justice Webber, Appellant was subjected to a flurry of disgusting, unmerited remarks from Ms. Holmes, which were heard by multiple parties in the vicinity.

56. For example, Ms. Holmes stated, *inter alia,* that: (a) Respondents justifiably didn't want to settle because Appellant was a pain in the neck (b) Appellant's application for relief was without merit (c) the Hon. Judge would likely refuse to renew the TRO. All of these comments were unprofessional and uncalled for. It is noted that several disparaging remarks were made by the Appellate Division staff to the effect of "how annoying pro se litigants are to deal with".

57. Furthermore, when Ms. Holmes came back with the signed order in hand, she stated out loud: "surprise, surprise, the relief was granted".

58. Justice Webber reinstated the TRO as written by the Court. Appellant was given a piece of paper which likely meant he would be free from homelessness. Ms. Holmes then explained the next steps to both parties, and entered October 04, as the date Appellant should serve the TRO, and further entered answer due date, and a reply date.

59. The Respondents counsel, Ms. Schonfeld (HPD), an attorney for BG named Phillip Shreiber (main counsel, Ms.Williams, was on vacation) and another BG paralegal (collectively "Counsel") were all visibly angry. They asked Ms. Holmes if the terms of the TRO could be modified.

60. Ms. Holmes responded loud and clear: "No". As the TRO was already issued, "any request for modification needs to be submitted in your opposition papers".

61. Respondents Counsels left the Clerk's Office.

62. Appellant took a deep breath. Finally, thanks to Justice Webber, an iota of justice, a home, and the ability to help Mother were all within reach for the first time. Appellant sat down and reviewed the language of the TRO. He got up and asked Ms. Holmes if there was a way to enforce the TRO if Respondents violated it. Her response frightened Appellant. He sat back down, texted his mother and father, shared the good news, and a picture of the TRO. Appellant started gathering his personal belongings.

63. Due process, fundamental fairness, equal protection under the law, finality of judgement, prohibition on ex-parte communication and the proper legal decorum- all demanded that Appellant was entitled to rely on the fact proceedings had concluded. This is especially true as a pro se litigant.

64. In an honorable court of law, there is is no precedent for privileged parties who disagree with a valid order to muscle their way and demand, post-proceedings, that the valid order should be substantially-modified, in a ex-parte proceeding, as to suit their specifications. Rather, it is settled that any such request must be in writing, with notice, and served properly. At the very least, barebones integrity scream for Appellant to be heard for any such changes are made.

65. As such, what followed was, respectfully, a despicable abuse of authority, profound violation of fundamental fairness, and more than anything, attested to Respondents credo that they are above-the-law. It is equally shameful, respectfully, that all of Appellant's attempts to protest a broad-day-light, egregious crusade against proper procedure.

66. Approximately 10-15 minutes later, Respondents Counsels stormed back into the Clerk's Office, walked up directly to Ms. Holmes, and said something in low voice to Ms. Holmes that Appellant did not hear. Appellant was confused as to what was happening, and walked over. It was revealed that Respondents Counsels called partners in their firms to share the news. The partners weren't happy, and instructed Respondents Counsels to go back into the Clerk's Office and attempt to modify the TRO.

67. Appellant was hopeful that Ms. Homeless would repeat the same answer: any such modification has to be in writing, with proper notice. The law hadn't changed. There is no back door exclusively available to privileged parties, such as powerful partners in a law firm, or high-ranking lawyers in corporation counsel.

68. Instead, Ms. Holmes sprang into action, indicating that she would help the Defendants. Appellant  protested, but Ms. Holmes ignored. Appellant pleaded with Ms. Holmes to recognize that her actions were outrageous and inconsistent with the rule she had just stated. At the very least, Appellant asked to explain to Justice Webber why this modification was a disgrace to due process. Appellant further asked: how could Ms. Holmes do this post proceedings: "what if I had already left the room?".

69. Ms. Holmes responded with a sadistic smile, proclaiming: "oh... now you really wish you had left the room... but you didn't!".

70. In desperation, Appellant pleaded with other clerks in the vicinity, who stated that while they were stunned, and while they have never seen anything like that- they lacked authority to challenge Ms. Holmes.

71. Next, Appellant begged Counsels to recognize that their actions were a serious breach of a lawyer's oath, and they could face discipline. In response, they laughed out loud.

72. Ten minutes later, Ms. Holmes returned from an ex-parte conversation with Justice Webber, in which Appellant was deprived of a fundamental right to be heard. The TRO was modified to suit the exact demands of Defendants: instead of stopping the leasing process, Respondents only had to set aside the last available studio or one bedroom apartment. This empowered Respondents to resort back to the ruthless, inhuman disregard for the fact they had just sentenced Appellant back into public shelter.



73. The closet clerk who witnessed the entire episode stated that they never had never seen an order changed in such a manner. This clerk even suggested that Appellant might  simply run out of the building, such that the original TRO would still be in effect.

**POINT SIXTEEN: Ms. Holmes Corrupted The Judicial Process a Second Time Pursuant to Her Collusion to Modify A Valid Order on October 02, 2019**

74. On November 25, 2019, the Honorable Appellate Justice Rosalyn R. Richter ("Justice Richter") held a conference with all parties regarding

Appellant 's Motion to Compel Compliance with the FOIL. In this conference, Justice Richter asked the Respondents to comply with their stated guarantee to expedite a single document they had promised to expedite on October 16, 2019, but which was still not delivered.

75. Furthemore, it was ordered that the Appellate Division will defer discussion of Appellant 's Motion until December 13, 2019, in order for Appellant to be given a fair chance to access and submit, as part of his Reply, critical FOIL information withheld by Defendants, and deleted from the administrative record, in violation of of CPRR 7804 (e). Justice Richter further instructed Ms. Holmes to make sure the motion sleeve would be labeled as adjourned and placed accordingly.

76. The order stated: "Per RHR, if document sought per FOIL is obtained by 12/13/19, Appellant may submit it to be considered with motion- 7793".



77. Upon receiving in his hand a copy of the order, Appellant had a justifiable reliance that this order would be honored. Similarly, it was appropriate for Appellant to assume that Ms. Holmes would comply and file the motion sleeve as "adjourned".

78. Appellant  requests for Respondents to explain why Ms. Holmes, the same
person with whom Respondents colluded on October 02, 2019, to change a
valid order- ignored the clear instruction given to her a second valid order,
to docket the motion as adjourned. On December 05, 2019, the Appellate
Division went ahead, disregarded Justice Richter's order, deciding it on
December 05, 2019, without giving Appellant the chance to present
exculpatory evidence, substantially supporting his merits.



79. Even more egregious is the fact that the FOIL request which eventually
came on December 05, 2019 contained multiple omissions of troubling
documents that heavily support Appellant 's allegations. For example:

**From:** Pell, Shatara (HPD) <PellS@hpd.nyc.gov>
**Sent:** Monday, July 8, 2019 11:05:20 AM
**To:** Teresa Palmieri; Dormi, Nidia (HPD); Vanessa Cucurullo; Stephanie Labarta; Sasha Williams; Jon Lee
**Cc:** Mombrun, Gabriel (HPD); Morgan, Monica (HPD); Hernandez, Victor (HPD); Lugo, Edwin (HPD)
**Subject:** RE: ███████████  waterline Square| Log ████

Hi Teresa,

This file is out of order with skewed documents. The way this file was sent is completely tossed around and unprofessional and it needs to be resent in a decent order. I'm really confused, does Breaking Ground review the files they send to us?

Thank You,

**Shatara Pell** | **Deputy Director** | Marketing and Affordability Oversight Program
NYC Department of Housing Preservation & Development
212-863-6211

---

**From:** Dormi, Nidia (HPD) <DormiN@hpd.nyc.gov>
**Sent:** Friday, July 5, 2019 3:07:42 PM
**To:** Vanessa Cucurullo; Stephanie Labarta; Sasha Williams; Jon Lee; Teresa Palmieri
**Cc:** Pell, Shatara (HPD); Mombrun, Gabriel (HPD); Morgan, Monica (HPD); Hernandez, Victor (HPD); Lugo, Edwin (HPD)
**Subject:** RE ███████████ | waterline Square| Log ████

Good afternoon,

Can we go over this file Monday morning? Mr. Lugo and I have been trying to figure this file but we would need further clarification. In addition to that, the applicant has submitted an ineligible letter dated June 10, 2019 that has not been included in his file.

We will be available for a call at 11 am, please confirm.

Thank you,

**Nidia Dormi** | **Senior Policy Analyst** | Marketing and Affordability Oversight Program
NYC Department of Housing Preservation & Development
212-863-5565

## POINT SEVENTEEN: The Clerk's Offices Purposefully Sabotaged Appellant's Case

80. On February 5, 2020, all parties stipulated to enlarge the time to perfect the appeal until May 12, 2020.



81. Pursuant to converting this case into E-file Format, Appellant immediately began creating a record of the original proceeding for his appeal on NYSCEF. Appellant diligently uploaded Respondents determinations, all communications, all FOIL requests, all court submissions, all supporting documents, all court orders, court transcripts, and the Respondent's administrative record. In addition, Appellant uploaded crucial, newly-found evidence that further demonstrated the unbearable reality: As Respondents falsely swore that they comply with regulations, they continued to award a flurry of affordable housing apartments to egregiously-ineligible, privileged parties.

82. The very next day, the Appellate Clerk's Office ("the Clerk") instantly and without warning deleted these documents. Appellant begged the Clerk to refrain, to no avail. Hundreds of additional documents were deleted by the Clerk, despite Appellant pleading.

83. Respectfully, this action is emphatically inappropriate for an honorable court of law, which is generally known to value the preservation of records, rather than the deletion of records (even those containing procedural errors).



84. The Appellant was then informed by the Clerk that he could not create the record on his own, rather, he was required to obtain the official record from the Supreme Court.

85. During the Coronavirus, Appellant was instructed by the Supreme Court to purchase a new flash drive and serve the subpoena in order for the certified record to be sent to the Appellate Court.

86. Appellant promptly complied. On May 14, 2020, Appellant served a signed Subpoena by the Hon. Administrative Judge Kaplan commanding that the record be transferred to the Appellate Division by May 20, 2020.



87. The Supreme Court Clerk also specified that Appellant would be given access to the official record from the Appellate Division- and for this reasons, per the Supreme Court Clerk- Appellant was not given the opportunity to obtain photo copies of the record (nor could have Appellant even made copies as that section of the court was sealed off).

88. The Supreme Court's records proved an unsettling fact: between May 20 through July 1, 2020, records for numerous other cases- that were subpoenaed after Appellant's subpoena were nevertheless delivered in a timely manner to the Appellate Division. Appellant's record is the only one that sat in the Supreme Court until July 1, 2020, when it was confirmed as delivered.

89. No explanation for this disturbing fact has been given, despite Appellant begging to understand why the Supreme Court only delayed delivering

Appellant's record. Respectfully, an honorable judicial conscience is bothered by the notion that clerks are free to saboteur a litigant's case.

90. This is not a conspiracy theory, rather, the only rational explanation that is entirely consistent with the sad history of these proceedings: Appellant's fundamental rights for fairness and equal protection under the law are deprived whenever an authority figure- so desires.

91. From May 20, 2020-July 20, 2020, Appellant repeatedly emailed, called and begged the Appellate Clerk's Office to upload the record such that he could access the official record (as his own attempts were deleted by the Clerk).



92. During at least six conversations, in response to Appellant inquiring why the Clerk wouldn't upload the record from the Supreme Court, the Clerk responded evasively without answering the question. For example: "it is probably still on the truck", "you are not the only case we have", "I don't know where the record is, maybe call the Supreme Court", "we are very overwhelmed right now with covid-19". On at least two occasions, the Clerk also hung up the phone.

93. Then, on July 21, the Clerk's Office casually informed all parties that the appeal has been dismissed for failure to perfect. There was no order of dismissal posted, just a casual, *we dismissed the appeal.*



**Appellate Division - 1st Dept**

Comment Added to Case
07/20/2020

**Comment from Court User - Kam Yuen**

IMPORTANT NOTICE: This application, under document #38, is an application for limited interim mandamus and vacating of order, is being presented as appealing from an order dated 5/8/2020, order by Judge John J. Kelly, if this is so, please provide this court with the Notice Appeal and informational statement filed with court of original instance. Also note if this is an appeal of the order noted above, you must initialize to obtain a new case number for this new appeal filed, and file your present application under the new case number once issued by this court. This case number, 2019-04206, is assigned to an appeal with Notice appeal dated 9/16/2019 appealing from an order entered on 8/23/2019 which has been deemed dismissed by this court for failure to perfect. Also note a mandamus request against a supreme court justice is an original processing with this court, and may not be may via an application, and to vacate an order you must file a full motion and not by application. Please contact this office if you have any questions. As a result this application can not be accept or entertained as this time.

**Case Information**

Appeal #: **2019-04206**
Caption: **ABRAHAM GROSS v. THE DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT (HPD) et al**

**Document Information**

Document #: **38**
Document Type: **APPLICATION FOR INTERIM RELIEF**

94. Respectfully, is this an honorable way for a court mandated to provide equal protection under the law to operate?

95. At no point did the Clerk ever volunteer the simple, critical information Appellant was graciously informed of today, August 26, 2020: the Appellate Division will not grant access to the official record, despite what Appellant was promised by the Supreme Court, and what was clearly implied by the Clerk who deleted Appellant's attempt to create a record on NYCSEF, and then demanded that Appellant acquire a certified copy of the record from the Supreme Court.

96. This decision is even more unbearable due to exacerbating factors, namely (a) the Clerk's Office declaring their personal contempt for Appellant and other pro se litigants (b) the malicious measures taken with the clear intention of damaging Appellant, and which should never see daylight in a court of law (c)  the Clerk is well-aware of how much Appellant is suffering, and what was at stake in this appeal (d) and the pandemic.

97. It is unjust for the Clerk to torture a litigant with the clear intention of sabotage. The appeal should, respectfully, be reinstated and expedited.

---

**THIRD ARGUMENT:** **There are No Words to Describe how prejudicial it was for the Court to aggressively defend, protect and endorse Respondents' proud intention to undermine the spirit and clear directive of the Legislator and the Court of Appeals, and even the Court' own application of the FOIL.**

98. Pursuant to the Public Officers Law § Article 6, Section 84:

> [...] The legislature therefore declares that government is the public's business and that the public, individually and collectively and represented by a free press, should have access to the records of government in accordance with the provisions of this article. [...] The people's right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality. [...]

99. Further, The Court of Appeals has repeatedly affirmed[33] that the FOIL, *inter alia,* is: (a) a binding statute that demands an agency's good-faith compliance; (b) generally based upon a presumption of access; (c) all records of an agency are available, except to the extent that records or portions thereof fall within one or more grounds for denial appearing in §87(2)(a) through (i) of the FOIL; (d) if an agency repeatedly demonstrates its prerogative to violate and/or express contempt for the FOIL, then, upon being presented with evidence of such violations in a timely-filed special proceeding, the court must redress- rather than endorse- an agency's disregard for the FOIL.

---

[33] *Mtr of Buffalo v. Buffalo Entr. Dev.* 578 NYS 2d 945, (1991); *Westchester-Rockland Newspapers v. Kimball* 50 NY2d 575 (1980); *The Legal Aid Soc'y. v. Albany Local Dev.* (Sup. Crt, Albany Cty, (1989); *Babigian v. Evans,* 427 NYS 2d 688 (1980); *S.W. Pitts Hose Company et al. v. Capital Newspapers* (Sup. Crt, Albany Cty, (1989);  *Quirk v. Evans,* 455 NYS 2d 918, 97 Ad 2d 992 (1983).

100.   The aforesaid, respectfully, failed to make any impression on the Court. Instead of using its adjudicative powers to correct an agency's non-compliance, the Court uses its powers to assist Respondents efforts to withhold information- a bewildering choice that renders the FOIL null and void.

101.   For the egregious detailed illustration of the manner the Court set aside the FOIL, the clear precedent from the Court of Appeals, and the Court's own application of this precedent, see EXHIBIT B.

---

**FOURTH ARGUMENT: The Fraud-Friendly Approach is Devastating to the Public Interest. To Protect the Public, Respondents Criminal Enterprise and Above-the-Law Culture Must be Redressed, Rather than Endorsed or Tolerated.**

**FIFTH ARGUMENT: The Appellate Court Must Not Dismiss The Overwhelming Evidence Respondents Are Engaged In A Massive Criminal Enterprise That Harms the Public.**

**SIXTH ARGUMENT: Respondents Public Statements Regarding The Importance of Helping the Homeless Find Housing During the Pandemic, Are Sadistic, Cruel, Unusual, and a Breach of Social Norms**

---

## POINT ONE: The Problem Is Pervasive Corruption

102.   Respectfully, these proceedings, at their core, are a sad testament to American Jurisprudence, and the law enforcement community. It is the City of New York and its residents who continue to suffer from Respondents criminal enterprise. The City of New York should be the *Appellant in this action, not the Respondent.*

103.   By virtue of overwhelming evidence in the public domain, Respondents, wealthy developers ("Developers") and their co-conspirators, have hijacked New York City's affordable housing

programs to create a lucrative criminal enterprise motivated and enabled by: (a) insatiable greed of officials who view public property as though it were their own (b) discriminatory selection practices, featuring a by-default prejudice against all non-Hispanic applicants (c) a general intention to reject as many applicants as possible, such that more public property can be embezzled and/or converted to market rate, despite being designated as affordable (d) deliberate indifference and/or active participation of public agencies, who are mandated to protect the public interest, but refuse to do so.

104.    By virtue of this evidence, it is unnerving that Appellant is the one forced to fill the void created by agencies with the resources and mandate to protect the public[34]. For example:

    i.    As first exposed by Respondent HPD whistle-blower, Steven Werner[35], and as Respondent HPD publicly admitted before City Council[36], wealthy developers have- in fact- been nonchalantly stealing $100 million per year from the public[37], by collecting tax breaks without registering the affordable units as rent-stabilized[38].

    ii.    The Brooklyn D.A.'s June 2019 admission[39] that bribery in Mitchell Lama affordable programs is likely the norm- not the exception.

    iii.    The DOI Commissioner's admission[40] that Respondents systemically fail to honor their oversight mandate.

---

[34] Demanding this of Appellent is particularly cruel, as the Respondents have proven their ability and willingness, time and time again, to render honorable courts of law into, respectfully, vessels in service of their cause.

[35] https://www.propublica.org/podcast/these-people-want-new-york-landlords-to-stop-ripping-off-tenants

[36] https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=458975&GUID=A4F32C2C-519F-4987-9A1E-CF0D66CA008B

[37] https://www.propublica.org/article/ny-state-data-indicates-even-more-landlords-duck-rent-limits

[38] https://www.propublica.org/article/nyc-landlords-flout-rent-limits-but-still-rake-in-lucrative-tax-breaks

[39] http://brooklynda.org/2019/05/21/three-luna-park-housing-corp-officials-indicted-for-conspiring-to-rec eive-bribes-forge-documents-to-corrupt-the-process-by-which-mitchell-lama-apartments-are-acquired/NY SCEF, Appl Div. First Department, 2019-04206, Docket # 49, page 10.

[40] Ibid, ibid.

    iv.    The overwhelming number of fraudulent affordable deeds readily available on ACRIS[41].

    v.    Six (6) recent sworn affidavits of credible Respondent HPD whistle-blowers[42] , who were compensated prior to discovery, and who swore before The United States District Court for the Southern District of New York ("the Federal Court"), that the Respondents are engaged in outrageous criminal conduct.

    vi.    The indictment of HPD Assistant Commissioner, Wendel Walters, three other HPD executives, and six others Developers on a 26-count indictment including charges of racketeering, conspiracy, bribery, extortion, wire fraud, and money laundering in excess of $22 million[43].

    vii.    In the past five years alone, more than sixty (60) City housing employees, including numerous HPD employees, were indicted on charges of conspiracy, bribery, corruption, and fraud[44].

    viii.    HPD's own internal audits from 2012-2017[45] revealing "serious irregularities" in affordable Mitchell Lama projects.

105.    At a minimum, the aforesaid should, independently and collectively, inspire the U.S. Attorney's Offices, the DOI, the F.B.I., the Office of the City Comptroller, the D.A.'s Offices, and the Judiciary to take uncompromising remedial measures to redress the root of Respondents criminal enterprise. Instead, the adjudicative aftermath that followed the aforesaid indictments, respectfully, has only made crime seem more attractive to the culprits.

---

[41] For example, NYSCEF, Appl Div. First Department, 2019-04206, Dockets # 9, EXHIBITS B-E.

[42] See below Par 16, Footnote (15).

[43]https://archives.fbi.gov/archives/newyork/press-releases/2011/assistant-commissioner-of-nyc-departme
nt-of-housing-preservation-and-development-indicted-for-racketeering-bribery-and-extortion.

[44]For example:
https://www.manhattanda.org/manhattan-das-office-doi-nypd-announce-arrests-and-criminal-charges-wid
espread-briber/

[45] Quoted in Comptroller's Audit MJ06-134A, at page 10. Only two (2) out of the forty-three (43) projects audited
did not show any irregularities.

## **POINT TWO: Lack of Oversight - Haven for Corruption**

106.    In 2014, the developable land in Manhattan was estimated to be worth $1.74 trillion[46]. By a vast disparity, the City is the biggest property owner in the five boroughs[47]- with a massive 362.1 million square feet to its name[48]. A substantial portion of the City's public property is designated for affordable housing, in programs managed by Respondent HPD and its many affiliated entities, including Respondent Breaking Ground[49]. Officially, the purpose is to help low/mid level income New Yorkers find housing solutions.

107.    The public is likely unaware that there are anywhere between 168-216 affordable programs within the jurisdiction of City Housing Agencies, such as HPD, HDC, and NYCHA. A partial list includes: the 421-a Tax Incentive, 421-b Tax Incentive, 420-c Tax Incentive, 50/30/20 Mixed-Income, Housing+, Mitchell Lama, Inclusionary Housing, J-51 (A), Rent Controlled, Rent Stabilized, Third Party Transfer, Neighborhood Pillars, Mix and Match Income, Mixed Middle Income, Multifamily Disposition and Finance, Mutual Housing Association, and the Nehemiah Programs. Despite many of these programs pertaining to tax breaks and "public construction bids" worth billions of dollars, the "oversight" over these programs is, at best, a sad joke.

108.    By virtue of the City's enormous assets, it is imperative for the Respondents and their affiliated parties- such as marketing agents, and developers granted permits for public housing projects- to act with

---

[46] That figure- which excludes the combined value of Brooklyn, Queens, Staten Island, Bronx, as well as, the aggregate value of all parks, roads, and highways- is significantly larger than the combined market capitalization of the world's three largest corporations in 2014. See: https://www.journals.elsevier.com/regional-science-and-urban-economics/ https://www.bloomberg.com/news/articles/2018-04-24/manhattan-s-land-value-is-an-incredible-1-74-trillion.

[47] https://therealdeal.com/issues_articles/who-owns-all-of-new-york/

[48] That is more than one and a half times what the top  private developers- such as Vorando, Blackstone, Tishman Speyer, Extell, SL Green Realty- own combined.

[49] For reasons unknown, the precise breakdown is concealed from the public.

integrity, transparency, and the recognition that public property must serve to benefit the public.

109.    Nevertheless, over the past fifty years, Respondents, the Developers and their co-conspirators, have and continued to betray the public, by corrupting the hundreds of affordable programs with lucrative, mind-bending scams, the worst of which- shameless embezzlement of affordable properties to enrich themselves and their co-conspirators.

110.    This breach is supported and facilitated by the purposeful lack of oversight exercised by those mandated to protect the public. Considering credible evidence that this scam has exceeded hundreds of billions of dollars, and that has been going on for five decades- no judicial conscience of integrity could ever view the lack of oversight as accidental. Rather, it is intentional, and in all likelihood, motivated by the insatiable greed of above-the-law public officials.

111.    A growing number of members of the public have gained first-hand knowledge of the sinister truth perverting the City's affordable housing programs. Further, many public officials in positions of power- including Honorable members of the bench are, respectfully, aware of this reality. Nevertheless, the absence of remedial measures continues to empower the Respondents to destroy lives.

112.    To protect their interests, the culprits have harnessed access to City's public property as a limitless resource to bribe any public official, law enforcement or oversight agency that dares challenge, effectively rendering the scam to be untouchable.

113.    Granted, blanket denials of these serious allegations are expected- most certainly from those who desire to protect corruption, and/or are directly benefiting. Nonetheless, a sensible judicial conscience cannot turn a blind eye. The credible evidence of corruption, fraud, and embezzlement is overwhelming to any reasonable mind. Respectfully, these crimes will carry on unfettered, as long as oversight agencies and the Judiciary abide by the laissez faire approach.

**POINT THREE: Respondents Admitted in 2015 that Due to Their Weak Oversight, at Least $100 Million Dollars Is Stolen Every Year**

114.    In a shocking series of articles published between 2014-2018, investigative journalists Cezary Podkul and Marcelo Rochabrun, exposed the catastrophic harm inflicted on the public, which goes to the heart of the harm inflicted on Appellant. Simply put, for decades, numerous Developers have audaciously cheated the public, by claiming tax breaks but refusing to provide affordable housing. Despite collecting tax breaks over $100 million per year, these articles demonstrated that 200,000 affordable units which were required to be registered as rent-stabilized, were never registered to begin with, or in some cases, fraudulently converted back to market rate, in express violation of Regulatory Agreement 1.

115.    The sinister factor enabling this breach was on full display HPD executives testified before City Council, in a special hearing that was prompted by Pro Publica's expose. It is baffling to observe their resistance to any meaningful proposal aimed at redressing this travesty, such as claiming back the stolen $100 million. It is apparent that the breach of their statutory oversight mandate- failed to make any impression.

**POINT FOUR: Respondents Admitted In May 2020 That They Rejected 99.9% of the Applicants to Waterline Square**

116.    Based on Respondent HPD's own rules as illustrated in the HPD handbook, prior to holding a second lottery- which is not mentioned in any regulatory agreement- the Respondents must first process all applicants from the original lottery. Thus, in effect, Respondents are claiming that in the first lottery, they disqualified 73,773 applicants out of 74,000 applicants to Waterline Square as ineligible, and that as result of disqualfying 99% of the application pool, 22 apartments remained vacant. This unnerving admission supports the nucleus of this complaint.

117.    The Respondents callous conduct is demonstrative of a cruel and unusual disregard for Appellant's life, as he continues to struggle to

survive the pandemic, while facing unsafe living conditions, on-and-off
homelessness, pursuant to 353 days of unjustified torment, while the last
twenty-two (22) apartments for which he is eligible- even according to
Respondents cryptic, conclusory calculations- are given away to
unqualified applicants.

### POINT FIVE: Respondents Cover Up Attempts Prove Countless Apartments Were Granted To Unqualified Privileged Parties

118.    On June 28, 2020, Appellant confidentially submitted to Respondents
Counsels, Ms. Schonfeld, and Ms. Williams, a list of unlawful residents at
Waterline Square, who either owned property out-of-state, resided
simultaneously in multiple affordable properties, exceeded the max income
requirements, or were family and friends of Respondents. On June 29, each and
every one of these people removed incriminating information their credit reports.

### POINT SIX: The Luna Park Affordable Housing Scandal[50]

119.    In May 2019, the Brooklyn D.A. arrested and indicted three women in
connection with a bribery scam at the Luna Park Affordable Housing
Mitchell-Lama Complex. The accused allegedly committed fraud, forgery and had
taken $875,000 in bribes that enabled unqualified parties to skip the waiting list.
At the official press conference, the Brooklyn D.A., stated that the D.A. suspects
the scam to be the norm. In turn, the Commissioner of DOI stated:

> "Protecting affordable housing in New York City is not just about building
> more units but also preserving fair access to the ones we have. These
> defendants undercut that effort by manipulating the rules on access to
> affordable housing apartments in return for hundreds of thousands of
> dollars in bribes, according to the indictment. The corruption
> vulnerabilities DOI found during this investigation are being addressed
> with the City's Department of Housing Preservation and Development,
> which has already begun strengthening its oversight of City-supervised
> Mitchell-Lama developments. DOI thanks the Brooklyn District
> Attorney's Office for their partnership and commitment in this important
> investigation".

---

[50]http://brooklynda.org/2019/05/21/three-luna-park-housing-corp-officials-indicted-for-conspiring-to-rec
eive-bribes-forge-documents-to-corrupt-the-process-by-which-mitchell-lama-apartments-are-acquired/

**POINT SEVEN: ACRIS Contains Thousands of Fraudulent Deeds
Pertaining to Affordable Properties**

120.    In many cases, it is *Respondent HPD* (alongside *City Hall and the NYC Law Department*) who facilitated the transfers. Some of the deeds even include a sworn proclamation that a public hearing was held, pursuant to which a public auction was held, and that the property was awarded to the *highest bidder at this auction.* The breach of administrative integrity  is two-fold: *first*, the *highest bid recorded rationally demonstrates no such bid was ever held,* as it is implausible the highest bid for a property worth between $500,000-$6,200,000 was in the $1-$2500 range. *Second*, equally concerning is the reference to public hearings and public auctions, which are nowhere to be found on official City databases.

121.    When an affordable property is awarded to anyone- let alone, a privileged party- it is imperative that the hearings precipitating the transfer, must be held in the open. *Not behind closed doors.* Records of these transfers must be readily accessible. The unconscionable terms, coupled by the suspicious similarity in some of the signatures, coupled by the lack of transparency cast a heavy shadow on the legitimacy of these transfers.

122.    For example, on October 03, 2008, Respondent HPD authorized, notarized, and signed off on the sale of an affordable, city-owned property to Lash Kocovic for the highest bid of $1000- a fraction of its market value. Even more disturbing, the deed references a public hearing and a public auction that are missing from the official City Council database.

123.    Similarly, on July 06, 2011, HPD authorized, notarized, and signed off on the sale of an affordable, city-owned property to Decatur Properties LLC, for the highest bid of $2254 - a fraction of its market value. The hearings referenced in this deed are also missing.

124.    Similarly, on July 07, 2011, HPD authorized, notarized, and signed off on the sale of an affordable, city-owned property to Mohinder Bahanot, as the

highest bid of $1040- a fraction of its market value. The referenced hearings in this deed are also missing.

125.    Similarly, on January 15, 1995, HPD authorized, notarized, and signed off on granting the same Mohinder Bahanot a city-owned, affordable property at Sutphin Blvd, Queens for $0 dollars.

126.    Similarly, on July 13, 2011, HPD authorized, notarized, and signed off on the sale of an affordable, city-owned property to the BT Family Trust for the highest bid of $1,300- a fraction of its market value. The referenced hearings in this deed are also missing.

127.    Similarly, on August 10, 2011, HPD authorized, notarized, and signed off on the sale of an affordable property valued at $690,000 for the highest bid of $250. The referenced hearings in this deed are also missing.

128.    Similarly, between 2004-2018 HPD authorized, notarized, and signed off on the sale of thirteen (13) affordable properties at Chester Park, Bronx, to Lovely Meah and Nadir Ahmed, whereas the limit is one affordable unit per person. Thousands of applicants were rejected, but the aforesaid were awarded thirteen (13) apartments. Further, Lovely Meah is a city employee school helper with an annual salary of $17,000, and Nadir Ahmed is a fraud investigator for the Department of Homelessness ("DHS") with an annual salary of $40,000, yet still they managed to acquire thirteen (13) apartments, which they continue to enjoy, as Appellant continues to suffer.

129.    Similarly, as it relates to the subject property, Waterline Square, and adjacent properties at Riverside Blvd 40-60, Respondents awarded affordable apartments ineligible applicants including but not limited to: Tatayana Maldeno, Jason C Rivera, Jason M Rivera, Hadith Narine, Kim Bevan, Stephanie Perez, Luis Brito, Adriana Salazar, Rosa Mendoza, Rosura Mendez, Edwardo Campanella (who was awarded an apartment after his confirmed death), Angie Acosta, Michael Acevedo, and Maria Martinez. The aforesaid illustrations are an iota of Respondent criminal enterprise.

## POINT EIGHT: Why Are Respondents Indifferent to the Well-Established Right for Adequate Shelter?

130.    The right for adequate shelter is well-established in New York State: *Callahan v. Carey, No. 79-42582 (Sup. Ct. N.Y. County, Cot. 18, 1979); Eldredge v. Kock, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983); McCain v. Koch, 511 N.E. 2D 62 (N.Y. 1987).*

131.    The said cases heavily relied on Article XVII, Section 1 of the New York State Constitution:

> "the aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine".

132.    Due to the pandemic, these shelters are extremely dangerous and inadequate. Appellant's well-established right for adequate shelter is being deprived by being forced into harmful conditions in which there is a high likelihood of contracting COVID-19.

133.    Respectfully, why should the Honorable Appellate Court continue disregarding the deprivation of Appellant's protected right for adequate shelter? This right is but one on a never-ending list of civil and constitutional rights that have been ignored. Respectfully, by the time the Appellate Court gave Mr. Callahan his day in court, he had tragically died on the street. His lawyers begged to be heard sooner, to no avail.

134.    Appellant has been begging for his day in court for more than a year. The Clerk has done everything possible to deny Appellant of this right, by refusing deliberately stalling the record, ignoring the subpoena, and deliberately giving misinformation. Further, if it wasn't for the malicious sabotage of Ms. Holmes, Appellant would have had a home on October 02, 2019. Considering the totality of circumstances, the evil shown by Respondents, it is truly impossible to fathom how the judicial conscience could continue being so indifferent to a callous injustice.