Abraham Gross
Pro Se Plaintiff
agross2@gmail.com

November 05, 2020

The Honorable Robert W. Lehrburger
United States Magistrate Judge
United States Southern District Court of New York
500 Pearl St, New York, NY 10007-1312

<u>Re: HPD's Motion to Be Excused from Settlement Conference in Case
Abraham Gross, et al. v. The City of New York, et al., Civil Case No.
18-cv-12198</u>

Dear Judge Lehrburger,

1. The following is written with humility and respect to this Honorable Court, Ms. Jasmine Paul, Ms. Laura Juffa, Ms. Jeanne Williams and the Defendants.

2. I ("Plaintiff", or "I") am the pro se plaintiff in this case.

3. Based on justified grounds, I unequivocally oppose Defendant HPD's most recent motion to excuse Louise Carroll, Shatara Pell, Nidia Dormi, Nicole London, Mark Matthews, Anne-Marie Hendrickson, Harold Weinberg, Nick Lundgren, Samantha Schonfeld, James E. Johnson, Margaret Brown, Helen Rosenthal, Baaba Halm, Edwin Lugo and Victor Hernandez from the settlement conference.

4. Due to my extenuating circumstances of which Ms. Defendant HPD is well-aware, I do not have the ability to articulate all the reasons that this motion should be denied, but I will list ten reasons demonstrating why it is heavily warranted that: (a) all the Defendants appear (b) all Defendants take this conference seriously and recognize the seriousness of prolonged homelessness during the pandemic (c) Defendants come to the conference and with an open mind (d) Defendants consider what possible measure need to be taken towards a potential settlement.

5. **First,** as a matter of fundamental fairness, this motion should have been submitted by November 02, 5:00pm, and granted me a proper time to respond. While I most certainly appreciate the need for flexibility and extensions, in prior State-proceedings, I was repeatedly

1

harmed by a double standard: procedural requirements were consistently enforced to my detriment, whereas the Defendants were granted by Judges, Court Employees, and Court Clerks a moratorium on abiding by procedure, as they deemed fit[1].

6. **Second,** I didn't just randomly choose Defendants. They were each chosen due to their personal involvement in this atrocity, breach of administrative/fiduciary duties, or personal abuse of public property (for example, Mark Matthews). Based on the record, Shatara Pell, Nidia Dormi, Nicole London, Edwin Lugo, Samantha Schonfeld, and Victor Hernandez were all directly involved in processing my application.

7. Further, the severe harm inflicted on me and millions of other applicants heavily warrants that the executive level at HPD/Corporation Counsel/City Council (Louise Carroll, Anne-Marie Hendrickson, Harold Weinberg, Nick Lundgren, James E. Johnson, Margaret Brown, Baaba Halm and Helen Rosenthal) carve the time to recognize the horrific corruption in affordable housing that is proven beyond a scintilla of doubt. The public interest continues to be devastated by the executive level refuses to address what is really happening in the application process. Our grievance arises from a catastrophic breach of integrity. The public interest warrants careful attention, rather than dusting the problem under the rug.

8. The Defendants choices- many of which remained unexplained a year later- have inflicted on Plaintiffs inexpressible harm and loss. Their indifference to prolonged homlessness during the pandemic is impossible to grasp. They should explain their position to the Honorable Court and to Plaintiff, before costly litigation ensues.

9. **Third,** the fact that Nicole London is not listed in the official City payroll database as an HPD employee, coupled by a fraudulent profile that was created for her, and then instantly modified pursuant to my inquiry- heavily warrants Ms. London to appear and explain her absence on the official City payroll database.

---

[1] My complaint lists many such illustrations, including: (a) ex-parte conversations post proceedings to change valid orders (b) disregard for official procedures regarding assignment of related cases (c) disregard for official procedures regarding the random assignment of cases. I'll give one more example: HPD's "amended FOIL" was promised on or about January 20, 2020. Instead, it was delivered on or about March 12, 2020. In their Answer, Respondent casually notes these two dates, without providing any explanation as to the delay. Tellingly, in its FOIL Order, the Trial Court also chose to ignore this fact, as it ignored 25 pages of Plaintiff's affidavit which specifically refuted the Trial Court's cryptic conclusion (see EXHIBIT G of Plaintiff's complaint).

10. **Fourth,** the evidence of fraud in Waterline Square is overwhelming. The number of unlawful applicants who continue to enjoy apartments, as I continue to suffer, screams for an explanation, not more cover-ups. The bizarre modifications of the regulatory agreement in response to litigation further calls into question why is truly motivating this travesty. As Ms. Louise Carroll and Ms. Brenda Rosen's signatures are on the Waterline Squares regulatory agreements, at the very least, they should hear legitimate concerns of massive fraud that is taking place on public property under their supervision.

11. **Fifth,** from a decency standpoint, it should, respectfully, alarm the judicial conscience that the Defendants cannot spare the time to take notice of the prolonged suffering Plaintiff continues to endure. Respectfully and simply put, reasonable minds who take a look at the totality of evidence cannot reconcile why Plaintiffs should have to suffer another minute during the pandemic. Reasonable minds expect and hope all of those executives of housing agencies who are asking to be excused, should instead try to evaluate how this suffering could be resolved. Indeed, the very request to be excused- to continue inflicting harm from the shadows- proves that they are in complete denial of the horrors they have inflicted, and continue to inflict on Plaintiff and millions of others good-faith applicants. Pursuant to a year of suffering, they should have the decency, at the very least, to understand the impact of their misconduct.

12. **Sixth,** HPD is a public housing with 2019-2020 budget totaling $5.9 billion in City funds and $162 million in Non-City funds[2]. The official websites of HPD and BG are abundant with proclamations about an uncompromising commitment to ensure all New Yorkers have access to safe and adequate affordable housing. As one example, BG's homepage states:

> "Home is more than four walls and a roof. At Breaking Ground, home is a support system. We provide a full spectrum of wraparound supports that help people recover from the trauma of homelessness, achieve stability, and rebuild their lives in housing" [...] "for individuals experiencing street homelessness who are not yet ready to transition into permanent housing, as well as those who may have struggled in other housing programs, our Safe Havens offer an alternative to life on the street: private, safe, clean, and affordable short-term accommodations. On-site case management and clinical services are available [...] to help them secure permanent housing".

---

[2] https://council.nyc.gov/budget/wp-content/uploads/sites/54/2019/03/806-HPD-2020.pdf

13. **Seventh,** when the pandemic erupted, Defendants cruelty elevated to the realm of extraordinarily-evil. Despite the pandemic placing the homeless population at an increased health risk, and albeit the surge of deaths within homeless shelters, Defendants did not show an iota of humanity. Instead, they made a series of false, cynical press releases, which all things considered, are nothing short of sadistic:

> "This is the time to help families out of the shelter system in a bigger way then we've done before," said Louise Carroll, the Commissioner of the New York City Department of Housing Preservation and Development or HPD (May 30, 2020)[3].
> "We are pleased to introduce new changes to the Housing Connect lottery process, aimed at moving New Yorkers into stable, affordable housing as quickly as possible, during the COVID crisis and beyond. We are committed to working with developers and marketing agents to expedite the leasing of developments, while maintaining a clear, consistent process and strong protections for applicants" (April 22, 2020)[4].

14. **Eighth,** HPD's old (page 40) and new (page 37) Official Marketing Handbooks state[5]:

> "Homeless Referrals: the Agency may require that all or a portion of the [...] community preference units[6], [...] and/or units associated with any other additional preference and set-aside then existing, be set aside as housing for households then residing in emergency shelter and referred by the City as long as such homeless applicants meet the requirements of the applicable preference or set aside and any other applicable program eligibility criteria".

Plaintiff is a valid DHS referral since September 27, 2019. Why must he continue to suffer, while so many other unqualified candidates continue to enjoy their embezzled apartments?

15. **Ninth,** from a rational standpoint, why would Defendants spend an estimated $800,000 on legal fees (at the very least, two partners and eight lawyers who have worked countless hours for over a year), and which would be more than 5 times Plaintiff's rent for the next ten years? Further, were Plaintiff to be granted the apartment during the week he originally qualified (June 2019), in addition to saving legal fees, Defendants would have had an additional $14,600 in rent, which Appellant offered to pay up front via a bank loan. It is highly suspect for public housing agencies to spend $800,000 in fees and forfeit an additional $14,600, solely to deprive a

---

[3] https://www.ny1.com/nyc/all-boroughs/coronavirus-blog/2020/05/30/200-homeless-families-getting-apartments-because-of-the-pandemic
[4] https://www.newyorkcountypolitics.com/2020/04/24/city-relaxes-rules-for-affordable-housing-lottery/
[5] https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/marketing-handbook.pdf
[6] Plaintiff qualified for the relevant community board 7.

low-income litigant an affordable apartment for which he qualified for, especially during the pandemic.

16. **Tenth,** the right for adequate shelter is well-established in New York State: *Callahan v. Carey, No. 79-42582 (Sup. Ct. N.Y. County, Cot. 18, 1979);  Eldredge v. Kock, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983); McCain v. Koch, 511 N.E. 2D 62 (N.Y. 1987).* The said cases heavily relied on Article XVII, Section 1 of the New York State Constitution:

> "the aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine".

17. Due to the pandemic, these shelters are extremely dangerous and inadequate. Appellant's well-established right for adequate shelter is being deprived by being forced into harmful conditions in which there is a high likelihood of contracting COVID-19. Respectfully, why should the Defendants- public housing agencies- continue showing indifference to the deprivation of Appellant's protected right for adequate shelter?

18. In conclusion, for all of the aforesaid reasons, for the reasons emanating from the EXHIBITS below, and for many the other reasons which Plaintiff cannot articulate, this motion should be denied.

19. Plaintiff further asks that the Honorable Court consider requesting Defendant Brenda Rosen to be available during the conference.

20. Plaintiff further asks the Defendants Counsel and Defendants to recognize that a humanitarian settlement has never been more warranted, and to take serious measures and actively look into different settlement possibilities- not just to pretend to do so. Finally, Plaintiff humanatarily asks Defendants to approach the settlement conference with an open mind.


Respectfully Submitted,


Abraham Gross



# Marketing Handbook

Policies and Procedures for Resident Selection and Occupancy

July 2018





Department of
Housing Preservation
& Development



NEW YORK CITY
HOUSING DEVELOPMENT
CORPORATION

Effective 07/01/2018

## D.  RESIDENCY PREFERENCE FOR NEW YORK CITY RESIDENTS

After fulfilling the disability set-asides and Community Board, municipal employee, and any remaining preference requirements, applicants in the general pool who reside in New York City must be processed before non-residents.

## E.  ADDITIONAL SET-ASIDES AND PREFERENCES

There may be additional preferences and set-asides tied to certain government programs or funding sources. However, they are subject to the same resident selection criteria and application process and must be approved by the Agency.

> ✓ **The Marketing Plan and Project advertisement must reflect all set-asides and preferences.**

## F.  HOMELESS REFERRALS

1.  The Agency may require that all or a portion of the Mobility Disability Set-Aside Units and Hearing/Vision Disability Set-Aside Units, the Community Preference Units, the Municipal Employee Preference Units and/or units associated with any other additional preference and set-aside then existing, be set aside as housing for households then residing in emergency shelter and referred by the City as long as such homeless applicants meet the requirements of the applicable preference or set aside and any other applicable program eligibility criteria. This requirement may apply to initial rentals and/or re-rentals.

2.  The Agency may also amend these policies and procedures for individual Projects (for initial rentals or re-rentals from a waiting list) to authorize the owner to give a preference or set-aside for referrals of homeless persons from the Department of Homeless Services, provided that the homeless persons meet program eligibility criteria (i.e., have incomes at or below the maximum allowable income for eligibility).

## G.  REFERRALS

The Agency may refer to the Marketing Agent potential applicants who are being relocated or displaced due to a governmental action. The Marketing Agent, if directed by the Agency, must first offer units to these referrals.  Their applications must be processed according to program selection criteria for eligibility and the Agency must complete its review before any referred applicant may be offered a lease. Referrals must be entered into a separate log by the Marketing Agent or a







# Volunteers of America
### Greater New York
65 Charles Gay Loop, Wards Island, NY 10035
Phone: 212-369-8900

Date: 9/27/19

This is to introduce **Abraham Gross** who is currently a Resident at the Schwartz Assessment Men's Shelter; He has been a resident at Schwartz since, **9/24/19**. The Shelter is located at 65 Charles Gay Loop, Ward's Island, New York, N.Y. 10035.



As Resident in the shelter, client receives Lodging services, Toiletries, Three meals a day and Case Management services. Please let this resident's letter serve as a referral letter to Housing Preservation Development (HPD). Thank you for your cooperation and assistance with regards to this client; if there is any other information that is required or need please feel free to contact me.

Respectfully yours,

CM Rodolfo Rivera
65 Charles Gay Loop, Wards Island, NY 10035 (Office 24)
Phone: 212-369-8900, Ext #6532

https://www.kingscountypolitics.com/city-relaxes-roadblocks-for-affordable-housing-lottery/

☰  **Kings County Politics**    NEWS ⌄    GET INVOLVED ⌄    COMMUNITY    PODCAST    ABOUT ⌄    ** SUBSCRIBE **



**HOUSING**

## *City Relaxes Roadblocks For Affordable Housing Lottery*

  By Chaya Gurkov

Posted on April 22, 2020



The city's Department of Housing Preservation Development (HPD) along with the Housing Development Corporation (HDC) this week relaxed measures for city residents looking for affordable housing through its **Housing Connect lottery,** KCP has learned.

The easing of restrictions come as there has been a lot of speculation that in order to get called for one of the apartments one had to know somebody, and/or that a good many of the "affordable" apartments are beyond the AMI (Area Medium Income) band financial reach of working- and lower-middle-class New Yorkers.

But in a memo from the HPD and HDC marketing team to real estate trade insiders, the city announced the changes.



"We are pleased to introduce new changes to the Housing Connect lottery process, aimed at moving New Yorkers into stable, affordable housing as quickly as possible, during the COVID crisis and beyond.  We are committed to working with developers and marketing agents to expedite the leasing of developments, while maintaining a clear, consistent process and strong protections for applicants.  Thank you for your process recommendations, which helped to shape



### Third-Party Review

For projects that are utilizing a third-party consultant to verify the agent's income and eligibility certification prior to submission to the agencies, HPD and HDC will waive the agency file review upon submission of an affirmation of eligibility from the third-party reviewer. The agency will continue to review compliance with lottery procedures to ensure that applicants are processed in the appropriate order and are afforded all of the protections outlined in the Marketing Handbook. This change will reduce agency review of approved applicants from 5 to 2 business days.

### Reduced Appeal Period

Effective immediately, the appeal period for rejected applicants will be reduced from 10 business days to 5 business days.  Marketing agents will only be required to hold a unit for a rejected applicant for five days before moving on to the next eligible applicant, expediting the processing for subsequent applicants. Applicants who request to be contacted via paper-mail, rather than email, are to be contacted by telephone to inform them of their rejection and their opportunity to appeal, as USPS mail communication will not provide sufficient time for an applicant to receive a rejection letter and assemble an appeal.

### Relaxed documents for Low-Income Housing Tax Credit (LIHTC) and non-LIHTC units

A reduced checklist of documents required for verifying student status, income, and assets will be implemented immediately.

### Affirmation of Interest



contacted by email may be conducted by email.  Applicants who requested to be contacted by paper-mail must be contacted by phone; those who indicate they are no longer interested or do not respond within five days must receive a letter communication documenting the phone call. Applicants who do not respond are considered rejected. No rejection notice is required to be sent.

**Applicant Concessions**

Owners may consider offering rental concessions, such as eliminating first month's rent and/or security deposit for approved applicants. Where the first month's rent is eliminated, the minimum income requirement will re-calculated based on the year's net rent, increasing the marketing band and, ultimately, the number of applicants deemed eligible. Increasing the number of eligible applicants can expedite the lease-up of the project.  Likewise, eliminating the security deposit removes barriers for applicants to accept a unit for which they have been approved.

An HPD spokesperson said the agency must ensure document requirements meet the right standards while causing as little burden to applicants as possible.

"We want to make sure that document requirements do not represent a barrier for any applicants to qualify," the spokesperson said.



**SECTIONS**   **SEARCH**

DAILY⊚NEWS

**LATEST CORONAVIRUS UPDATES IN NYC AND AROUND THE WORLD**

A person believed to be homeless is seen sleeping on W. 57th Street near Columbus Circle earlier this month.(Luiz C. Ribeiro/for New York Daily News)

At least 76 homeless people have died of coronavirus in New York City so far, the social services agency head said on Monday.

That's up from the 40 homeless deaths caused by COVID-19 around the same time last month. Fifty-two of the 76 deaths were living in single adult shelters that tend to be large and dorm-like.

**From:** Pell, Shatara (HPD) <PellS@hpd.nyc.gov>
**Sent:** Monday, July 8, 2019 11:05:20 AM
**To:** Teresa Palmieri; Dormi, Nidia (HPD); Vanessa Cucurullo; Stephanie Labarta; Sasha Williams; Jon Lee
**Cc:** Mombrun, Gabriel (HPD); Morgan, Monica (HPD); Hernandez, Victor (HPD); Lugo, Edwin (HPD)
**Subject:** RE: ▮▮▮▮▮▮▮  waterline Square| Log ▮▮▮

Hi Teresa,

This file is out of order with skewed documents. The way this file was sent is completely tossed around and unprofessional and it needs to be resent in a decent order. I'm really confused, does Breaking Ground review the files they send to us?

Thank You,

Shatara Pell | **Deputy Director** | Marketing and Affordability Oversight Program
NYC Department of Housing Preservation & Development
212-863-6211

**From:** Teresa Palmieri <TPalmieri@breakingground.org>
**Sent:** Monday, July 8, 2019 9:27 AM
**To:** Dormi, Nidia (HPD) <DormiN@hpd.nyc.gov>; Vanessa Cucurullo <vcucurullo@breakingground.org>; Stephanie Labarta <sLabarta@breakingground.org>; Sasha Williams <swilliams@breakingground.org>; Jon Lee <JLee@breakingground.org>
**Cc:** Pell, Shatara (HPD) <PellS@hpd.nyc.gov>; Mombrun, Gabriel (HPD) <mombrung@hpd.nyc.gov>; Morgan, Monica (HPD) <MorganM@hpd.nyc.gov>; Hernandez, Victor (HPD) <HERNANDV@hpd.nyc.gov>; Lugo, Edwin (HPD) <LUGOE@hpd.nyc.gov>
**Subject:** Re: ▮▮▮▮▮▮▮ waterline Square| Log ▮▮▮

10:30 works.

Teresa Palmieri
Director of Leasing
Breaking Ground
1359 Broadway 9th Floor
Ph:(646) 870-8301
Email: TPalmieri@breakingground.org



Breaking Ground/Waterline Square
330 West 42nd Street, 14th Floor
New York, NY 10036

6/10/2019

Abraham Gross
40 West 77st
10C
New York, NY 10024

Re:   Waterline Square
675 West 59th Street | 400 West 61st Street | 645 West 59th Street
New York, NY, 10023
Log #:   5695

Dear Applicant:
We received your application for residency in the project indicated above. Based on the guidelines for eligibility for this project, your application has been rejected for the following reason(s):

____   **1. Upon         complete review, your income and/or household size does not meet the**
          **guidelines.**  *See attached income eligibility chart.*

                    Your household income:  _____

                    Your household size:   _____

____   **2.     Your income does not demonstrate a continuing need.**

                    ☐ Assets
                    ☐ Property Ownership
                    ☐ Gift Income
                    ☐ Other:

____   **3.     Criminal background check:**

__X__   **4.     Your application and/or documentation has been found to include**
**inconsistent**
          **information.**

____   **5.     Failure to schedule an eligibility appointment or failure to attend a scheduled and**
          **confirmed appointment.**

ENGLISH REJECTION NOTICE

Travis,

In response to me politely asking you to refrain from constantly talking about being rejected without merit, and potentially transferring me to another associate, you send me a rejection letter.

Since the letter you sent me does not specify what information you found inconsistent, how am I supposed to file an appeal?

Please specify what inconsistencies you are referring to.

Thanks

Avi


Good Morning,


The information you provided about your business income is inconsistent and it doesn't match what I was being told by you Mr. Gross, I would suggest getting a CPA letter or a self notarized statement with a break down of expenses and business income. You may email  WaterlineSquare@breakingground.org within ten (10) business days in writing to request a review.


Best Regards,


Travis Fong
Intake and Eligibility Specialist
Breaking Ground
1359 Broadway 9th Floor
Ph:(646) 870-8359    Fax (646) 870-8350
Email: tfong@breakingground.org
www.breakingground.org



For units with income limits set at or below 80% of New York City's Area Median ~~~ ~~~~~), or $50 (for the fee is not to exceed $25 per application (for households with 1 or 2 adult members), households with 3 or more adult household members).

L. **Program Eligibility Criteria**
Please complete and attach *Apartment Distribution Chart (Attachment U).*

M. **Resident Selection Criteria**
1. Refer to the Marketing Handbook for selection criteria requirements. Please check all those that apply and provide additional details below.

[X]Income Eligibility*                          [X]*Credit and Housing Court History****

[X]Student Status (e.g., IRS projects)          [X]Other (specify):

[X]*Criminal Background Checks***

[X]Falsification of Information

2. **Income Verification – Pay Stubs**

• Please indicate how many pay stubs you will initially request from applicants to verify their income (check one):

[ ] Four

[X] Six

Regardless of whether four or six pay stubs are requested, applicants may be asked to provide additional pay stubs to help confirm patterns or variations.

3. **\*\*Criminal Background Check is mandatory.**

A. When rejecting an applicant based on a criminal background check, you must indicate the reasons the applicant is being rejected.

B. A prior conviction of fraud in connection to any governmental housing program is a reason for <u>mandatory</u> rejection.

C. Any rejection based on criminal justice information, pursuant to the Marketing Plan, must be consistent with current HUD guidance (available at www.hud.gov). At publication of this Handbook, HUD guidance was 4/4/2016 HUD Office of General Counsel Guidance on *Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of*





**Department of
Housing Preservation
& Development
nyc.gov/hpd**

**Office of Asset & Property
Management
Division of Housing Opportunity &
Program Services
100 Gold Street
New York, N.Y. 10038**

**LOUISE CARROLL
Commissioner**

**EVA TRIMBLE
Executive Deputy Commissioner**

**A. A. HENDRICKSON
Deputy Commissioner**

**MARGARET BROWN
Associate Commissioner**

July 9, 2019

Abraham Gross
40 West 77th Street
Apt 10C
New York, NY 10024

Re: Waterline Square. Log #5695

Dear Abraham Gross:

This letter is in response to the correspondence you filed with the City of New York Department of Housing Preservation and Development (HPD) regarding your application to: Waterline Square, which is a privately-owned development located in Manhattan. The lottery and lease up process for the affordable units are monitored by HPD.

Please be advised that tenant selection is the responsibility of the building owners and managing agents. As the supervising agency, HPD reviews requests by applicants to determine if there are any grounds to question or intervene in their decision using the information that was available to either the building owner or managing agent at the time of an applicant's submission.

HPD requested your file from management and reviewed it in its entirety. The primary reason for your rejection was that your household did not meet the minimum income required.

An applicant may have a combination of wages and self-employment income. Such applicants may also have sporadic unemployment income. Their income should be evaluated similarly to the instructions outlined in the self-employment section; however, the evaluation will include both W2 wages and self-employment income.

For applicants with "combination income," the most recent two years of tax returns should be reviewed and evaluated (page 52).

Households receiving gift income exceeding $10,000/year are not eligible unless they would be income-eligible with or without the gift income (page 58).

Based on your file, your 2017 Historical Income is Wages $9,565+ your 2018 Historical Income is Wages $18,685+ Self-Employment $0 + Unemployment Insurance $2,600= $30,850 /2= $15,425

Your gift income is $1,000 x 12= $12,000 and it exceeds the maximum gift income allowed.

The minimum income for a single household at 60%AMI is $37,578

Based on the above information, HPD finds no grounds to interfere in the decision regarding your application for this project.

Please review our Marketing Handbook: http://www1.nyc.gov/assets/hpd/downloads/pdf/developers/marketing-handbook.pdf

In the case that an applicant's income changes after the eligibility appointment (for reasons other than change in household composition and such change impacts their eligibility for the unit for which they are in process, the Marketing Agent will not reconsider the application unless the change is due to an extenuating circumstance (page 42).

All of the applicants to this and similar developments are held to the same standards and subject to the same income calculation criteria.

Thank you for your continued interest in our programs, and we wish you the best success in your apartment search.

Sincerely,



Compliance Reviewer
Marketing and Affordability Oversight Program

Printed on paper containing 30% post-consumer material.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  FIRST DEPARTMENT
------------------------------------------------------------------ x

ABRAHAM GROSS,

                                Petitioner-Appellant,

                  -against-

THE DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT (HPD),

-and-

BREAKING GROUND (BG),

-and-

RCB1 RESIDENTIAL FOR SALE LLC,
RCB3 RESIDENTIAL FOR SALE LLC,
RCB4 RESIDENTIAL FOR SALE LLC,

                          Respondents-Respondents.

------------------------------------------------------------------ x

**AFFIRMATION IN
OPPOSITION TO
PETITIONER'S MOTION
FOR A MANDATORY
PRELIMINARY
INJUNCTION**

Index No. 101081/2019

      **SAMANTHA SCHONFELD**, an attorney at law admitted to practice in the Courts of this State, hereby affirms the following as true under penalties of perjury:

            1.     I am an Assistant Corporation Counsel in the office of James E. Johnson, Corporation Counsel of the City of New York, the attorney of record for Respondent, the New York City Department of Housing Preservation and Development ("HPD") in the above-captioned proceeding. I am fully familiar with the facts and circumstances of this proceeding based upon my review of the records of HPD and conversations with employees of HPD.

            2.     I submit this affirmation in opposition to the motion of Petitioner-Appellant, presumably made under CPLR § 5518 and returnable on January 27, 2020, for a

the Administering Agent shall submit to the Department an affidavit attesting that each Household occupying an Affordable Housing Unit complied, at Initial Occupancy, with the annual income eligibility requirements of the Program and that the Monthly Rent registered and charged for each Affordable Housing Unit, complied with the Monthly Rent requirements for such unit, at Initial Occupancy . . . . "Annual Income" shall mean the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the initial determination of income. The Administering Agent shall also retain all records and documents relating to income determination for a minimum of three (3) years after the date a tenant commences occupancy in an Affordable Housing Unit.

Id. (emphasis added).

11.     In the Administering Agent Agreement Inclusionary Housing Program between HPD and Breaking Ground, which is annexed as an exhibit to the Regulatory Agreement, Breaking Ground "assume[d] the ongoing responsibility for insuring that each Affordance Housing Unit is rented and upon vacancy re-rented in compliance with the Regulatory Agreement." Id. at Ex. F.

**Marketing Handbook and Income Guidelines for Subsidized Residential Developments**

12.     The New York City Housing Development Corporation ("HDC") and HPD published a Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy (the "Marketing Handbook") for residential developments subsidized by HPD and HDC. A copy of the Marketing Handbook, revised July 2018, is annexed hereto as Exhibit "B."

the Administering Agent shall submit to the Department an affidavit attesting that each Household occupying an Affordable Housing Unit complied, at Initial Occupancy, with the annual income eligibility requirements of the Program and that the Monthly Rent registered and charged for each Affordable Housing Unit, complied with the Monthly Rent requirements for such unit, at Initial Occupancy . . . "Annual Income" shall mean the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the initial determination of income. The Administering Agent shall also retain all records and documents relating to income determination for a minimum of three (3) years after the date a tenant commences occupancy in an Affordable Housing Unit.

ed).

**OLD HANDBOOK-2018**

applicant's household who leases rental residential real property must terminate the lease for and surrender possession of such rental property on or before the move-in date for a rental affordable unit or the date of purchase for a homeownership affordable unit.

2. For a homeownership affordable unit, the applicant must agree to continuously occupy the affordable housing unit as his or her sole primary residence, residing there no less than 270 days per year, with the exception of days spent on active military duty or subleasing (where permitted by the project's regulatory documents).

3. For a rental affordable unit, the applicant must agree to the requirements in 5-5.D(2) except where preempted by other laws.

### E.   GIFT INCOME

1. Households receiving gift income exceeding $10,000/year are not eligible unless they would be income-eligible with or without the gift income.

2. The following are not gift income and should not be included in the income calculation: (1) gifts of groceries for children in the household, (2) the value of free or reduced school lunch, or (3) the value of meals provided to the elderly or needy.

### F.   OTHER RESTRICTIONS

1. If a unit is also subject to statutory restrictions, such as Inclusionary Housing in the New York City Zoning Resolution, additional rules may apply to property ownership, asset limit, and primary residence policies. The Marketing Agent must consult the Project's regulatory requirements for details. If a unit is also subject to another governmental subsidy, such as State Tax Credits, that program's governing agency should be consulted regarding any additional or different income and asset requirements.

2. If, after processing the entire lottery log, a development is experiencing difficulty in leasing or selling the remaining units or subsequent re-rentals or resales, HPD/HDC may modify the Continuing Need policies to ensure that available affordable units are occupied in a timely manner.

---

✓  **All asset limit, property ownership, and occupancy requirements must be disclosed in the Marketing Plan and approved by the Agency.**

---





**NEW HANDBOOK-2020**

For a rental affordable unit, no member of the applicant's household may own any residential real property in, or within a 100-mile radius of, New York City.

**4.** Prohibition – Homeownership Affordable Unit

For a homeownership affordable unit, no member of the applicant's household may own, or have previously purchased, any interest in residential real property.

**D. PRIMARY RESIDENCE**

**1.** If approved for an affordable housing unit, the applicant must surrender any unit where applicant is then currently residing. Each member of the applicant's household who leases rental residential real property must terminate the lease for and surrender possession of such rental property on or before the move-in date for a rental affordable unit or the date of purchase for a homeownership affordable unit.

**2.** For a homeownership affordable unit, the applicant must agree to continuously occupy the affordable housing unit as his or her sole primary residence, residing there no less than 270 days per year, with the exception of days spent on active military duty or subleasing (where permitted by the project's regulatory documents).

**3.** For a rental affordable unit, the applicant must agree to the requirements in 5-5.D(2) except where preempted by other laws.



**E. GIFTS AND DOWN PAYMENTS**

For homeownership affordable units, no more than half of the down payment amount may come to the applicant as a gift. The applicant can demonstrate this by providing bank statements from the three months prior to closing that show at least half of the down payment amount in the applicant's account.

**F. OTHER RESTRICTIONS**

**1.** If a unit is also subject to statutory restrictions, such as Inclusionary Housing in the New York City Zoning Resolution, additional rules may apply to property ownership, asset limit, and primary residence policies. The Marketing Agent must consult the Project's regulatory requirements for details. If a unit is also subject to another governmental subsidy, such as State Tax Credits, that program's governing agency should be consulted regarding any additional or different income and asset requirements.

**2.** If, after processing the entire lottery log, a development is experiencing difficulty in leasing or selling the remaining units or subsequent re-rentals or resales, HPD/HDC may modify the Continuing Need policies to ensure that available affordable units are occupied in a timely manner.

✓ **All asset limit, property ownership, and occupancy requirements must be disclosed in the Marketing Plan and approved by the Agency.**

rentstabilizedbuildings.azurewebsites.net/About

# Finding 200,000 Apartments in Registered Rent Stabilized Buildings and
# Buildings Receiving Tax Incentives for Rental Buildings that Should Be Registered.

**Background:**
**The official estimate** of the number of rent stabilized apartments in New York City **is approximatedly 1.0 million\***. That number has remained the same for at least the last 20 years. At the same time, there are now and have only been about **800,000 apartments** *registered* as stabilized. The difference is 200,000.

**Why is there a difference?** Because **the official estimate includes apartments that are registered as stabilized as well as those that *should be registered*.** Among those that 'should be registered' are 1) all the apartments in a *building* that is not registered but should be, and 2) some, or many, of the *apartments* in a registered building but where not all the apartments are registered. In the first category are thousands of buildings receiving 421a or J51 tax incentives for rental units. In the second category are apartments that are not longer registered because of, for example, un-audited claims of exemption status filed by building owners for individual apartments. Why aren't they registered? The primary reasons is that over the years, starting in 1984, the laws, rules and regulations regarding registration have changed to lessen penalties for not registering. For another, the registration data comes solely from the building owners. And until recently when the State established a "Tenant Protection Unit", there has been ineffective monitoring and enforcement of the regulations at both the State and City levels.

**Purpose:**
This site is intended to help renter households who are entitled to a lease for a rent stabilized apartment find out that they are entitled to such a lease even though their ability to do so has been obscured. The site allows users to check on whether the building they are in is registered with the State or it should be registered even if it is not. The site integrates the State registration data with data on buildings receiving 421a or J51 tax incentives for rental apartments. For registered buildings, the site provides not only the number of apartments registered as stabilized but also the number of residential units on the tax lot, whether the lot is receiving tax incentives or not.

**Method:**
On the Home page, enter an address. Over the web, the address will be checked against all known addresses in New York City. For a valid address, the site will return a unique building and tax lot code, and other data including the NY City Council and State Assembly District codes for the area. Next the program will access the NY State records of registered buildings. For a registered building, the program will return 1) the State Registration ID for the building and the number of apartments registered as stabilized, 2) the number of buildings on the tax lot, 3) the number of residential units on the lot, and 4) the year the building was built. For any builing on a lot receiving 421a or J51 tax exemptions, the program will return the name of the owner of the lot, the number of residential units on the lot, the number of buildings on the lot, the total dollar amount of taxes assessed, and the total dollar amount of dollars exempt from taxes.

**Sources and Notes:**
\* The source of the estimate of rent stabilized apartments is the New York City Housing and Vacancy Survey (HVS). As explained in the appendix to the most recent HVS report, the estimate is based on 1) a complete listing of the administrative records on rent stabilized apartments supplied by the State and 2) data from other sources, including City J51 and 421a tax records.  Click here to see the appendix to the 2011 report.





**VOTING PROBLEMS?**
Text or message the word VOTE, VOTA or 投票 to us.




**THE RENT RACKET**

# Thousands of NYC Landlords Who Ignored Rent Caps Got Tax Breaks They Didn't Qualify For




A new ProPublica analysis shows that two-thirds of more than 6,000 rental properties receiving tax benefits from the city's 421-a program don't have approved applications on file and most haven't registered apartments for rent stabilization as required by law. That allows owners to raise rents as much as they want.

by Cezary Podkul, Oct. 20, 2016, 12:16 p.m. EDT



https://www.propublica.org/article/nyc-landlords-flout-rent-limits-but-still-rake-in-lucrative-tax-brea

Racial Justice          Politics          Civil Rights          Environment          More...          Series

**VOTING PROBLEMS?**
Text or message the word VOTE, VOTA or 投票 to us.

[📱 SMS]     [✆ WhatsApp]     [💬 Mes






**THE RENT RACKET**

# N.Y.C. Landlords Flout Rent Limits — But Still Rake In Lucrative Tax Breaks

Help ProPublica and WNYC investigate how renters are being exploited under a housing program that will save developers $1 billion in property taxes this year.

by Cezary Podkul and Marcelo Rochabrun, Nov. 4, 2015, 12 a.m. EST

City University of New York (CUNY)

## CUNY Academic Works

Capstones                          Craig Newmark Graduate School of Journalism

Fall 12-16-2016

# New York City's Affordable Housing Lottery: Inconsistent Screening Methods and Lack of Government Oversight

Donna M. Airoldi
*Cuny Graduate School of Journalism*

## How does access to this work benefit you? Let us know!

More information about this work at: https://academicworks.cuny.edu/gj_etds/178
Discover additional works at: https://academicworks.cuny.edu

This work is made publicly available by the City University of New York (CUNY).
Contact: AcademicWorks@cuny.edu

🏠 Reginald's Report  ›  **Address & Property History**                                                    ✕

① DECEMBER 2019 - MARCH 2020
400 W 61st St
New York, NY 10023
**Waterline Square- Affordable**

⑥ DECEMBER 1994 - DECEMBER 2009
100 W 93rd St Apt 30b
New York, NY 10025
**Rent Stabilized Purchased Apartment for $367,000, sold 2 years later for $545,000**

② AUGUST 2007 - FEBRUARY 2020
175 W 95th St Apt 6a
New York, NY 10025
**NO RENTAL OR SALE AGREEMENT EVER FILED**

⑦ JULY 1987 - NOVEMBER 2004
230 Green St Apt 2a
Albany, NY 12202
**SECOND RESIDENCE**

③ OCTOBER 2003 - AUGUST 2015
733 Amsterdam Ave Apt 6a
New York, NY 10025
**NO RENTAL OR SALE AGREEMENT EVER FILED**

⑧ FEBRUARY 1988 - JANUARY 2003
1309 Washington Ave
Bronx, NY 10456
**NYCHA Income Restricted**

④ MAY 1998 - SEPTEMBER 2011
1763 2nd Ave Apt 24h
New York, NY 10128
**City Public Housing -Rent Stabilized And Affordable**

**NEW** ⑨ JULY 1996 - AUGUST 2000
175 W 87th St Apt 30b
New York, NY 10024
**City Public Housing -Rent Stabilized And Affordable**

⑤ AUGUST 1996 - SEPTEMBER 2011
175 W 87th St Apt 31b
New York, NY 10024
**City Public Housing -Rent Stabilized And Affordable**

⑩ DECEMBER 1994 - JUNE 1996
100 W 93rd St Apt 4d
New York, NY 10025
**Rent Stabilized Apartment was Purchased by other party for $180,000, sold for $420,000**